**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **TERRY CARTRETTE TINDALL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 5:10-cv-044(CAR)** |
| | : | |
| **H & S HOMES, LLC, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

## *ORDER ON MOTION TO COMPEL*

Currently before the Court is Plaintiff Terry Tindall's Motion to Compel. Plaintiff seeks to have the Court compel testimony about and the production of attorney-client communications. Plaintiff believes that these communications will demonstrate that attorneys representing Defendants provided legal advice in furtherance of fraudulent transfers, as defined in the Georgia Uniform Fraudulent Transfers Act, O.C.G.A. § 18-2-70, *et. seq.*. Defendants object, invoking the attorney-client privilege. The issue before the Court, therefore, is whether privilege attaches to the attorney-client communications at issue or is destroyed by the crime-fraud exception. For this determination to be made, Plaintiff requested that the Court consider relevant communications *in camera*.

Upon consideration of the evidence presented, the Court finds that Plaintiff satisfied her burden of creating a factual basis to support a reasonable, good-faith belief that review of attorney-client communications may reveal evidence that Defendants planned and made fraudulent transfers and that attorneys provided legal advice or services related to or in furtherance of those transfers. *In camera* review of the documents filed with the Court is thus appropriate. Having reached this conclusion and subsequently reviewed the relevant attorney-client communications, the Court

1

further finds that the evidence presented by Plaintiff combined with the documents considered *in camera* establishes a prima facie case that Defendants planned and executed a fraudulent transfer and that attorney-client communications were made in furtherance of that transfer. Plaintiff's Motion to Compel is granted in part.

## PLAINTIFF'S EVIDENCE

The present case arises out of Defendant H&S Homes' inability to pay a $343,100.00 judgment awarded to Plaintiff by a South Carolina court in 2003. Defendant H&S Homes is a limited liability company which was, until January 2007, the primary sales arm and a wholly-owned subsidiary of Horton Homes, Inc. (See Deposition of Dudley Horton, Oct. 21, 2009, "Horton I Dep.," at 15) [Doc. 41]. Defendant Horton Homes is in the business of manufacturing homes and is owned by Defendant Horton Industries, Inc., a holding company owned and managed by Defendant Dudley Horton. Defendant Horton in fact owns or controls the vast majority of stock in all of the Horton companies (including Best Value Housing, Inc., Horton Homes, Inc. and its subsidiaries, H&S Homes, L.L.C. and Horton-American, L.L.C., and Triangle Homes, L.L.C.). He serves as either the chairman of the board, president, or chief operating officer of each. (Deposition of Dudley Horton, September 22, 2020, "Horton II Dep." at 20). Defendant Steve Sinclair was the president of H&S Homes and served as vice president of Horton Homes and Horton Industries.

According to Plaintiff, Defendants conspired to evade and have evaded payment of judgments awarded against H&S Homes through fraudulent transfers of H&S assets. Plaintiff has identified three suspect transactions Defendants allegedly used or attempted to use to avoid payment of the judgments: (1) a lawsuit and default judgment, (2) a consent action declaring a transfer of real property from Horton Homes and its subsidiaries to Horton Industries, and (3) the creation of new entities to take over the business of H&S Homes. Through the motion at bar, Plaintiff further asserts

that the attorneys of the law firm Chamberlain-Hrdlicka ("Chamberlain attorneys") were involved in and furthered Defendants' efforts to avoid payment of judgments against H&S.

The first of the alleged fraudulent transfers occurred in early 2005. On December 17, 2004, an Alabama judgment against Defendant H&S Homes was affirmed by the Alabama Supreme Court. Less than three weeks later, Defendant Horton Homes, at the direction of Defendant Horton, filed a lawsuit against H&S Homes, its own subsidiary and sole retail sales business. Defendant Horton made the decision to file the suit and did not bother to advise the Board of Directors of either Horton Homes or H&S of his plan. (Horton II Dep. at 142). In fact, there are not even any documents concerning the decision to sue H&S. (Id. at 111). Defendant Horton claims that he simply decided to sue his subsidiary in an effort re-coup funds previously lent to H&S Homes and to give notice to H&S that Horton Homes was not going to continue lending it money. (Id. at 85-86).

H&S Homes was operating at a loss and owed substantial debt to Horton Homes. In fact, H&S Homes was always undercapitalized and could not operate without loans from Horton Homes. (Id. at 67-68). Still, H&S Homes was able to pay back 17 million dollars of the debt owed despite the fact it had lost money from 2002 to 2005. (Id. at 79-82. The cumulative balance owed to Horton Homes was actually less in January 2005 than at any other time between June 2000 and January 2005. (Id.). Moreover, despite the lawsuit, Horton Homes continued to make loans to H&S, $600,000.00 in 2005 alone. (Id. at 86-87). Defendant Horton knew that H&S Homes would not be able to pay its creditors without loaned funds from Horton Homes and that the suit would eventually result in the closure of H&S. (Id. at 23, 69, 141).

Defendant Sinclair, the president of H&S Homes and long-time business partner of Defendant Horton, claims that he was entirely unaware of the suit against H&S until he was served with the complaint. (Deposition of Steve Sinclair, October 21, 2009,"Sinclair II Dep.," at 83-84

[Doc. 40].) When he received notice of the suit, Sinclair contacted attorney Marty Fierman and was told to allow a default judgment. (Id. at 86-87). Although Defendant Sinclair denies talking to anyone else about the decision to go into default, including Defendant Horton, he admits that he corresponded with attorney Sid Williams just two and half weeks before the default was entered. (Id. at 93-94). Mr. Williams is an attorney with Chamberlain-Hrdlicka and has served as legal counsel for Defendant Horton and his companies for thirty years. (Horton II Dep. at 5). When asked about the content of these communications with Sid Williams, Defendants asserted privilege.

Defendant Sinclair never answered the complaint, and Horton Homes was awarded a default judgment of $22,003,000.00 in February of 2005. (Sinclair II Dep. at 92). As with the decision to file the lawsuit, there are no documents about the decision to allow a default judgment. (Horton II Dep. at 112). The Board of Directors for H&S Homes was never consulted about the $22,000,000.00 decision, and no effort was made to settle the significant claim. (Sinclair II Dep. at 88, 97). The judgment was only partially enforced; yet, by the time H&S ceased doing business, it had paid Horton Homes $8,288,000.00 towards its debt. (Horton II Dep. at 89). Interestingly, Plaintiff's judgment against H&S became final in March 2005, about a month after entry of the default judgment. Plaintiff then filed to have her judgment domesticated in Georgia.

Defendant Horton admits the he made a decision to close H&S Homes with the filing of this lawsuit in 2005. (Horton II Dep. at 23, 141). In fact, at that time, Defendants Horton and Sinclair were already discussing plans to do just that. (Sinclair II Dep. at 14). Defendant Horton admits that he did not want to pay the Alabama judgment against H&S Homes and thought it was unjust. (Horton II Dep. at 10, 35). During meetings of the H&S Homes Board of Directors in 2005 and 2006 Defendant Horton referenced H&S's "legal situations" and expressed concerns about the judgments against H&S, including Plaintiff's judgment. (Horton II Dep. at 8-9, 155, Ex. P-3).

Defendant Horton was specifically concerned that H&S property could be seized or that its bank accounts could be levied at any time. (Id. at 32-33, 158). He worried that this property was going to be "up for grabs," (id. at 33) and thought H&S assets may be put "on the square and [sold to satisfy] some of these judgments." (Id. at 158). Accordingly, the decision was made to begin liquidating the assets of H&S Homes. (Id. at 69, 151-52, 158; Sinclair II Dep. at 11,14). Thereafter, there were many discussions about closing H&S; Chamberlain attorneys were included in the discussions. (Sinclair II Dep. at 13-14, 58; Horton II Dep. at 40-41).

In December 2006, Horton Homes received notices of as many as ten arbitration demands seeking to hold Horton Homes liable for money owed by H&S Homes. (Horton Dep. at 138-39). Plaintiff contends that this is when the second alleged fraudulent transfer occurred. In what Plaintiff calls a "consent action," the Board of Directors for Horton Homes declared a dividend of all its real property, valued at just over $10,000,000.00, to its parent company, Defendant Horton Industries. (Horton II Dep. at 127). The consent action was prepared by Chamberlain attorney Sid Williams and provided that Horton Industries would acquire and manage the real estate owned by Horton Homes and its various subsidiaries. (Horton I Dep. at 14, Horton II Dep. at 120-21). In other words, Horton Homes would simply "pass" assets up to its parent company. (Horton II Dep. at 121). This transfer could include the real estate owned by H&S Homes, though Defendant Horton denies that he ever intended to transfer any assets of H&S Homes to Horton Industries through the consent action. (Horton I Dep. at 14-15) According to Defendant Horton, the consent action was designed to transfer only real property owned by Horton Homes so that the business could be sold to a competitor who was not interested in owning the property. (Id. at 16-19). Again, however, there are no documents concerning the possible sale of Horton Homes to a competitor. (Id. at 16-17). The consent action was never executed, but it was not rescinded. (Horton II Dep. 122-23).

The third alleged fraudulent transfer occurred in late December 2006 and early January 2007, with the closure of H&S homes and creation of Defendant Triangle Homes and its subsidiaries. Defendant Horton made the decision to do this in the Fall of 2006. (Id. at 25-26). He discussed the reasons for forming a new business entity with Chamberlain attorney Sid Williams, and Mr. Williams drew up the papers to create the new subsidiary. (Id. at 30, 131-32). There are, however, no documents discussing the alleged business reasons for creating a new business entity to carry on the business of H&S, and Defendant Horton never discussed his plans of closing H&S and opening a new business with the Board of Directors of either Horton Homes or H&S Homes. (Id. at 112, 142). The new entity, Triangle Homes, has three subsidiaries: Beacon Homes, LLC, New Generation Homes, LLC, and Regal Homes, LLC. (Id. at 13).

In March of 2007, H&S Homes ceased doing business, and Triangle's subsidiaries immediately began operating. (Deposition of Steve Sinclair, October 20, 2009, "Sinclair I Dep.," at 49; 116) [Doc. 40]. By that point, H&S Homes had been stripped of all its inventory. (Horton II Dep. at 14-15, 34). This was accomplished by Defendant Horton Homes simply repurchasing H&S inventory though the "floor plan arrangement." (Id. at 52). The "floor plan" is a financing scheme in which the finance company would agree to purchase and hold title to the homes in H&S inventory and to take the homes back if H&S failed to pay for them (for whatever reason); Horton Homes then had the obligation, under the agreement, to repurchase the homes from the finance company.[1] (Id.). Thus, when H&S was closing, Horton Homes repurchased all of the homes in its inventory from the finance company; it then re-sold the homes to the Triangle entities. (Id. at 53-54). It appears the repurchase and re-sale only required a bit of paperwork. H&S simply defaulted on its payments,

---

[1] Apparently, this is a routine financing tool for automobile and manufactured home dealerships.

and Triangle entered into new financing arrangements immediately thereafter. (Id. at 34-37, 52-53). The inventory never moved locations. (Id. at 14-15). H&S was also never paid for over $500,000.00 worth of "add-ons" to homes in its inventory; H&S took no steps to remove or receive payment for the add-ons. (Id. at 59-63).

H&S inventory was not the only thing inherited by the subsidiaries of Triangle Homes. Around the same time, the H&S leases were terminated and immediately re-negotiated by the Triangle entities. (Horton II Dep. at 15, 30, 34). H&S employees were fired and then re-hired by the Triangle entities. (Sinclair II Dep. at 8; Horton II Dep. at 38; Deposition of R.W. Hicks, September 24, 2010 at 34 [Doc. 122]). H&S insurance arrangements were terminated and thereafter renewed by the Triangle entities. (Horton II Dep. at 36-37; Hicks Dep. at 39, 44). Triangle subsidiaries then advertised themselves as new business entities. (Horton II Dep. at 15). Thus, while the corporate structure and business plan was slightly different, Triangle and its subsidiaries were, in effect, carrying on the same business formerly pursued by H&S Homes. (Id. at 23-24, 104). Defendant Horton in fact knew that the new entities created would operate out of the same places as H&S Homes and sell the H&S inventory even before they were formed. (Id. at 136).

All other assets of H&S were sold at auction on January 16 and 17, 2007. (Sinclair I Dep. at 9). There are no documents concerning the decision to conduct the auction. (Horton II at 113). Defendant Horton claims that, after consultation with Defendant Sinclair and Chamberlain attorneys, he just made the decision to sell the H&S assets at an absolute auction and contacted a professional auction company to facilitate the sale. (Sinclair I Dep. at 129-30; Sinclair II Dep. at 73).

At the "public auction," however, Triangle subsidiaries and other Horton entities purchased the vast majority of H&S assets. Horton American Properties, a sister company of H&S and subsidiary of Horton Homes, purchased the office units owned by H&S Homes. (Sinclair I Dep. at

66; Deposition of Dudley Horton, Sept. 28, 2010, "Horton III Dep.," at 7 [Doc. 121]). The units were sold to Horton-American with furniture, computers, telephones, and other office supplies still in them. (Horton III Dep. at 30-31). The units were not appraised beforehand, the contents were not inventoried, and they were purchased for much less than the depreciated value shown on the books. (Sinclair I Dep. at 114; Horton II Dep. at 92, 98; Horton III Dep. at p.29-31). According to Defendant Sinclair, then president of H&S Homes, office and storage units costing over $1,500,000.00 and having a depreciated value of $1,215,005.00 were purchased by Horton American for only $293,000.00, an apparent loss of over $900,000. (Sinclair I Dep. at 62; Horton III Dep. at 4). The office units purchased by Horton-American were then leased to Triangle's subsidiaries. (Horton III Dep. at 9,13)

Land belonging to H&S Homes was sold to a Horton Industries subsidiary Best Value Housing. Best Value also paid much less than the book value of the land. Like the other assets, the land was not appraised before being sold to Best Value, and Defendant Horton did not figure in any appreciation in the value of the land when setting the price. (Horton II Dep. at 97-99). H&S also did not receive any payment for land improvements even though the depreciated value of these improvements was just shy of $1,000,000.00. (Id.; Horton III Dep. at 73). The Triangle subsidiaries now use these improvements. (Id. at 73-74). H&S simply walked away from storage buildings and left them for use by the Triangle subsidiaries. (Id. at 55).

Thus, the Triangle subsidiaries now operate former H&S facilities, using the H&S office and storage units, equipment, furniture, and land improvements. (Horton II Dep. at 56; 102-103). Triangle did not have to buy any of the assets from H&S or build any new assets. (Hicks Dep. at 42-43). When business began, Triangle employees even used the very same paper, pens, typewriters, and toner that had been used by H&S employees. (Id. at 43). The only changes

Triangle needed to make when it began business was to switch the billing name of the utilities, print new letterhead and business cards, and correct the signs to display the new name. (Hicks Dep. at 41). Immediately after H&S ceased doing business, Triangle subsidiaries operated out of the very same sales units that H&S operated out of, sold Horton Homes manufactured homes just like H&S had sold, employed managers employed by H&S just days before, and occupied the same sales lots previously occupied by H&S Homes. (Sinclair II Dep. at 157-58; Hicks Dep. at 16-17, 21-22). There was no time gap between the operation of the two businesses. (Hicks Dep. at 21-22). It could appear that H&S was simply operating under a new name; in fact, remarks on an internal human resources document stated that "H&S Homes has changed their name . . . ." (Id. at 53).

Although Defendant Horton made the decision to liquidate H&S, Defendant Steve Sinclair organized the auction of H&S assets and admitted that he may have discussed aspects of the sale with Chamberlain attorneys. (Sinclair II Dep. at 66-67). Defendant Sinclair also admits that, about the time the decision was made to close H&S Homes and open the Triangle entities, there was some communication with Chamberlain attorneys regarding the corporate structure. (Id. at 76-81). The privilege log shows that a Chamberlain attorney sent a letter and emails to Defendant Sinclair regarding "corporation formation and tax documentation" in December 2006 and early January 2007. (Id.). When asked whether these documents discussed the formation of Triangle Homes, Defendant Sinclair refused to answer based on attorney-client privilege. (Id.)

In April of 2007, just one month after H&S ceased doing business, Plaintiff's South Carolina judgment was finally domesticated in Georgia. H&S, now defunct, maintains that it is insolvent and unable to pay even a penny of Plaintiff's judgment. Meanwhile, virtually all of its former assets remain untouched and in use by Triangle Homes' subsidiaries.

## CONCLUSIONS OF LAW

Through the motion at bar, Plaintiff Tindall seeks discovery of relevant attorney-client communications between Defendants and the attorneys of Chamberlain-Hrdlicka. She hopes that the content of these communications will help establish her claims that conveyances of H&S assets were fraudulent attempts to avoid payment of the judgments against H&S, including her 2003 judgment. Obviously, any inquiry into the communications between attorney and client is a serious matter, to be undertaken by the Court reluctantly and only after careful deliberation. The attorney-client privilege is an integral part of the American legal tradition, created "to encourage full and frank communication between attorneys and their clients," and enable the attorney to act as a fully-informed advocate for his client. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).

Here, Plaintiff contends that the communications fall within the crime-fraud exception to the attorney-client privilege and are thus discoverable. Simply stated, Plaintiff believes that transfers of H&S assets were fraudulent and that Defendants' long-time attorneys assisted in and furthered these fraudulent transfers. Plaintiff bases her theory of fraud on provisions of the Georgia Uniform Fraudulent Transfers Act, O.C.G.A. § 18-2-70, *et. seq*, which essentially define the elements for proving a debtor's transfer of assets is fraudulent as to a creditor. In relevant part, the Act provides that a debtor's transfer of property may be considered fraudulent as to a creditor if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." § 18-2-74(a).

To assist in the finding of an "intent to hinder, delay, or defraud," the statute lists a number statutory "badges of fraud." O.C.G.A. § 18-2-74(b). Among these are evidence (1) that the transfer of assets was to an insider, (2) that, before the transfer was made or obligation was incurred, the debtor had been sued, (3) that the transfer was of substantially all the debtor's assets, and (4) that the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was

incurred.  Id.  These badges of fraud are, however, mere "circumstances, signs, marks, suspicions, not of themselves sufficient to authorize a finding [of fraud], unless more than one [are] combined." Sheppard v. Broome, 214 Ga. 659, 662, 107 S.E.2d 219 (1959).  In other words, a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance; but several of them considered together may form a basis to infer fraud. Moreover, the factors listed in the statute are not the sole indicators of an intent to defraud. Fraudulent intent may be inferred from the totality of the circumstances.

For the purposes of her motion to compel, however, Plaintiff must do more than simply produce evidence that Defendants had an intent to make fraudulent transfers.  Plaintiff must show that attorney-client communications may have been made in the furtherance of the fraudulent transfers.  See Rose v. Commercial Factors of Atlanta, Inc., 262 Ga. App. 528, 529, 586 S.E.2d 41 (2003) (citing In re Hall County Grand Jury Proceedings, 175 Ga. App. 349, 352, 333 S.E.2d 389 (1985)).  Clearly, under Georgia law, "the attorney-client privilege bars revelation, discovery, and testimony of a lawyer except when waived by the client or in very limited circumstances." Philman v. State, 292 Ga. App. 612, 615, 664 S.E.2d 904 (2008).  One such circumstance is where the attorney-client communications are related to "proposed or ongoing infractions of the law in the commission of a crime, or the perpetration of a fraud."  Id. at 615-16.  Such communications are excepted from the privilege; this, of course, is referred to as the "crime-fraud exception."  In re Fulton County Grand Jury Proceedings, 244 Ga. App. 380, 381, 535 S.E.2d 340 (2000).

A party seeking to invoke the crime-fraud exception does not have to prove "the existence of a crime or fraud to overcome the claim that a communication is privileged."  Rose, 262 Ga. App. at 529.  Rather, the party opposing the privilege only has to establish a prima facie case that the communication was made in furtherance of an illegal or fraudulent activity. Id.  For this purpose,

"[p]rima facie evidence is that which, on its face, is good and sufficient to establish a given fact, though it can ultimately be rebutted or contradicted." Id. at 529-30. Thus, stated another way, the party opposing the privilege need only present prima facie evidence that the charge has "some foundation in fact." Atlanta Coca-Cola Bottling Co. v. Goss, 50 Ga. App. 637, 639 (1935). "There must be something to give colour to the charge." Id. When prima facie evidence is supplied by the party opposing the privilege, "the seal of secrecy is broken," and the communications are subject to discovery. Rose, 262 Ga. App. at 530.

Though Georgia law certainly controls in this case, federal law regarding the application of the crime-fraud exception is very similar to Georgia law and more instructive in how application of the exception must be justified by the moving party. Under federal law, a party seeking to apply the crime-fraud exception to the attorney-client privilege must satisfy a two part test:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

United States v. Cleckler, 265 Fed. App. 850, 853 (11th Cir. 2008) (citations omitted). "The first prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." Id. (quoting In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226-27 (11th Cir.1987)). "The second prong is satisfied by a showing that the communication is related to the criminal or fraudulent activity established under the first prong." Id.

Under Georgia law, *in camera* review of attorney-client communications may be used to determine whether they are excepted from privilege. In re Hall County Grand Jury Proceedings, 175

Ga. App. 349, 351, 333 S.E.2d 389, 392 (1985). The standard for showing that attorney-client communications should be reviewed *in camera* is not a stringent one. A *lesser* evidentiary showing is needed to trigger *in camera* review than is required to ultimately overcome the privilege. <u>See</u> <u>id</u>; <u>see</u> <u>also</u> <u>United States v. Zolin</u>, 491 U.S. 554, 574-75, 109 S.Ct. 2619, 2632, 105 L.Ed.2d 469 (1989). To warrant an *in camera* review, the party opposing the privilege must only make a preliminary showing, without the allegedly privileged material, that "the communication was made in furtherance of illegal or fraudulent activity." <u>Hall County Grand Jury Proceedings</u>, 175 Ga. App. at 351. A preliminary showing must be more than a mere allegation of fraud; but, it does not need be conclusive proof of fraud. <u>Id.</u>

Again, although Georgia law governs in this case, the choice of law is ultimately of little consequence. The decisions of federal courts concerning the crime-fraud exception are largely consistent with the holdings of Georgia courts. Georgia courts have even looked to federal law when developing the standard. <u>See</u> <u>Hall County Grand Jury Proceedings</u>, 175 Ga. App. at 351. Under federal law, prior to conducting an *in camera* review of potentially privilege documents, the district court must "require a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." <u>Zolin</u>, 491 U.S. at 574-75. The Supreme Court has further instructed that, once the preliminary showing is made, the district court may also consider other facts and circumstances of the particular case to determine whether *in camera* review of the attorney-client communication is appropriate. <u>Id.</u>

Here, the Court finds that Plaintiff has in fact made a preliminary showing, without the allegedly privileged material, adequate to support a reasonable, good-faith belief that an *in camera* review may reveal evidence justifying the application of the crime-fraud exception. After reaching

this conclusion, the Court reviewed the relevant attorney-client communications. As a result, the Court further finds that Plaintiff has established a prima facie case that some of the communications were made in furtherance of a fraudulent activity. Plaintiff's Motion to Compel is thus due to be granted in part. The reasons for each of the Court's findings will be discussed in turn below.

I.     Plaintiff Has Created a Factual Basis Adequate to Support *In Camera* Review.

Upon consideration of Plaintiff's evidence, the Court finds that she has met her burden to demonstrate that an *in camera* review of the relevant attorney-client communications is warranted. While Defendants' asserted business reasons for the various transfers at issue may be plausible, Plaintiff's evidence demonstrates that her theory of fraud is also plausible and additionally gives rise to a reasonable belief that an *in camera* review of communications between Defendants and Chamberlain attorneys may lead to the discovery of further evidence to support the application of the crime-fraud exception.

As discussed above, to warrant an *in camera* review of attorney-client communications the party opposing privilege need only make a preliminary showing that "the communication was made in furtherance of illegal or fraudulent activity." Hall County Grand Jury Proceedings, 175 Ga. App. at 351. Clearly, a *lesser* evidentiary showing is needed to trigger *in camera* review than is required to ultimately overcome the privilege. See id.

Taken together, the case law suggests a two step analysis for determining whether an *in camera* review of attorney-client communications should be conducted. First, Plaintiff must present factual basis adequate to support a reasonable, good-faith belief that an *in camera* review may reveal evidence to establish the exception. Again, this requires more than mere allegations or suspicions that the communications were made in furtherance of fraudulent activity; evidence must be identified by the party requesting *in camera* review. See Hall County Grand Jury Proceedings, 175

Ga. App. at 351. At this stage, circumstantial evidence of the attorney's involvement with a fraudulent act is sufficient. The Wenona, 19 Wall. 41, 86 U.S. 41, 58, 22 L.Ed. 52 (1873) ("Inferences from circumstantial facts may frequently amount to full proof of a given theory, and may even be strong enough to overcome the force and effect of direct testimony to the contrary."). "It is [also] sufficient for the district court, in its discretion, to consider only the presentation made by the party challenging the privilege." Haines v. Liggett Group, Inc., 975 F.2d 81, 96 (3rd Cir 1992). In other words, "[t]he court may decide on [the moving party's] submission alone whether a factual basis is present to support a good faith belief that the materials may reveal evidence of a crime or fraud." Id.

If the party requesting the *in camera* review satisfies this burden, the court may proceed to the second step of the analysis and make a discretionary decision to consider other "facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply." Zolin, 491 U.S. at 574-75 (internal cites omitted). Thus, under the second step, the district court may choose to look beyond the preliminary showing and consider "other available evidence." Haines, 975 F.2d at 96. At this point, the party invoking privilege may be given an opportunity for rebuttal. In re Grand Jury Subpoena, 223 F.3d 213, 218 (3rd Cir. 2000). However, while it is certainly proper for the court to entertain rebuttal evidence before conducting an *in camera* review, the law does not require it. In re Grand Jury Subpoena 92-1(SJ), 31 F.3d 826, 830 (9th Cir. 1994). Ultimately, the decision whether to conduct an *in camera* review rests in the sound discretion of the trial court. Rose, 262 Ga. App. at 530; Zolin, 491 U.S. at 574-75.

Here, the evidence produced by Plaintiff illustrates a suspect time-line. Each of the challenged actions occurred at or near the time of some event which put H&S or Horton Homes assets at greater risk because of the pending judgments. Plaintiff's evidence demonstrates more than a temporal proximity of events, however. There is evidence to support a finding that Defendants intended to transfer H&S assets to avoid payment of the pending judgments and that there were attorney-client communication between Defendant Horton or Sinclair and Chamberlain attorneys either prior to or as a part of each transaction. Thus, based on the evidence presented, the Court finds that there is a factual basis adequate to support a reasonable, good-faith belief that review of the attorney-client communications may reveal evidence (1) that Defendants planned or engaged in fraudulent transfers at or near the time legal advice was sought, or completed a fraudulent transfer subsequent to receiving the benefit of legal advice and (2) that Chamberlain attorneys provided legal advice or services related to or in furtherance of fraudulent transfers.

A. The Default Judgment.

The first of the challenged transfers, the default judgment, occurred only weeks after an Alabama judgment against H&S Homes became final. Defendant Horton admits that he did not think the judgment was fair, and he did not want to pay it. H&S had long been in debt to Horton Homes, and Defendant Horton simply picked this time, without notice to or consultation with anyone, to file a lawsuit with the intent to close down H&S Homes entirely, knowing that H&S could not pay its creditors without funds loaned from Horton Homes. Defendant Sinclair then, without objection or guidance from the H&S Board of Directors, chose not to answer the complaint and subject his company to a $22,000,000.00 default judgment. He also knew that this would likely result in the closure of H&S Homes. Though both Horton and Sinclair deny that long-time Horton counsel Sid Williams, a Chamberlain attorney, was involved in the decision to have H&S default

on a massive suit resulting in a judgment in favor of Horton Homes, there is evidence that Williams corresponded with Sinclair just two weeks prior to the default judgment being entered.

Based on this, the Court finds sufficient factual basis to support a reasonable, good-faith belief that further inquiry into Defendant Sinclair's communication with Sid Williams may reveal evidence establishing that the crime-fraud exception should be applied. The temporal proximity of events, Defendants' feelings about the pending judgment, and the unusual and extreme business practices employed in this instance suggest that the default judgment may in fact have been an attempt to transfer assets of H&S in order to avoid payment of the judgment. As one legal commentator explained, the mere fact that a transaction was not conducted "in accordance with usual and customary business practices . . ." may be evidence of fraudulent intent. See Peter Spero, *Fraudulent Transfers: Applications and Implications* § 2:6 (2010) (commenting on an identical provision of the Uniform Fraudulent Transfers Act ("UFTA"), codified in Georgia at O.C.G.A. §18-2-70 *et. seq*.). Here, there are also numerous statutory "badges of fraud" present to support a finding of an intent to defraud: the transfer of the assets was to an insider;[2] the transfer was made mere days after the Alabama judgment against H&S had been finalized; and payment of the full $22,000,000.00 judgment would have left H&S insolvent. See O.C.G.A. § 18-2-74(b).

Admittedly, the evidence of Sid Williams' involvement with this transaction is slight; but, given the low threshold that Plaintiff must cross at this stage, Sinclair's admission that Sid Williams corresponded with him just prior to the entry of default judgment, combined with the evidence discussed above, is a sufficient preliminary showing that the content of those communications may implicate Mr. Williams in a fraudulent transfer. Plaintiff has thus shown that an *in camera* review of the attorney-client communications just prior to the default judgment is warranted.

---

[2] See O.C.G.A. §18-2-71(7)(B)(iii), (9), defining an "insider" under the Act.

B.  The Consent Action.

With respect to the second fraudulent transfer, the "consent action," the evidence of fraud is not quite as strong, and the transfer was never in fact consummated.  However, the Court finds that Plaintiff has satisfied her minimal burden on this claim as well.  The evidence demonstrates that the consent action was entered into just after Horton Homes received notices of as many as ten arbitration demands seeking to hold both Horton Homes and H&S Homes liable for the actions of H&S.  Moreover, the action could be read to apply to property owned by H&S Homes, affecting Plaintiff's claims against H&S directly.  Thus, arguably, the declared dividend of all Horton Homes' real property, valued at just over $10,000,000.00, to its parent company, Horton Industries, could be seen as a way to fraudulently avoid payment of the judgments.  Plaintiff's evidence further shows that the consent action was discussed with and prepared by Sid Williams.  Though Defendants claim that the consent action was motivated solely by a possible sale of Horton Homes, there are no documents establishing that there ever was a possible sale of Horton Homes to a competitor.

Albeit a bit attenuated, Plaintiff has created a factual basis adequate to support a reasonable, good-faith belief that inquiry into the attorney-client communications made at the time of or shortly before the consent action may reveal evidence that Defendant Horton was planning a fraudulent transfer of assets when he sought legal advice and that Chamberlain attorneys provided legal advice or services in furtherance of a fraudulent transfer.  There is evidence to support a finding of an intent to hinder or defraud: the transfer was made to an insider and the consent action was entered into just after Horton Homes learned of arbitration requests seeking to hold Horton Homes liable for money owed by H&S Homes.  See O.C.G.A. § 18-2-74(b).  Furthermore, there is no dispute that Chamberlain attorney Sid Williams was contacted before the consent action and drafted the document.  Thus, while Plaintiff's evidence of fraud may ultimately be rebutted by Defendants,

there is, for the purposes of the present inquiry, adequate evidence to support an *in camera* review of the attorney-client communications at or near the times relevant to the consent action.

C. The Creation of Triangle Homes.

The factual basis for finding a fraudulent transfer is greatest with the third series of transactions. There are, in fact, more than enough facts to support a reasonable, good-faith belief that inquiry into the attorney-client communications regarding the creation of Triangle Homes and its subsidiaries may reveal additional evidence that Defendants planned and made fraudulent transfers of H&S assets to avoid payment of the judgments against H&S and that attorney-client communications were made in furtherance of these transfers.

The totality of the circumstances create the preliminary showing. The evidence shows that Defendant Horton took steps to close H&S and to create Triangle Homes and its subsidiaries in the Fall of 2006 and knew, at that time, Triangle's subsidiaries would operate out of the same places as H&S Homes and sell the H&S inventory. He knew this would involve an absolute transfer of all of H&S assets and even admits that he did not want this property being up for grabs and sold on "the square" to satisfy judgments against H&S Homes. Defendant Horton never presented his plan to the Board of Directors of either company. Suspiciously, there are no documents concerning how and why the decision was made to close H&S Homes and create Triangle Homes, a company which would, through its subsidiaries, serve the same function as H&S.

The evidence suggests that Triangle homes was simply created as an alter-ego of H&S to enable Defendants to avoid payment of the judgments. When H&S closed, Triangle's subsidiaries became the beneficiaries of H&S's assets and business. Manufactured homes in H&S inventory became the inventory of Triangle Homes and its subsidiaries. H&S's land, storage units, offices, office equipment, and furniture were "auctioned" off without being inventoried or appraised and

ultimately sold at extremely discounted prices to other Horton companies. These assets were then provided to the Triangle subsidiaries. In most instances, H&S property did not change locations, and in other instances H&S did not receive payment for valuable assets now used by the Triangle subsidiaries. H&S leases were terminated and immediately re-negotiated by the Triangle entities. H&S employees were fired and then re-hired by the Triangle entities. H&S insurance and financing arrangements were terminated, and the Triangle entities entered into the same or similar arrangements immediately thereafter. Thus, almost immediately after H&S ceased doing business, Triangle subsidiaries operated out of the very same sales units that H&S operated out of, sold manufactured homes just like H&S had sold, employed managers employed by H&S just days before, and occupied the same sales lots previously occupied by H&S Homes. There was no time gap between the operation of the two businesses; it appeared that H&S simply changed its name.

Chamberlain attorneys undoubtedly had their hand in this endeavor. It is undisputed that Chamberlain attorneys were included in discussions about closing H&S Homes. In the Fall of 2006, Defendant Horton further discussed the business reasons for forming Triangle Homes with Sid Williams. Chamberlain attorneys drew up the papers to create the new subsidiary. Defendant Sinclair admits that, about the time the decision was made to close H&S Homes and open Triangle and its subsidiaries, there was some communication with Chamberlain attorneys regarding the corporate structure; and Chamberlain attorneys sent Defendant Sinclair "corporation formation and tax documentation" in December 2006 and early January 2007.

Based on this evidence, the Court finds that Plaintiff has met her preliminary burden, considering the temporal proximity of events, the informal nature of the decision-making process, the complete stripping of the assets of H&S Homes, the simultaneous appearance of an affiliated company performing the same service with the same inventory, offices, and managers, and the

undisputed participation of the attorneys. To support a finding of intent, there are statutory badges of fraud present: transfers were made to insiders; H&S Homes had been sued, and Plaintiff's judgment was about to be domesticated in Georgia; the transfer was of all H&S Homes's assets; and after the transfer was completed, H&S was absolutely insolvent and no longer in business. See §18-2-74(b). Also, Defendant Horton's actions in this instance were not carried out in accordance with usual business practices and formalities that you would expect in this situation; this is further evidence of fraudulent intent. See Spero § 2:6.

Another factor supporting a finding of fraudulent intent is the evidence that the value of consideration received by H&S was not reasonably equivalent to the value of the assets transferred. See §18-2-74(b). The absence of full and adequate consideration in connection with the conveyance of assets is evidence a fraudulent transfer. Spero, § 2:6. "In this regard, the basis on which adequacy of consideration is determined (e.g., appraisals and comparable sales) is relevant. A substantial difference between the value of property and the amount paid for it is a badge of fraud." Id. Here, all of the assets were sold well below book value, and in some cases, H&S did not receive any payment for assets transferred and later used by Triangle subsidiaries.

The court also finds it relevant that Horton companies (meaning companies in which Defendant Horton had some ownership) retained ownership of virtually all the H&S assets; that the assets were not cataloged, inventoried, or professionally priced before they were sold; and that the assets are now being used by the very companies created to conduct the business of the former H&S Homes. In fact, under Georgia law, "[t]he failure to examine property, or take an inventory of goods bought, or looseness or incorrectness in determining the value of the property conveyed . . ." may be considered evidence of a fraudulent intent. Varn Inv. Co. v. Bankers' Trust Co., 165 Ga. 694, 141 S.E. 900, 901 (1928) (approving this statement as a jury instruction); see also In re Grand Jury

Subpoena Duces Tecum, 731 F.2d 1032, 1041 (2d Cir. 1984) ("The fraudulent nature of a conveyance may be inferred from . . . from inadequacy of consideration . . . ."). Transfers to related or affiliated corporations have also justified the finding of fraudulent intent. Spero, § 2:6.

Because of decisions made by Defendants, with the assistance of Chamberlain attorneys, H&S is insolvent and unable to satisfy Plaintiff's judgment; meanwhile, virtually all its former assets remain untouched and in use by Triangle's subsidiaries. Therefore, it is entirely reasonable to conclude, in good-faith, that inquiry into attorney-client communications at the time of or before the close of H&S Homes and the creation of the Triangle entities will result in additional evidence (1) that Defendants were planning or engaged in fraudulent transfers when advice of counsel was sought, or completed a fraudulent transfer after receiving the benefit of counsel's advice, and (2) that Chamberlain attorneys provided advice or services in furtherance of the transfers.

Accordingly, with respect to all three of the challenged transfers, the Court finds that Plaintiff has gone beyond mere allegations and suspicion and created a factual basis adequate to support a reasonable, good-faith belief that *in camera* review of attorney-client communications may reveal evidence to support application of the crime-fraud exception. Consideration of other facts and circumstances of this case likewise persuades the Court that *in camera* review is not only warranted but in fact necessary. The volume of materials to be reviewed *in camera* is not overwhelming. The Court can easily review the materials without an overly burdensome extension of judicial resources. The content of the attorney-client communications in this case is also quite important. It is unlikely that Plaintiff can meet her burden of ultimately establishing the communications were made in the furtherance of fraudulent transfers in absence of the information she believes is contained within these documents. Inasmuch, Georgia courts recognize that *in camera* review is appropriate "when the underlying facts demonstrating the existence of the privilege may be presented only by revealing

the very information to the court that is sought to be protected by the privilege." <u>Southern Guar. Ins. Co. of Ga. v. Ash</u>, 192 Ga. App. 24, 28, 383 S.E.2d 579 (1989) (quotes and alterations omitted).

The Court further finds that the evidence presented by Defendants does not absolutely foreclose the possibility that an *in camera* review will lead to additional evidence to support application of the crime-fraud exception. As stated above, Defendants have asserted legitimate-sounding business justifications for each transfer. However, there is no documentary evidence to support these non-fraudulent justifications, and the Court finds that, for the purpose of the present inquiry, Plaintiff's evidence sufficiently challenges the veracity of those proffered business justifications and raises suspicion as to Defendants' real motivations for the transfers.

While the preliminary evidence presented by Plaintiff may not quite reek of fraud, there is a discernable stench present, and this is enough probable cause to warrant a further search of the relevant documents. The Court finds, therefore, that an *in camera* review of the attorney-client communications is appropriate.

## II. <u>Application of the Crime-Fraud Exception</u>

After completing the above analysis and concluding that *in camera* review of the relevant attorney-client communications was warranted, the Court reviewed the documents and finds that "the crime-fraud exception" to the attorney-client privilege authorizes discovery of some, but not all, of these communications. As briefly discussed above, a party seeking to invoke the crime-fraud exception does not have to prove "the existence of a crime or fraud to overcome the claim that a communication is privileged." <u>Rose</u>, 262 Ga. App. at 529. Rather, the applicability of the exception turns on "whether a prima facie case has been made that the communication was made in furtherance of an illegal or fraudulent activity." <u>Id.</u> Georgia courts have stated that the party opposing the privilege need only present prima facie evidence that the charge of fraud has "some

foundation in fact" and gives "colour to the charge." <u>Atlanta Coca-Cola</u>, 50 Ga. App. at 639. Federal courts likewise require that a party seeking to apply the crime-fraud exception to the attorney-client privilege satisfy a two-part test showing prima facie evidence that, if believed by a trier of fact, would establish (1) that the client was in the process of making a fraudulent transfer of assets when he sought the advice of counsel, that he was planning such to make the transfer when he sought the advice of counsel, or that he made a fraudulent transfer subsequent to receiving the benefit of counsel's advice, and (2) that the communication was made in furtherance of or was otherwise related to the fraudulent transfer. <u>See</u> <u>Cleckler</u>, 265 Fed. App. at 853.

Thus, while a party opposing the privilege enjoys a minimal burden to trigger *in camera* review of the relevant attorney-client communications, a more stringent burden is imposed when considering the ultimate question whether the exception applies. <u>Haines</u>, 975 F.2d at 96. The party opposing the privilege must go beyond a preliminary showing and create a prima facie case that the communication was made in furtherance of illegal or fraudulent activity. For this purpose, "[p]rima facie evidence is that which, on its face, is good and sufficient to establish a given fact, though it can ultimately be rebutted or contradicted." <u>Rose</u>, 262 Ga. App. at 529. "In considering whether a prima facie case has been made, reasonable inference from circumstances proved [may be considered] to support . . . the prima facie case, but, of course, this does not mean that an inference of guilt or wrong doing can be made where that ultimate fact may not be reasonably drawn from the circumstantial facts established." <u>Securities & Exch.Comm'n v. Harrison</u>, 80 F. Supp. 226, 232 (D. D.C. 1948). At this stage of the inquiry, the party invoking the privilege has the absolute right to be heard by testimony and argument. <u>Haines</u>, 975 F.2d at 97.

In light of this and having reviewed the arguments, evidence, and relevant attorney-client communications, the Court finds that Plaintiff has not satisfied her burden of establishing that the

crime-fraud exception should be applied to communications related to the default judgment or the consent action. However, Plaintiff has satisfied her burden of demonstrating the crime-fraud exception is applicable to attorney-client communications concerning the closure of H&S Homes and creation of Triangle Homes and its subsidiaries.

A. Default Judgment.

As discussed in detail above, Plaintiff produced sufficient preliminary evidence to warrant an *in camera* review of certain communications between Defendants and Chamberlain attorneys regarding the default judgment; however, there is, at this time, insufficient evidence currently before the Court to ultimately justify application of the crime-fraud exception to these communications. With respect to the entry of the default judgment against H&S, Plaintiff has identified a suspicious temporal proximity of events, illustrated unusual and seeming extreme business decisions to sue H&S for $22,000,000.00 and then allow the company to simply default, and provided evidence that Sid Williams corresponded with Defendant Sinclair shortly before the default was entered. Still, Plaintiffs' evidence that the communication between Sinclair and Williams was related to the default judgment is circumstantial - based solely on the fact that the communications took place just before the default was entered.

Defendants, on the other hand, have identified evidence that Chamberlain attorneys were not consulted about the suit. (See Affidavit of N. Dudley Horton and Steve Sinclair [Doc. 88 & 89]). They have also produced evidence that Defendant Horton retained an attorney outside of the Chamberlain-Hrdlicka law firm, Joseph Briley, to file the lawsuit and Defendant Sinclair contacted another non-Chamberlain attorney, Marty Fierman, who advised him not to answer the complaint. The involvement of other attorneys here lessens the likelihood that Defendants needed legal advice from Sid Williams about the suit and default judgment, and there is no evidence that Defendant

25

Horton spoke with or received legal advice from any Chamberlain attorney at or near the time of the lawsuit. Moreover, a review of the attorney-client communications before the Court reveal nothing that would assist Plaintiff in proving her claim; none of the documents address the suit or default.

Based on this, the Court finds that, though the referenced communications between Defendants and attorneys Joseph Briley and Marty Fierman may be excepted from privilege,[3] the conclusion that Chamberlain attorneys were involved in this alleged fraudulent transfer "may not be reasonably drawn from the circumstantial facts established." See Harrison, 80 F. Supp. at 232. Thus, Plaintiff has failed to show that her claim implicating Chamberlain attorneys in this transfer has "some foundation in fact." Therefore, even if the default judgment was designed to be a fraudulent transfer of H&S assets, the crime-fraud exception does not apply to communications between Defendants and Chamberlain attorneys; those communications remain privileged.

B. Consent Action.

Plaintiff has also failed to establish a prima facie case that attorney-client communications between Defendant Horton and Sid Williams at or around the time of the consent action were made in furtherance of a fraudulent activity. Of course, Plaintiff's evidence shows that there was a close temporal proximity between the consent action and the receipt of ten arbitration demands seeking to declare that Horton Homes was an alter-ego of H&S, that Defendant Horton had recently expressed concerns about property being seized and sold to satisfy judgments pending against H&S, and that the consent action would potentially transfer substantial assets from Horton Homes and its subsidiaries to Horton Industries. Plaintiff has also shown that there are no documents evidencing

---

[3] The present motion appears to be limited to communications between Defendants and Chamberlain attorneys, and it is unclear whether attorneys Briley and Fierman have asserted privilege with respect to the communications surrounding the suit and default judgment. None of the documents reviewed in camera involved communications between Defendants and these attorneys.

a legitimate business reason for the transfer and that Sid Williams was consulted about and drafted the consent order. This evidence was enough to warrant *in camera* review of the communications; however, this evidence, without more, is not sufficient to ultimately invoke the crime-fraud exception in light of Defendants' evidence.

In rebuttal, Defendants have shown that Chamberlain attorneys, while involved in the drafting of the consent action, were not involved in the decision to distribute the property as a dividend. (Horton Decl. ¶ 19). Defendant Horton, through a sworn affidavit and deposition testimony, has proffered a legitimate, non-fraudulent reason for the consent action. He testified that the sole reason for the consent action was preparation for a possible transaction involving the sale of Horton Homes' manufacturing business to a competitor, Champion Homes. (Id.) Horton claims that, during the latter part of 2006, he met with Mr. Walt Young, a principal of Champion Homes, regarding a sale, and Mr. Young made it clear that Champion did not want to purchase the corporate campus which was owned by Horton Homes. (Id.) Thus, in order for the transaction to go forward, Defendant Horton decided, without consulting counsel, that the real estate assets owned by Horton Homes should be distributed to its 100% owner Horton Industries, Inc. as a dividend. (Id.) It is undisputed that Horton then asked Sid Williams to assist in preparing the necessary documents to accomplish this and that Sid Williams did prepare the consent action. (Id.) The consent action was approved by the Board of Directors of Horton Homes, but no property was transferred; Defendant Horton testified that this was because the sale never occurred. (Id.)

It is not fatal to Plaintiff's theory that no property was ever transferred. Again, for application of the crime-fraud exception, the party opposing the privilege need not show that an actual fraud occurred. The party need only identify prima facie evidence that, if believed by a trier of fact, would establish that the client was *planning* to make a fraudulent transfer of assets when he

sought the advice of counsel and that the communication was made in furtherance of or otherwise related to the fraudulent transfer. See Cleckler, 265 Fed. App. at 853. It is problematic, however, that Defendant Horton is able to articulate a legitimate, non-fraudulent reason for the consent action which is not inconsistent with the facts presented by Plaintiff.

Both Plaintiff and Defendants' evidence could be true and correct; there is material no factual dispute. The timing of the transaction could simply be coincidental, and the secrecy and lack of documentation surrounding the transaction could be explained by the confidential nature of a sale to a competitor. That no property was ever transferred as a result of the consent action merely bolsters Defendants' claim that a sale of Horton Homes' manufacturing business was the sole motivation for the consent order. Plaintiff has not produced any evidence which would specifically challenge the veracity of Defendant Horton's explanation, such as testimony or affidavit or other document showing that a purchase of Horton Homes was not contemplated or any evidence otherwise demonstrating that sale negotiations had not yet progressed to the point of necessitating the consent action. Moreover, the Court found nothing during the *in camera* review to further Plaintiff's theory that the consent action was an attempt to avoid payment of the pending judgments.

Thus, the Court finds that Plaintiff has not presented evidence sufficient to establish that Defendant Horton was planning a fraudulent transfer by way of the consent action or that the attorney-client communications regarding the consent action were made in furtherance of a plan to make a fraudulent transfer. As a result, Plaintiff has not shown that her claim of fraud has "some foundation in fact." Communications concerning the consent action are protected by privilege.

C. Creation of Triangle Homes & its Subsidiaries

Plaintiff, however, has satisfied her burden of demonstrating that the crime-fraud exception is applicable to attorney-client communications related to the closure of H&S Homes and creation

of Triangle Homes and its subsidiaries. The evidence already considered regarding these transactions is more than enough for the Court to reach this conclusion. Defendant Horton was concerned about the pending judgments and the effect satisfaction of those judgments may have on his assets. He decided to close and did close H&S Homes, without consulting the Board of Directors of either H&S or Horton Homes. Defendant Horton knew, months before H&S closed, that he also was simultaneously creating another entity, with a slightly different corporate structure, to conduct H&S's business. H&S's inventory, leases, insurance contracts, finance agreements, managers, and assets became those of the Triangle entities. Most if not all of these assets were purchased by affiliated Horton corporations for prices far less than book value and then provided to Triangle's subsidiaries; H&S was not even paid for some assets used by Triangle. Now, Triangle's subsidiaries essentially operate in the place of H&S Homes. The evidence also suggest that Chamberlain attorneys were involved in this plan by, and likely before, the Fall of 2006 and assisted in the plan's execution.

As with the default judgment and consent action, Defendant Horton describes plausible, non-fraudulent business reasons for these transactions. Simply put, Defendant Horton claims that H&S Homes was a losing enterprise and that he hoped a new company with a different format would have more success in retail sales. (Horton II Dep. at 24; Affidavit of N. Dudley Horton [Doc. 88] at ¶¶ 22-24). According to Defendant Horton, Triangle Homes was never intended continue in business long-term; rather the general plan for the operation of Triangle and its subsidiaries was to continue to market the approximately 225 homes which Horton Homes had been required to repurchase and to try to develop the potential to sell one or more of the subsidiary companies or sales lots. (Horton Aff. at ¶ 35). Defendants thus contend and attempt to show that there was "never a plan developed as a single concept to shut down H&S and open Triangle." (Defts Response [Doc. 91] at 17).

However, this Court's *in camera* review of the relevant attorney-client communication revealed evidence to the contrary. Though Defendants may have had some business justification for their actions, the Court found at least one document, which clearly suggests that Defendants planned these events as a single concept and transferred H&S assets for the purpose of avoiding payment of the pending judgments against H&S and that the attorneys of Chamberlain-Hrdlicka assisted in the planning and execution of such transfers.[4]

Within the documents reviewed *in camera* is a letter from Sid Williams to Defendant Horton sent in the early Fall of 2006. Therein, Mr. Williams warns that they are not optimistic about Defendants' "prospects for ultimately **avoiding the payment of the outstanding judgment[] held by . . . Terry Tindall** through normal means." In the letter, he explains that

> timing has now become critical and we can reasonably anticipate that the McDonalds and probably Tindall will soon begin aggressively trying to turn their judgments into cash by various means including garnishing H&S bank accounts . . . . In short, funds that H&S might even temporarily have in its bank account, could soon be up for grabs in the absence of taking some extraordinary measures. . . . [W]e believe that now is the time to consider a new course of dealing with the existing judgments and pending and threatened litigation.

He further informed Defendant Horton that "I will be in your offices at 10:00am on Wednesday, September 13 to discuss the alternatives . . . ," and attached to the letter, is a memorandum from Sid Williams which details a comparison of six "alternative strategies."

---

[4] Plaintiff is not required to disprove Plaintiff's legitimate justifications entirely; she need only establish that Defendants' dominant motive was to avoid payment of the pending judgments against H&S. Spero explains that "[w]here the motives for the transfer are mixed, the dominant motive will normally control the characterization of the transaction." § 2:5; see also U.S. v. Engh, 330 F.3d 954, 956 (7th Cir. 2003) (noting that "[r]egardless of what other motivations for the transfer may have been present, a clear intent to avoid a creditor . . . was also present."); In re Schneider, 417 B.R. 907, 915 (Bkrtcy. N.D. Ill. 2009) ("If the primary motivation for the transfer is based on fraudulent intent, other motivations may be urged, but they are irrelevant.").

"Alternative IV" is suspiciously similar to the events that began to occur shortly after September 13, 2006, the date that Sid Williams was to meet with Defendant Horton to discuss his "alternatives." This strategy involves "forming a completely new entity which would essentially replace H&S through a number of structured steps **designed to avoid claims of successor liability to the maximum extent possible**." It was recommended that Defendant Horton

> i)      Form a completely new entity ("NewCo") with different ownership than H&S, different officers and directors than H&S and a dissimilar name;
>
> ii)      Have [Horton Homes] repurchase a number of the manufactured homes under the floor plan arrangement and either resell the homes to other dealerships, or resell the homes to NewCo,
>
> iii)      Have NewCo renegotiate leases with most of the landlords rather than taking assignment of existing leases;
>
> iv)      Have H&S terminate existing employees; NewCo hires employees; and
>
> v)      [Have] NewCo advertise[] itself as a new dealership.

In the last paragraph, the memorandum details the benefits and risks of taking this approach:

> We should be able to structure an approach which involves the creation and operation of NewCo in such a way as to ultimately avoid successor liability being imposed on NewCo. A successful structure is fairly complex and will involve many steps which are necessary for both substantive and cosmetic reasons, and which are somewhat awkward from a business standpoint, for example: termination of existing leases and negotiation of new leases for sales lots, rather than assumption of existing leases by NewCo; partial repurchases of manufactured homes by [Horton Homes], and perhaps partial sales of manufactured homes by H & S to NewCo and rehiring of employees by NewCo; devising a way to finance operations of NewCo which will hold up in discovery and will not be subject to attack that NewCo is in substance just another [Horton Homes] owned or controlled entity.

This strategy mirrors the steps taken in creating Triangle Homes and its subsidiaries. Within weeks of the planned meeting with Sid Williams to discuss this and other strategies, Triangle Homes was formed as a new entity with different officers and directors and a dissimilar name. Horton Homes then repurchased the manufactured homes in H&S's inventory under the floor plan

31

arrangement and re-sold them to Triangle Homes. Triangle Homes subsidiaries renegotiated H&S's leases, rather than taking assignment of existing leases. Triangle Homes subsidiaries hired H&S employees and managers immediately after they were terminated from H&S. Triangle Homes subsidiaries then advertised themselves as new dealerships.

Accordingly, it appears from this memo that Chamberlain attorneys devised and recommended a plan to assist Defendants in transferring assets from H&S Homes for the purpose of "avoiding the payment of the outstanding judgment[] held by . . . Terry Tindall." The plan was in fact "designed to avoid claims of successor liability to the maximum extent possible." However, Defendants assert that this is not sufficient evidence of fraud, as Georgia law permits a debtor to prefer one unaffiliated third party creditor over another. See O.C.G.A. § 18-2-40. Defendants thus contend that there is no evidence of "fraud" because proceeds from the auction of H&S assets were used to pay other creditors.

The Court is not persuaded. While Defendants may be correct that Georgia law permits a debtor to prefer one creditor over another, Defendants have failed to show that this is an irrefutable defense to a claim of fraudulent transfer under O.C.G.A. § 18-2-74. In fact, Georgia law provides that a debtor can prefer one creditor over another and make transfers to that end *only* if the transfer is made in good faith and does not benefit the debtor. Bank of Cave Spring v. Gold Kist, Inc., 173 Ga. App. 679, 681, 327 S.E.2d 800 (1985). A transfer of assets cannot "be tainted with any intention to hinder, delay, or defraud others" and is "judged by the intention with which it is made and accepted, not by its consideration or effect." Cotton States Fertilizer Co. v. Childs, 179 Ga. 23, 174 S.E. 708, 709 (1934). The facts here suggest that Defendants' transfer was not made in good faith, primarily for legitimate business reasons, but was made to benefit Defendants. Defendants' dominant intent appears to have been to hinder, delay or defraud Plaintiff by making H&S insolvent

and unable to satisfy her judgment. The fact that other creditors were paid is not determinative. "[A] transfer by a debtor to one creditor, even though for consideration, is still a fraud against other creditors if there is intent to defraud." King v. Ionization Intern., Inc., 825 F.2d 1180, 1186 (7th Cir. 1987); In re Schneider, 417 B.R. 907, 915 (N.D. Ill. 2009) (applying an identical provision of the UFTA adopted in Illinois). "Such an intent will be found if the circumstances indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt." Id.

The Court is also not persuaded by Defendants' argument that a fraudulent transfer cannot be established in this case because Plaintiff's judgment was not yet enforceable in Georgia when the transactions occurred. The evidence suggests that Defendants acted with the pending judgment in mind and the specific of intent of "avoiding the payment of the outstanding judgment[] held by . . . Terry Tindall." "Because timing [had] become critical" and they "reasonably anticipate[d]" that Plaintiff would soon begin "aggressively trying to turn [her] judgment[] into cash," Defendants made the necessary transfers prior to the judgment being domesticated in Georgia. For this Court, it is enough that the judgment existed and was a motivating factor for Defendants' transfer of assets.

Plaintiff, therefore, has met her burden of showing that her claim in this instance has "some foundation in fact." The evidence presented by Plaintiff combined with the documents considered *in camera* make a prima facie case that Defendants planned and executed a fraudulent transfer and that attorney-client communications were made in furtherance of that transfer. To this extent, Plaintiff's Motion to Compel is granted.[5]

---

[5] Through the motion at bar, Plaintiff further argues that Defendant Horton waived privilege as to this subject matter during his deposition. Given this Court's findings herein, Plaintiff's waiver argument need not be addressed. In the present Order, the Court has in fact gone to great lengths to avoid relying on Defendant Horton's responses to questions regarding the September 2006 memorandum from Sid Williams so as to prevent any inadvertent boot-strapping from findings in a previous case. The Court will thus decline to delve into that issue now, as it is not necessary for the ultimate resolution of the matter at hand.

III.  Scope of the Exception

Plaintiff contends that, in the event that she is able to make a prima facie case as to one of the challenged transactions, the Court may apply the crime-fraud exception to communications concerning the other transactions, considering of the "totality of the circumstances."  In other words, Plaintiff contends that she does not have to establish a prima facie case for each act independently of the other.  Plaintiff is correct that the Court may consider all circumstances when determining whether the crime-fraud exception applies; yet, the Court is reluctant to apply the exception across-the-board to all "suspicious" transactions when a prima facie case has only been established for one.

A balance must be reached between a moving party's interest in investigating other transactions and the interests in protecting the confidentiality of the attorney-client relationship.  Unlike *in camera* review, which is essentially a "non-dispositive procedural way station," application of the crime-fraud exception to attorney-client communications "break[s] the seal of a highly protected privilege" and subjects private communications to public disclosure.  See Haines, 975 F.2d at 96.  Thus, although a preliminary showing as to one transaction may, in some cases, warrant *in camera* review of communications concerning other transactions, the standard should be higher when attorney-client communications will be disclosed.  Here, in light of the need to protect the confidentiality of attorney-client communications and the lack of any connection between the transfers at issue, the Court finds that the prima facie evidence of fraud in the third series of transactions does not necessarily taint the first two.  Plaintiff needed to make a prima facie showing for each of the three suspect transfers individually.  This may not be the conclusion in every case; but in this case, the Court will not extend application of the exception beyond the transactions for which Plaintiff made her prima facie case.

Accordingly, only those communications concerning the cessation of H&S Homes and creation of the Triangle entities will be excepted from attorney-client privilege. The terms of this Order are limited. The crime-fraud exception to the attorney-client privilege applies only to communications concerning proposed or ongoing infractions of the law in the perpetration of a fraud. Pihlman v. State, 292 Ga. App. 612, 615, 664 S.E.2d 904 (2008). Only those communications which occur before the perpetration of a fraud or commission of a crime and which relate thereto are excepted from privilege; communications occurring after a fraud or a crime has been completed are still privileged and are not discoverable. See id. at 616. Plaintiff, therefore, may inquire into attorney-client communications only as they are related to the planning or execution of the transition from H&S Homes to the Triangle entities, as described in this Order. Plaintiff may not inquire into communications made after these transactions were carried out, even if those communications concern the possible legal implications of the transactions. Plaintiff also may not inquire into matters unrelated to the planning and execution of these transactions, such as matters related to the defense of this lawsuit or any other lawsuit.

Thirteen documents listed in the privilege log appear to address aspects of the transition from H&S Homes to the Triangle entities. These documents are numbers 1, 2, 3, 4, 5, 6, 20, 22, 40, 62, 63, 64, and 65. The "crime-fraud exception" to the attorney-client privilege authorizes discovery of these communications. Accordingly, these and any other attorney-client communications concerning the closure of H&S and the creation of the Triangle subsidiaries shall be produced over Defendants' objection. Plaintiff may conduct additional discovery into matters involving attorney-client privilege to the extent those requests are limited to information about the cessation of H&S and the creation of Triangle Homes. Defendants are directed to make substantive responses to all the relevant interrogatories and requests for production where privilege was previously

asserted and are to produce documents from the Chamberlain firm related to the cessation of H&S and the opening of the Triangle subsidiaries, including but not limited to relevant billing records, interoffice memos and emails. Defendants shall also respond to questions about attorney-client communications related to the cessation of H&S and the creation of Triangle and its subsidiaries.

It is SO ORDERED this 10th day of January, 2011.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

jlr