THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **TERRY CARTRETTE TINDALL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civil Action** |
| | : | **No.   5:10-CV-044(CAR)** |
| **H & S HOMES, LLC, et. al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

## ORDER ON HORTON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THEIR NINTH DEFENSE

Currently before the Court is the Horton Defendants' "Motion for Partial Summary Judgment on their Ninth Defense."   Through this Motion and the supporting briefs, Defendants contend that they are entitled to summary judgment on any claims alleging that assets of H&S Homes were transferred for less than "reasonably equivalent value" because Plaintiff has not produced *any* admissible evidence of the "actual value" of the assets sold by H&S Homes.

Defendants are correct that Plaintiff has not produced expert testimony identifying the actual market value of each H&S asset at the time it was transferred. This, however, does not entitle Defendants to summary judgment as the Court finds sufficient other evidence in the record to create a genuine issue of material fact regarding

Plaintiff's claims.   Defendants' Motion for Summary Judgment on their Ninth Defense

[Doc. 165] is accordingly **DENIED**.   Defendants' related Motions to Strike [Docs. 238 &

262] are also **DENIED** for the reasons discussed herein, as are Plaintiff's Motion to File a

Sur-Reply [Doc. 247] and the parties' Motions for Oral Argument [Doc. 172 & 178].

## STANDARD OF REVIEW

Summary judgment must be granted if "there is no genuine issue as to any

material fact and . . . the movant is entitled to judgment as a matter of law."   Fed. R. Civ.

P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

On a motion for summary judgment, the moving party "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact" and that entitle it to a judgment as a matter of law.

Celotex, 477 U.S. at 323.   If the moving party discharges this burden, the burden shifts

to the nonmoving party to go beyond the pleadings and present specific evidence

showing that there is a genuine issue of material fact (i.e., evidence that would support a

jury verdict) or that the moving party is not entitled to a judgment as a matter of law.

Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see Fed. R. Civ. P. 56(e); Celotex,

477 U.S. at 324 26.   This evidence must consist of more than mere conclusory allegations

or legal conclusions.   See Avirgan, 932 F.2d at 1577.

Summary judgment must be entered when "the nonmoving party has failed to

make a sufficient showing on an essential element of [his] case with respect to which [he]

has the burden of proof."   Celotex, 477 U.S. at 323.

**FACTS AS VIEWED IN THE LIGHT MOST
FAVORABLE TO THE NON-MOVING PARTY**

The claims involved in this Motion for Summary Judgment arise out of multiple

transfers of property, real and personal, which resulted in the liquidation and closure of

an insolvent H&S Homes, L.L.C.   Defendant H&S Homes was, until January 2007, the

primary sales arm and a wholly-owned subsidiary of Horton Homes, Inc.   Defendant

Horton Homes is in the business of manufacturing homes and is owned by Defendant

Horton Industries, Inc., a holding company owned and managed by Defendant Dudley

Horton.   Defendant Horton controls the vast majority of stock in all of the Horton

companies (including Defendants Horton Homes, Inc., H&S Homes, L.L.C., Best Value

Housing, Inc., Horton-American, L.L.C., and Triangle Homes, L.L.C.).   He serves as

either the chairman of the board, president, or chief operating officer of each.

Defendant Steve Sinclair was the president of H&S Homes and served as vice president

of Horton Homes and Horton Industries.

3

In January of 2005, Defendant Dudley Horton made the decision to close H&S Homes due, at least in part, to its ongoing litigation problems. The unilateral decision was made without considering other options and despite the fact H&S was, at that time, still paying its creditors.   H&S Homes actually made a profit in 2005.

The plan to close H&S included the sale of corporate assets.  This was done primarily through an "absolute" auction conducted by professional auctioneers in January of 2007.   An absolute auction is one in which the sale is awarded to the highest bidder; no reserve or minimum required bid is set.   The decision was made to conduct an absolute auction even though there is nothing to suggest that H&S had attempted or had difficulty selling its assets before this time.

Hudson & Marshall is an experienced auction company, having auctioned thousands of manufactured houses prior the dissolution of H&S Homes.   The company advertised the Horton sale to potential bidders using newspapers, the internet, and its extensive mailing list.   The auctions were then conducted by multiple auctioneers at various locations in Georgia, North Carolina, and South Carolina over a three-day period.

As a result of the auctions, H&S received approximately $ 1,503,150.00.   Of this amount, $ 204,050.00 was paid by third-party competing bidders.   The remaining

$1,299,100.00 was paid by two Horton companies: Defendants Best Value and Horton-American.   In every case, the purchases were awarded to the "highest bidder."

The auction, however, may not have been marketed well for outside bidders. The auctioneer's lackluster brochures and ads were described as "boring" and sometimes contained erroneous information.   The auctions, for example, were advertised as having reserves (though none were set), and the ads included incorrect addresses.   The mailed brochures contained no pictures and described the property to be sold without any reference to the contents (such as furniture, office equipment, and office supplies) as being included in the price, though these additional contents did transfer to the Horton "high bidders."   The brochures also included requirements that buyers pay within thirty days of closing and that the buyers of the office units remove those units from their location within thirty days.   This second requirement would be problematic for most purchasers because the units were connected to steps, porches, plumbing, and electricity.   The auctioneer in fact warned H&S that this requirement would cause problems for many bidders.   In the end, the requirements were apparently not enforced against the Horton buyers; Defendant Horton-American did not pay for the office units it purchased until more than sixty days after the auction.

It is also undisputed that Defendants made no effort to appraise or take inventory of the H&S assets prior to the sale; nor did they consult any other source to determine to

the value of the H&S assets.   The land was ultimately sold for less than the amount H&S paid for it, and other assets were sold for less than the "book value" (or adjusted basis) associated with those assets.   "Book value" is an accounting device used under the "Generally Accepted Accounting Principles." It is not intended to reflect an actual fair market value for the assets but merely reflects the cost of categories of property minus depreciation for those categories based upon applicable depreciation schedules.   These numbers, however, do fairly represent the financial condition of a company, and often times, the market value of the assets listed will be higher than the book value – especially if assets are depreciated on the books faster than the true declining value.

H&S Homes kept detailed financial records including balance sheets, fixed asset summary reports, and disposal reports.   In his deposition, Defendant Steve Sinclair explained that the H&S disposal reports showed the acquired value or cost, accumulated depreciation and adjusted basis, net proceeds, and gain or loss for each H&S asset.   He also admitted that, for tax reasons, H&S likely depreciated a good many of its assets on its disposal reports faster than the true declining value.

The H&S financial records show how all of the H&S assets were disposed of in the auction. According to the report, the office units were sold to Defendant Horton-American for half the "book value."   Horton-American, in fact, bought every one of the H&S office units and paid more than $15,000.00 for a unit only when there was

6

a competing outside bid.   Horton-American then leased the office units, which included the office equipment and furniture, to the Triangle Defendants, companies created by Horton to serve essentially the same purpose as the defunct H&S Homes.   Many of the land lots and homes were likewise sold to Defendant Best Value, another Horton company, for a fraction of the cost paid by H&S.   Best Value then turned around and sold many of the lots for a significant profit later that same year.

Based on this and other information, a corporate finance and business practices expert retained by Plaintiff, Harold C. Stowe, opines that "certain assets either transferred or surrendered by H&S were transferred or surrendered . . . for less consideration than the fair market value . . . ."   He bases this opinion upon his review of the H&S financial documents, Defendants' deposition testimony, interrogatories, and disclosures, orders from this Court, and information from outside sources such as appraisers, bankers, real estate agents, and public records.   Mr. Stowe's resources indicate that the value of land in the Southeast (including the areas relevant to this litigation) generally appreciated from the time H&S acquired land in 2002 until January 2007 when it was sold to Best Value for prices much less than the cost at which H&S purchased the land.   He also opines that the decision to auction H&S property piecemeal did not make sense from a business standpoint and questions H&S's failure to

seek any compensation from Defendants for furniture, equipment, add-ons, land improvements, storage buildings, signs, and office supplies transferred.

## DISCUSSION

In light of these facts, Plaintiff brought claims against Defendants under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-75(a) of the Georgia Uniform Fraudulent Transfers Act, asserting that the various transfers should be deemed fraudulent because H&S made the transfers without receiving a "reasonably equivalent value" in exchange.   Through the present Motion, Defendants contend that these fraudulent transfer claims fail as a matter of law because Plaintiff has not produced direct evidence of each asset's "actual value" at the time it was transferred.

Defendants have also moved to strike evidence submitted by Plaintiff in response to this Motion.   Defendants move to strike (1) Plaintiff's "Exhibit X" because it was filed outside the briefing schedule, and (2) paragraph 14 of the affidavit of Harold Stowe because Mr. Stowe is not an expert in real estate value and his "opinion" about land appreciation is not based upon a reliable basis or methodology.

Defendants, however, have failed to persuade the Court that any of Plaintiff's evidence on summary judgment should be stricken.   The Court further finds that there is sufficient evidence in the record to create a fact question as to whether H&S assets were transferred for "reasonably equivalent value."   Defendants' present Motion for

8

Summary Judgment [165] and both motions to strike [Docs. 238 & 262] are accordingly

**DENIED**.   The Court will address each motion in turn below.

A. <u>Motion to Strike Exhibit X</u>

The Horton Defendants have moved to strike "Exhibit X to Plaintiff's Response to Defendants' Motion for Partial Summary Judgment on their Ninth Defense."   "Exhibit X" is actually a demonstrative tool, which simply charts (1) the original price H&S paid for certain land and land homes, (2) the price for which Defendant Best Value purchased lots owned by H&S Homes at auction, and (3) the price Best Value received when it subsequently resold the same property.   It is thus intended to show that Defendant Best Value purchased properties at auction for less than half their adjusted basis and subsequently sold the same properties for a substantial profit.

The exhibit itself is not evidence.   It is derived from evidence and was apparently created by counsel as an aid for the Court.   On its face, the exhibit shows that it is based upon statements made in the deposition of Steve Sinclair and the discovery responses of Defendant Best Value.   Due a clerical error, however, Exhibit X was not filed with Plaintiff's Response, and this error was not discovered until after Defendants had already replied to Plaintiff's Response.

Even so, the existence of Exhibit X was no secret to Defendants.   "Exhibit X" is plainly referenced in paragraph 23 of Plaintiff's Statement of Material Facts [Doc. 221-2],

9

in paragraph 6 of Plaintiff's Response to Defendants' Statement of Material Facts [Doc. 221-1], and on page 8 of Plaintiff's Memorandum in Response [Doc. 221] to the present Motion for Summary Judgment.   The claims for which the exhibit is cited in those documents are also supported by other citations to Steve Sinclair's deposition and Defendants' discovery responses.   Thus, it is clear that neither the information in the exhibit nor the evidentiary basis for the exhibit was unknown to Defendants when they filed their Reply.

Defendants have, nonetheless, now gone to great lengths to have "Exhibit X" stricken in a seemingly spiteful filing of the present Motion.   Defendants contend that the demonstrative exhibit must be stricken because it was filed "after the expiration of the briefing schedule and without leave of the Court."   Defendants further imply that they were prejudiced by this late filing because "Defendants' reply brief was based on the totality of Plaintiff's response brief," which did not include Exhibit X.

The Court is unpersuaded that Defendants suffered any prejudice whatsoever. The facts alleged and the actual evidentiary sources were clear in Plaintiff's responses. Defendants were never hindered in responding to the "totality" of Plaintiff's evidence. Moreover, Plaintiff has reasonably explained that the late filing was caused by an unintentional, clerical error.   Plaintiff in fact sought instruction from the Clerk's office when the error was discovered, and the late filing was suggested as a cure.

The Court thus finds that Plaintiff operated in good faith and not with the intent to hinder or delay Defendants' reply in filing the exhibit out of time.   More importantly, Defendants suffered no prejudice by the late filing.   The factual allegations were supported by other evidence, and the exhibit itself is not evidence.   Defendants' "Motion to Strike Exhibit X" is accordingly **DENIED**.

Defendants' Motion to Strike "Exhibit X" is also **MOOT**.   Clearly, this Court may only consider the *evidence* provided by the parties on summary judgment.   Thus, while a demonstrative exhibit may be helpful, the sources for "Exhibit X" and the other evidence cited are what are to be considered by the Court in ruling on Defendants' Motion. (See Deposition of Steve Sinclair, October 20, 2010 [Doc. 40] & Defendant Best Value's "Answers to Plaintiff's First Interrogatories" [Doc. 63-3]).

B.   Motion to Strike Paragraph 14 of Stowe Affidavit

In their other Motion to Strike, Defendants seek to have the Court strike paragraph 14 of the affidavit provided by Plaintiff's expert, Harold Stowe.   Therein, Mr. Stowe avers that

> the value of property in the southeast including the states of South Carolina, North Carolina, Georgia, and Tennessee appreciated from 2002[,] when H&S acquired the land shown on the balance sheets[,] until January 2007[,] when it sold that land to Best Value for prices much less than the cost at which it purchased that land. These opinions are based upon statements kept by appraisers, bankers, real estate agents and are reflected

in the public records of the [c]ounties in which H&S operated, which are generally recognized as reliable.

(Stowe Aff. at ¶ 14).   Defendants contend that this is impermissible opinion testimony and that the statement should be stricken from the affidavit because (1) Mr. Stowe has not demonstrated the "necessary knowledge, skill, experience, training, or education" to offer an opinion on the value of real property; (2) the "opinion" is not based on sufficient facts or data; (3) Mr. Stowe did not utilize reliable methods in determining the value of the real property belonging to H&S Homes; and (4) Mr. Stowe was not tendered as an expert on real estate value.

To the extent that Mr. Stowe may attempt to proffer expert testimony as to the actual fair market value of the specific parcels of land previously owned by H&S Homes, Defendants are correct.   He is not qualified to offer such testimony, has not demonstrated the expertise or a reliable basis for making such an opinion, and was not tendered as an expert on this issue.

The admission of expert testimony is guided in federal court by the Federal Rules of Evidence, particularly Rules 702 and 703.   Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

12

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended effective Dec. 1, 2011).   Thus, simply stated, expert testimony is admissible only upon a finding that the expert is qualified to testify competently regarding the matters he intends to address and that the methodology by which the expert reached his conclusions is sufficiently reliable. See McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

It is apparent from a consideration of these factors that Mr. Stowe should not be allowed to testify as to the specific market value of the H&S land when it was sold. Plaintiff proffered Harold Stowe as an expert in the fields of corporate governance, finance, and business practices. (See Stowe Aff. [Doc. 214]).   The scope of his inquiry was thus limited to whether H&S Homes and the other Defendants varied from industry standards for corporate governance, corporate decision making, corporate conduct, and business practice when making certain decisions.   Defendants do not object to his qualifications to testify as to these matters.   Mr. Stowe, however, has not demonstrated that he has any expertise, training or experience in land valuation; nor has he demonstrated that he relied on sufficient facts and data to offer an opinion as to the actual fair market value of the specific parcels of land in issue.   Accordingly, he will not be permitted to testify as to such matters.

It does not appear, however, that Mr. Stowe is necessarily offering an opinion as to the actual market value of the land at issue.   Contrary to Defendants' assertion that Mr. Stowe is impermissibly offering an opinion that "the value of the land purchased by H&S Homes, LLC appreciated from 2000 to 2007," the affidavit shows that his statement is much less specific, indicating only that land in this region of the country generally appreciated during this time period.   In fact, a full reading of his affidavit suggests that this statement may not necessarily be Mr. Stowe's "opinion" at all, but a description of the data used to support his opinions, specifically his opinion that "[c]ertain assets . . . transferred . . . by H&S were transferred . . . for less consideration than the fair market value of the asset transferred or reclaimed." (Stowe Aff. at ¶ 16) (listing Mr. Stowe's various "opinions").

Defendants do not object to Mr. Stowe's qualifications or expertise to offer *this* opinion.   Indeed, an expert in the field of corporate governance, finance, and business, like Mr. Stowe, is qualified to review the financial records, relevant business environment, and actions of those involved to determine whether a business transaction was conducted within the generally accepted business or corporate standards. Likewise, a corporate decision to sell property for less than its value may, under certain circumstances, be one that falls below the generally accepted business standards.

Mr. Stowe's testimony as to these matters would be admissible.   Not only is Mr. Stowe qualified to make that opinion within the scope of his expertise, he has also identified a reliable, accepted basis for forming that opinion.   Mr. Stowe relied, in part, on statements by appraisers, bankers, real estate agents, and public records in the counties in which H&S operated which apparently demonstrated a general economic condition of growth and land appreciation during the relevant time period.   Defendants do not dispute whether these are the kind sources that experts in Mr. Stowe's field would normally rely on when forming an opinion about the appropriateness of a business transaction.   See Fed. R. Evid. 703; Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 648 (10th Cir. 1991) (explaining that expert may rely upon facts outside the record if they are the kind that experts in his field reasonably rely on in forming opinions). Indeed, it seems that experts in Mr. Stowe's field would reasonably rely on information about the general economic conditions at the time of a transfer (such as those indicating a trend of appreciation) when evaluating transactions that involve the sale of corporate land assets.   Experts may also rely on the opinions of other non-testifying experts when reaching their conclusions. See U.S. v. Winston, 372 Fed. Appx. 17, 20 (11th Cir. 2010) (finding that district court did not err by admitting testimony of an expert witness who relied in part on another expert's report).   Mr. Stowe could thus properly rely on the

statements by qualified non-testifying experts in real estate valuation when forming his broader opinions.   See id.

Obviously, however, the data cited by Mr. Stowe is much too vague, standing alone, to support an opinion that the specific parcels of land owned by H&S actually appreciated in value between the time they were purchased by H&S and when they were sold at auction in 2007.   The fact that land in that area *generally* appreciated does not prove that the specific parcels appreciated or to what extent they may have appreciated.   There is no doubt that some parcels of land in the Southeast may have even depreciated during that time period.   Thus, more specific calculations addressing each individual parcel of land would be required to form an opinion about the land value, and it would have to be offered by an expert properly qualified in that field. See U.S. v. 33.5 Acres of Land, More or Less, Okanogan County, State of Wash., 789 F.2d 1396, 1401 (9th Cir. 1986) ("The preferred means of determining [land] value is by referring to sales of comparable property."); In re Vallambrosa Holdings, L.L.C., 411 B.R. 899, 908 (S.D. Ga. 2009) (finding that a "[l]and sales comparison approach represents the more reliable method of determining value.").   An opinion as to land value based only on the general data cited by Mr. Stowe would thus be inadmissible. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 2140 (11th Cir. 2005) (excluding expert testimony based "broad principles of pharmacology" instead of specific scientific data or testing).

16

On the other hand, the general proposition cited by Mr. Stowe may be considered among other evidence in reaching the larger opinion for which Mr. Stowe is qualified to state.   Indeed, Mr. Stowe indicates that in forming his opinions, he also relied on the deposition testimony of Defendant Steve Sinclair [Doc. 40] and Defendant Best Value's Objections and Answers to Plaintiff's First Interrogatories [Doc. 63-3].   (See Stowe Aff.) These sources indicate that some of the land lots sold to Defendant Best Value were purchased for a portion of the price H&S paid for them and that Best Value then sold the lots within that same year for a significant profit.[1]   Thus, while the data indicating a generalized appreciation in property between 2002 and 2007 may not by itself prove an increase in value of the specific land at issue, the subsequent sale of this land for a significantly higher price in the very same year certainly suggests that Best Value may have paid less than market value for those properties.   These facts together (and when combined with other evidence considered by Mr. Stowe) do provide a sufficient and reliable basis to support Mr. Stowe's opinions that H&S departed from accepted business standards when it transferred assets for less than fair market value.

Of course, Defendants have pointed to contrary evidence as to the actual value of

---

[1] For example, Defendant Best Value's Answers to Plaintiff's First Interrogatory [Doc. 63-3 at ¶ 3] discloses that Best Value purchased properties from H&S for prices of $ 55,038.00 and $ 84,767.00 and sold the same lots for $ 103,105.76 and $ 130,641.24 later the same year.

the land sold.   Defendants seem to suggest that the price paid for the land at auction reflects the actual fair market value of the land better than the circumstantial evidence used by Mr. Stowe.   This challenge to Mr. Stowe's opinion, however, is one better handled on cross-examination than through the exclusion of expert testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).   Thus, the weight to be afforded Mr. Stowe's testimony regarding land value should be left to the fact finder.

For these reasons, paragraph 14 of Harold Stowe's affidavit need not be struck. The Motion to Strike Paragraph 14 of Mr. Stowe's affidavit is, therefore, **DENIED**.   For the purposes of Defendants' Motion for Summary Judgment, the Court also finds that the Motion to Strike Paragraph 14 is **MOOT**.   As will be discussed in detail below, the Court finds sufficient evidence to send Plaintiff's claims before a jury even in the absence of Mr. Stowe's "opinion."

C.  Motion for Summary Judgment

Defendants' primary motion before the Court is their Motion for Summary Judgment.   Therein, Defendants contend that they are entitled to judgment on any claims alleging transfers for less than "reasonably equivalent value" because Plaintiff

18

cannot produce evidence of the actual market value of the assets transferred by H&S Homes.   Defendants are correct that, to survive summary judgment on these claims, Plaintiff must identify some evidence that specific assets were transferred for amounts less than "reasonably equivalent value."   See O.C.G.A. § 18-2-74(a)(2); § 18-2-75(a).

The Court does not agree, however, with Defendants' assertion that Plaintiff must come forward with direct evidence of the actual market value for each specific asset sold. While such direct evidence would certainly prove Plaintiff's case, Defendants have cited no law (and this Court found none) that prohibits proof of Plaintiff's claims through circumstantial evidence.   On the contrary, the Court finds that Plaintiff's circumstantial evidence is highly relevant to this issue.   The determination of whether fair consideration has been given for a transfer depends upon the circumstances surrounding each case and will almost always be a question of fact for a jury to decide. See Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 830 n. 5 (5th Cir. 1959), *cert. denied* 362 U.S. 962, 80 S. Ct. 878, 4 L.Ed. 2d 877);[2] see also In re Darrow Auto. Group, Inc., 2011 WL 1321504 at *5 (Bkrtcy. S.D. Ga. May 29, 2011) ("Whether a debtor receives reasonable equivalent value for an alleged fraudulent transfer is a question of fact.").

---

2 See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

Moreover, in this case, the lack of any pre-sale appraisal or comprehensive inventory of the assets sold likely foreclosed any possibility that Plaintiff could retroactively calculate the actual value of each asset.   It is undisputed that Defendants did not order any appraisals or take any inventory of the assets prior to the sale and that many of the office units were sold complete with their attachments and various contents, without any photograph or description thereof.   Thus, there is likely nothing on which to base an exact valuation, and any estimated actual market value of H&S assets would most surely be attacked by Defendants as being speculative.

In the absence of evidence of actual market value, however, Plaintiffs have identified circumstantial evidence that Defendants transferred H&S assets for less than a "reasonably equivalent value."   Among other things, this circumstantial evidence includes (1) documents and testimony showing that H&S assets were sold for less than "book value"; (2) documents and testimony suggesting that H&S assets had an actual value higher than indicated by the "book value"; (3) testimony that the decision to conduct an absolute auction did not conform with accepted business practices and resulted in the sale of H&S assets at prices less than their value; and (4) documents and testimony suggesting that the auction was not an attempt to get the highest possible prices for the assets sold, but a sham devised to protect Horton assets.

(1) H&S assets were sold for less than "book value."

In addition to the H&S "disposal reports" plainly illustrating the loss for each asset sold, Defendant Sinclair testified in detail about the cost adjusted basis and loss on every office unit owned by H&S as well as the original cost of the land lots sold as compared to the price brought at auction.  For example, in a relevant portion of the Sinclair deposition cited by Plaintiff, he admits that land lots purchased by H&S at $13,079.00, $13,210.00, and $13,111.00 were sold at auction to another Horton company for $6,600.00 each, a price approximately 50% of that paid by H&S.   (Sinclair Depo. Oct. 20, 2009 [Doc. 40] at 127).

Accounting expert Michael Thigpen similarly testified that his audit of H&S financial records revealed that office and storage buildings having an acquired value of $1,538,197.00 and accumulated depreciation of $323,388.00 were disposed of for $293,000.00 (for a realized loss of $ 922,008.00) and that many valuable assets were actually disposed of for nothing including (i) office furniture and equipment having an adjusted basis of $ 24,000.00, (ii) land improvements having an acquired value of $2,376,573.00 and depreciation of only $ 1,400,588.00; and (iii) add-ons having a value over $1,500,000.00. (Thigpen Depo. April 19, 2011 [Doc. 205] at pp. 55-58).

(2) H&S assets had an actual value higher than indicated by their "book value."

Both Defendant Steve Sinclair and accounting expert Michael Thigpen also testified that H&S depreciated many of its assets at a higher rate than generally used, suggesting that the actual value of some assets may have been higher than the "book value" shown in the reports.   (See Sinclair Depo at 36-37; Thigpen Depo. at 30-31).

In its Answers to Plaintiff's First Interrogatories [Doc. 63], Defendant Best Value further admitted that some of the land it purchased from H&S at auction was sold later that year for a significantly higher price.   For example, Best Value purchased Lot 18 in Deer Field Estates at auction in January 2007 for $ 55,038.00 and then sold the property in November 2007 for $ 87,819.08.   Lot 19 in the same area was likewise purchased for $55,038.00 and sold in November of 2007 for $ 103,150.76, and Lot 88 in Grace Chapel was purchased at auction for $66,067.00 and then sold in October of 2007 for $ 98,927.04.

(3) <u>The absolute auction was an unusual business decision and resulted in the sale of H&S assets at prices less than their value</u>

The affidavit of Plaintiff's business expert, Harold Stowe, states that the decision to sell H&S assets in piecemeal fashion at an absolute auction made no sense from a business standpoint and resulted in the sale of H&S assets at prices less than their value. He explains that land belonging to H&S was sold for prices less than what H&S originally paid for it and opines that Defendants further departed from accepted business practices by disposing of H&S furniture, equipment, add-ons, land,

22

improvements, office/storage buildings, signs, and office supplies, etc. without seeking

compensation from the Horton companies which received it. (Stowe Aff. [Doc. 214]).

    (4) <u>The January 2007 auction was not an attempt to get the highest possible prices for the assets sold.</u>

As noted above, Plaintiff's business expert opines that the decision to sell the

assets piecemeal instead of selling H&S as a going business or selling the lots as a

package "made no sense" from a business standpoint.   In his deposition, Defendant

Sinclair further admitted that the auction was "absolute" and thus no reserve was set to

ensure that a reasonably minimum price was received for the assets sold.   Sinclair also

testified that, in preparation for the sale, Defendants made no effort to inventory or

appraise the assets or to otherwise determine their value. (Sinclair Dep. at 114).

Other witnesses and documents suggest that outside marketing ads and

brochures for the auction contained errors and incorrectly advertised that reserves were

set.   Plaintiff's evidence likewise shows that the marketing materials were lack-luster,

difficult to find in newspapers, and failed to disclose the fact that office units were being

sold complete with their contents, add-ons, and improvements. (<u>See</u> Pl's Exhibits [Doc.

221-3]; Deposition of Tracy Marshal [Doc. 212] at p.8-9).   The brochures did, on the

other hand, impose problematic restrictions for outside buyers.   (<u>See</u> Pl.'s Exhibits;

Deposition of Ben Hudson [Doc.197] at 6-7).

It also undisputed that all of the office units auctioned were purchased by Defendant Best Value.   The office units were then leased to Triangle Defendants – the new Horton companies created to perform much the same business as H&S in many of the same locations.   Horton documents further suggest that the auction was simply part of an overall plan for the Horton companies to purchase H&S assets for the benefit of the Triangle Defendants and/or to protect Horton assets from creditors. (Deposition of Sid Williams [Doc. 207] Exhibits 4, 5, 6).

All of this evidence, when considered its totality, would be sufficient to support a jury finding that the H&S assets were transferred for less than "reasonably equivalent value."   Again, "[t]he question of whether fair consideration has been given for a transfer is largely a question of fact."   De Aragon v. Chase Manhattan Bank, 457 F.2d 263, 266-67 (1st Cir. 1972).   Therefore, a jury should be allowed consider the evidence presented and determine whether Plaintiff has proven her claims.

Notably, in their Motion for Summary Judgment, Defendants fail to address the majority of Plaintiff's evidence.   Defendants focus largely on Plaintiff's reliance on the "book value" assigned to H&S assets prior to the sale.   There is certainly no dispute that book value does not necessarily equate the "fair market value."   Book value, however, is indicative of a company's financial status, and often, the actual value of the assets on the books will actually be greater than the book value assigned to them.   Testimony

24

cited by Plaintiff suggests that this may have been the case at H&S.   As noted above, Steve Sinclair and Michael Thigpen both testified that, for tax reasons, the depreciation used by H&S was greater than the time-declining value of those items.

That is not to say, however, that Plaintiff's evidence regarding the book value (or "adjusted basis") of the H&S assets can be wholly determinative of value.   Like the question of whether reasonable consideration was paid, the question of "[w]hether the book value of [an asset] is . . . indicative of or equivalent to its market value is an issue to be determined by the trier of fact on a case by case basis."   Sears Roebuck and Co. v. Dallas Cent. Appraisal Dist., 53 S.W.3d 382, 391 (Tex. App. 2000).

Of course, the price actually paid for the asset at auction should also be considered.   As noted above, Defendants seem to assert that the price brought at auction is equivalent to the actual market value of the asset at the time of the sale.   This is not necessarily true.   See Ervin v. Arnold, 197 Ga. App. 841, 399 S.E.2d 548 (1990) (finding highest bid to be insufficient to authorize a finding of fair and reasonable value). While the highest bid on an item may be some evidence of its value, the price brought at auction will be determined largely by the manner in which the auction is conducted. For example, if an auction is held quickly, with limited bidders, and without reserve, an item appraised at $1,000.00 may easily be sold for $100.00.   In such a case, the buyer is said to have received a good deal; the item sold did not necessarily decrease in value

because of the auction.   That same buyer, under different circumstances, may then sell the same item at a sizable profit the very next day.   This in fact appears to be what Defendant Best Value did when purchasing the H&S lots at auction and then selling them for a sizable profit just months later.

On the other hand, the price paid for an asset at auction is certainly not irrelevant. Again, it is *some* proof of value under the circumstances.   Thus, the highest bid received for an H&S asset is just simply another factor which may be considered by the jury.   <u>See e.g.</u>, <u>Belans v. Bank of America, N.A.</u>, 309 Ga. App. 208, 709 S.E.2d 853 (2011).

Accordingly, in light of all of the evidence identified, the Court finds that Plaintiff has created a genuine issue of material fact with respect to whether H&S assets were transferred for less than "reasonably equivalent value."

## CONCLUSION

Defendants' Motion for Summary Judgment on their Ninth Defense [Doc. 165] is **DENIED**. Defendants' related Motions to Strike [Docs. 238 & 262] are both **DENIED** and deemed **MOOT**.

Because the Court further finds that the issues raised in the present motions were sufficiently briefed by the parties, no further briefing or oral argument is required. Accordingly, Plaintiff's Motion to File a Sur-Reply [Doc. 247] and the parties' Motions for Oral Argument [Doc. 172 & 178] are also **DENIED**, in relevant part.

SO ORDERED this 20th day of January 2012.

S/   C. Ashley Royal
C. ASHLEY ROYAL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

jlr