THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

TERRY CARTRETTE TINDALL, :
 :
  Plaintiff, :
 :
v. : Civil Action
 : No. 5:10-CV-044(CAR)
H & S HOMES, LLC, et. al., :
 :
  Defendants. :
_____

## ORDER ON PLAINTIFF'S MOTIONS TO EXCLUDE
## CERTAIN OPINIONS OFFERED BY DEFENDANTS' EXPERTS

Currently before the Court are Plaintiff's Motions in Limine to Exclude Certain Expert Opinions [Docs. 293 & 299].   Through the present action, Plaintiff Terry Tindall is, among other things, attempting to (1) establish Defendant H&S Homes, L.L.C. as an alter ego of Defendants Horton Homes, Inc., Horton Industries, Inc., N. Dudley Horton Jr., The N. Dudley Horton Revocable Trust, and Triangle Homes, L.L.C. and (2) attack certain conveyances between Defendant H&S Homes and the Horton Defendants as fraudulent.   To refute these claims, Defendants have identified two expert witnesses: Robert J. Taylor and Charles Campbell.   Robert Taylor, an accounting and finance expert, intends to offer opinions regarding Defendants' corporate structure, finances, and the valuation of assets – so as to refute Plaintiff's contention that H&S was merely an

1

alter ego of the Horton Defendants.   Defendants offer the opinions of Charles Campbell, an expert in bankruptcy and dissolution of corporate assets, in response to Plaintiff's claim that the transfers of H&S assets were fraudulent transactions under Georgia law – as he seeks to testify that the Horton Defendants employed reasonable and customary methods when disposing of the H&S assets and that their actions were fair to creditors.

Plaintiff now seeks to have the Court exclude the opinions offered by these experts under Federal Rules of Evidence 702.

## I.      Standard of Review under Rule 702

The admission of expert testimony is guided in federal court by the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended effective Dec. 1, 2011).  Thus, simply stated, expert testimony is admissible only upon a finding that the expert is qualified to testify competently regarding the matters he intends to address, that the methodology by which the expert reached his conclusions is sufficiently reliable, and that the expert's

testimony will assist the trier of fact.   See McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

Of course, "experts may be qualified in various ways."   Frazier, 387 F.3d at 1260. An expert's training or education can provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.   Id. at 1260-61.   Because "experts come in various shapes and sizes[,] there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." Santos v. Posadas de Puerto Rico Assocs., 452 F.3d 59, 63 (1st Cir. 2006).   The district court, therefore, must focus its inquiry on whether the expert has the requisite knowledge, skill, experience, training, and education to offer the testimony he intends to introduce. Fed. R. Evid. 702.

As to reliability, trial courts must assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).   This inquiry must focus "solely on the principles and methodology [of the expert], not on the conclusions that they generate."   Id. at 595.

In conducting this inquiry, the district court can consider many factors.   In Daubert the Supreme Court suggested that, when evaluating the reliability of an expert's

scientific testimony, a district court consider the (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance of an expert's opinion. 509 U.S. at 593-95.  These factors are not generally applicable in the context of non-scientific testimony, however.  See Fed. R. Evid. 702, advisory committee note (2000 amends.); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).  In such cases, the advisory committee notes for Rule 702 suggest that courts consider factors such as:

> (1) Whether the [expert is] proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation, or whether [he has] developed [his] opinion expressly for purposes of testifying;
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
>
> (3) Whether the expert has adequately accounted for obvious alternative explanations;
>
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;
>
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee note (2000 amends.) (citations and internal quotations omitted).

Expert testimony must also actually help the trier of fact to understand the facts in evidence or to determine a fact in issue.  Fed. R. Evid. 702(a).  Expert testimony does so

4

"if it concerns matters that are beyond the understanding of the average lay person."

Frazier, 387 F.3d at 1262.   "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63.   Expert testimony also does not help the trier of fact if it fails to "fit" with the facts of the case.   McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004).   This occurs when "a large analytical leap must be made between the facts and the opinion." Id.   The court may also exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1121 (10th Cir. 2004).

Ultimately, Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative, unreliable, and irrelevant opinions do not reach the jury.   See Daubert, 509 U.S. at 589 n.7; McCorvey, 298 F.3d at 1256; McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1237 (11th Cir. 2005).   At the same time, however, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.   A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1311 (11th Cir. 1999).   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S.

5

at 596.   The court's duty is thus limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence." <u>Frazier</u>, 387 F.3d at 1272.

With the above legal standards in mind, the Court will address the challenged opinions of each expert in turn below.

**II.      Opinions Offered by Robert J. Taylor**

According to his Expert Report [Doc. 294], Robert J. Taylor is a Certified Public Accountant ("CPA"), who holds degrees in both economics and finance and an accreditation in business valuation.   (Designation & Expert Report of Robert J. Taylor [Doc. 294] at 5).   Mr. Taylor has nearly thirty years of experience as a consultant specializing in accounting, finance, and valuation issues for both publicly traded and privately held companies in a wide range of industries. (<u>Id.</u> at 4).

In retaining Mr. Taylor, Defendants asked that he review the facts and circumstances of the present case and offer his opinion as to (1) whether the facts as presented to him support the requirements for establishing Defendant H&S as the alter-ego of Horton Industries, Horton Homes, Dudley Horton, and the Horton Trusts; (2) whether the facts as presented support the requirements for establishing H&S as the alter-ego of the Triangle Entities; and (3) the valuation of assets. (<u>Id.</u> at 1).   Mr. Taylor has thus offered opinions about the Horton Defendants' business, financing, corporate structure, and how the H&S assets were valued:

6

**Opinion 1:** The Trusts, Horton Industries, Horton Homes and H&S have consistently operated as separate legal entities within the normal course of business operations observed in the manufactured home industry.

*Management*: H&S managed its affairs as a separate entity.  Although some members of the management of H&S were also involved in the management of Horton Homes, management decisions for H&S were always made separately, and distinctly, from any management decisions of Horton Industries and Horton Homes.

*Assets and Liabilities:* H&S's assets and liabilities have always been maintained separately from Horton Homes' assets and liabilities.  Sales lots operated by H&S were either titled in H&S or leased by H&S. Manufactured home inventory held by H&S were titled in H&S and sold at retail to the consuming public by H&S.  Likewise, the Trusts held their own assets and liabilities separately.

*Employee Workforce:* H&S maintained its workforce at its locations, entirely separate from Horton Homes' workforce located at the manufacturing facility in Eatonton, Georgia.   All of H&S' employees, except for one or occasionally two, were paid by H&S.   Horton Homes' employees are paid by Horton Homes.

*Books and Records:* H&S has always maintained its own books and records related to the operations, assets, and liabilities.   Likewise, Horton Homes maintains its books and records respecting its assets, liabilities, and operations. The Trusts also maintained their own tax returns and separate book and records.

*No Commingling:*  Neither the assets nor the liabilities of Horton Homes and H&S have been commingled.   Likewise the assets and liabilities of the Trusts have not been commingled with those of H&S."

**Opinion 2:** "The observed facts support that Horton Industries, Horton Homes and H&S dealt at arm's length and always formally recognized the separate existence of on each other."

**Opinion 3:** "Horton Homes and H&S each maintained its own separate financial records, each independently owned assets and paid expenses, and each always accounted for inter-corporate loans between the two of them."

**Opinion 4:** "Horton Homes used reasonable methodologies for allocating the costs of shared administrative employees and office space."

**Opinion 5:** "H&S Homes at all times made its own decisions through its own management, despite the fact that one, or occasionally two, members of Horton Homes' management were also a manager at H&S."

**Opinion 6:** "Horton Industries and Horton Homes demonstrably respected the separateness of H&S, despite the parent/subsidiary relationship between the entities."

**Opinion 7:** "The Trusts each maintained its own assets and liabilities, financials and filed separate federal and state tax returns."

**Opinion 8:** "The Triangle Entities each maintained separate financials and functioned as separate operating companies."

**Opinion 9:** "A review of records show separateness and do not support Plaintiff's contention that 'H&S is the alter ego of Horton Homes, Inc., which is the alter ego of Horton Industries, Inc., which is the alter ego of N. Dudley Horton, Jr."

**Opinion 10:** "The facts as presented do not meet the requirement for establishing H&S as the alter ego of Mr. Horton in accordance with my understanding, as a financial and accounting expert, of the Georgia standard for piercing the corporate veil of H&S."

**Opinion 11:** "The facts as presented do not meet the requirement for establishing H&S as the alter ego of the Trusts in accordance with my understanding, as a financial and accounting expert, of the Georgia standard for piercing the corporate veil of H&S."

8

**Opinion 12:** "The facts as presented do not meet the requirement for establishing H&S as the alter ego of Triangle, Beacon, Regal, or New Generation in accordance with my understanding, as a financial and accounting expert, of the Georgia standard for piercing the corporate veil of H&S."

**Opinion 13:** "The facts as presented do not meet the requirement for establishing H&S as the alter ego of Horton Industries, Horton Homes, or Defendants in accordance with my understanding, as a financial and accounting expert, of the Georgia standard for piercing the corporate veil of H&S. . . ."

**Opinion 14:** "Accounting book value of a company or its assets does not represent the economic value of those assets, especially in the event of a liquidation situation."

(Id. at 2, 18).

Though not labeled as "opinions" or "conclusions," Mr. Taylor's Report also includes other observations about H&S, the "Triangle Entities," the manufactured home industry, Georgia law on "alter ego" and limited liability companies, and the valuation of assets.   These are identified as "Additional Opinions" in Plaintiff's Brief [Doc. 293-1]. As to these matters, Mr. Taylor specifically discusses (1) what he has been told about the management, corporate design, history, and financial condition of the former H&S Homes and the newly formed "Triangle Entities" (Pl.'s Additional Opinions 15, 16, 20, 21, & 23); (2) information he has learned about the manufactured home industry as a whole and the "observed corporate structures" of seven other companies in the industry (Pl.'s Additional Opinion 19); (3) how he understands Georgia's "alter ego test" and the

nature of limited liability companies (Pl.'s Additional Opinions 17, 18, & 24); and (4) "generally accepted principles" in asset valuation (Pl.'s Additional Opinion 22).

The primary issue for this Court is whether Mr. Taylor's opinions are reliable. See Fed. R. Evid. 702; Daubert, 509 U.S. at 589 n.7.   In large part, Mr. Taylor's opinions do satisfy the reliability factors to be considered by the Court.   See id.; Fed. R. Evid. 702, advisory committee's note.   Indeed, those opinions that the Court will admit are the types of opinions that CPAs commonly give, and in reaching these opinions, Mr. Taylor generally employed the tools and training that a CPA uses in his regular accounting practice.   He in fact reviewed hundreds of pages of documents, including detailed financial records, (see Taylor Report at Apx. C), and his factual conclusions logically arise from the information he reviewed.   Mr. Taylor's deposition testimony also indicates that he accounted for obvious alternative explanations.   Opposing counsel vigorously cross-examined Taylor about his conclusions, and Taylor clearly explained why he reached conclusions contrary to those explanations posed by Plaintiff.   (See e.g., Taylor Dep. [Doc. 296] at 17-23) (concerning Taylor's opinion about the "commingling" of assets).

As shown below, however, not all of Mr. Taylor's opinions are admissible.   In her Motion in Limine, Plaintiff specifically objects to the admission of Mr. Taylor's enumerated opinions that either express the view that Defendants were "separate" or

had "separateness," (Opinions 1, 2, 5, 6, 8, & 9) or otherwise apply Georgia law as it pertains to "alter ego" or "piercing the corporate veil" (Opinions 10-13).   She also objects to *all* of Mr. Taylor's "Additional Opinions."   Plaintiff asserts that Mr. Taylor is not qualified to offer opinions as to whether H&S was merely an alter ego of the Horton Defendants and that these opinions should be excluded as irrelevant and impermissible legal conclusions.   As to reliability, Plaintiff argues that Mr. Taylor has simply "regurgitated [facts] a party has told him," that he makes "unjustified extrapolations" based upon these facts, and that his opinions would be not be helpful to the jury.

The Court agrees that Mr. Taylor is neither qualified to offer an opinion about Georgia law nor authorized to make legal conclusions as to whether H&S Homes may be considered the "alter ego" of any Defendant.   Such opinions involve matters reserved for courts under an alter ego analysis and exceed the expertise of an accounting and finance expert.   See Rochester Gas & Elec. Corp. v. GPU, Inc., 355 F. Appx. 547, 551 (2d Cir. 2009) (explaining that "it was for the court alone to determine whether the facts met the standard for piercing the corporate veil"); Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co., no. CIV-05-445-c, 2008 WL 7211982, at *3 (W.D. Okla. Nov. 21, 2008) (accounting expert could not offer his "summary and understanding of the relevant legal rules applicable to whether one corporation can be held liable for the actions undertaken by another related corporation").

11

Mr. Taylor does not have any legal experience or training that would qualify him to offer such opinions.   He is not a lawyer and has no prior experience as an expert on the issues of corporate separateness, alter ego, or piercing the corporate veil.   (Taylor Dep. at p. 7, 12).   However, even if he was qualified to form these types of opinions, Mr. Taylor would still not be "permitted to articulate and apply the relevant law and, thereby, circumvent the jury's decision-making function by telling it how to decide [this] case." Id. (citing Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988)); see also Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law."); United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977) ("courts must remain vigilant against the admission of legal conclusions"); United States v. Long, 300 F. App'x. 804, 814 (11th Cir. 2008) ("An expert witness may not testify as to his opinion regarding ultimate legal conclusions."); United States v. Oles, 994 F.2d 1519, 1523 (10th Cir. 1993) (testimony that articulates and applies the law is inadmissible notwithstanding Rule 704's authorization of testimony on ultimate facts).

Accordingly, Mr. Taylor's opinions regarding the legal "separateness" of Defendants or the extent of their liability under an alter ego theory shall be excluded. See Sheet Metal Workers Int'l Ass'n Local Union No. 67 v. Todd-Ford Mgmt. Co., no. SA-03-CA-290-XR, 2005 WL 5977617, at * 2 (W.D. Tex. July 12, 2005) (expert could not

"offer conclusions of law, namely whether the companies are alter egos of one another"). These opinions are simply Mr. Taylor's "attempt to apply the law as he understands it to the facts of this case." <u>Ponca Tribe</u>, 2008 WL 7211982, at *3.

On the other hand, some of Mr. Taylor's opinions about Defendants' corporate structure and finances can be categorized as factual conclusions falling within the expertise of an accountant and someone experienced in examining complex financial records and corporate relationships.   Mr. Taylor may properly testify about these matters.   See <u>e.g.</u>, <u>Rochester Gas & Elec.</u>, 355 F. App'x. at 551 (finding no error where expert only testified about corporate structure and corporate dominance and did not state any legal conclusions); <u>Ward v. Healthsouth Corp.</u>, 2006 WL 5349213 *1 (W.D. Okla. Jan. 4, 2006) (allowing expert to testify about the indicia of corporate separateness "as long as he does not get too close to 'directing a verdict'"); <u>Sheet Metal Workers</u>, 2005 WL 5977617, at * 2 (expert permitted to testify as to how companies were organized but could "not offer conclusions of law, namely whether the companies are alter egos of one another").

Thus, insofar as Mr. Taylor's testimony is grounded only in fact, the Court finds that he is qualified to offer testify about Defendants' corporate structure and finances and that this testimony may be helpful to the jury.   Mr. Taylor is, undisputedly, an expert in accounting and finance, and the complex corporate transactions and

13

relationships involved in this case are likely "beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262.   At the very least, Mr. Taylor's testimony may assist the jurors in comprehending the financial data and business records in evidence. See e.g., Maher v. Cont'l Cas. Co., 76 F.3d 535, 542 (4th Cir. 1996).   The jury can then take into account all the facts indicating "separateness" of the legal entities involved in this case when deciding whether the companies were sufficiently "separate" under Georgia law, as it is explained by the Court in a jury charge.

If, as Plaintiff contends, Mr. Taylor has overstated the facts within his knowledge (about the management, corporate design, history, and financial condition of H&S Homes and Triangle Entities), this may certainly be brought to the jury's attention through cross-examination.   As Plaintiff points out, Mr. Taylor uses broad terminology – i.e., his opinions that Defendants "*consistently*," "*always*," and "*at all times*" acted in a certain way.   Many of the facts on which Mr. Taylor bases his opinions may also have been provided by a biased source, i.e. the Defendants and defense counsel.   However, these potential weaknesses in his testimony are not necessarily grounds for exclusion because they only go to the weight of the opinions not their admissibility. Daubert, 509 U.S. at 596; Fed. R. Evid. 703 ("[a]n expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed") (emphasis added); Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987) ("Questions relating to the

14

bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); see also Primrose Operating Co. v. Nat'l Amer. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004) (fact that expert did not personally review all the records at issue and provided only general descriptions may have weakened his testimony but did not require that his opinions be excluded); Sheet Metal Workers, 2005 WL 5977617, at *2.

Moreover, in this case, it appears that Mr. Taylor did *not* rely solely on his interviews with or the testimony of Defendants when forming his opinions.   He also examined various corporate documents, financial statements, audit and disposal reports, tax returns, and filings with the Securities and Exchange Commission. (Taylor Report, Appx. C. & Dep. at 14-17, 41-43).   These certainly appear to be the types of documents an expert in Mr. Taylor's field would normally rely on to form opinions about corporate structure, accounting, and finance.   Plaintiff does not contend otherwise.   As such, the court will not exclude his factual conclusions about Defendants' general business practices. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" is the more appropriate means of attacking this testimony.   Daubert, 509 U.S. at 596.

Thus, Plaintiff's Motion in Limine will be granted only in part.   Mr. Taylor will not be allowed to offer his Opinions 6, 9, 10, 11, 12, & 13 (as enumerated above) and

15

"Additional Opinions" 17, 18, & 24 (as identified in Plaintiff's Brief p. 4-8).   However, the Court will allow Mr. Taylor to testify as to Opinions 1, 2, 3, 5, 7, & 8 and "Additional Opinions" 15, 16, 19, 20, 21, & 23 to the extent that such opinions are offered in terms of factual conclusions made within the scope of Mr. Taylor's expertise in finance and accounting.[1]   Thus, for example, Mr. Taylor may testify as to whether Defendants' assets and liabilities were "commingled," as this can be established as a question of fact, but he may not offer a legal definition of "commingling" or offer any opinions about the legal relevance commingled assets.

Mr. Taylor may also testify about matters related the valuation of assets – Opinions 4 & 14 and "Additional Opinion" 22.   Plaintiff does not challenge his qualifications to testify about such matters, and the Court finds that this testimony will also assist the jury.   Frazier, 387 F.3d at 1262; see e.g., Maher, 76 F.3d at 541 (testimony would assist the jury in comprehending business records and financial data). Moreover, under Rule 702, Mr. Taylor is "not required to testify only in the form of opinions;" he is also permitted to "give a dissertation or exposition of [general] principles relevant to the case, leaving the trier of fact to apply them to the facts." See

---

1. The Court cautions Mr. Taylor to avoid using terminology that simply mirrors the language generally used when articulating the legal standard for piercing the corporate veil or Georgia's alter ego analysis. See Long, 300 F. App'x. at 814 (citing United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988) (expert's opinions that "drew directly upon the language of the statute and accompanying regulations . . . were legal conclusions that were highly prejudicial and went well beyond his province as an expert")).

Huffman v. Union Pac. R.R., 675 F.3d 412, 431 (5th Cir. 2012) (citing Fed. R. Evid. 702, advisory committee's note (1972 proposed rules)).

Defendants should note, however, that Mr. Taylor will not be permitted to testify to any great extent about the corporate design of other companies within the manufactured home industry.   He does not purport to be an expert in the industry, and other companies' corporate design and financial strength have little if any relevance to this case.   See Allison, 184 F.3d at 1311-12; Fed. R. Evid. 403.

Mr. Taylor is also prohibited from offering an opinion or making any inferences about Defendants' intent, i.e., whether Defendants intended "to defeat justice, perpetuate fraud, or to evade contractual or tort responsibility" (Taylor Report at 18 & Dep. at 24) when they transferred H&S assets.   "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Rezullin Prod. Liab. Litig., 309 F. Supp. 2d 531, 514, 546-47 (S.D.N.Y. 2004)

Plaintiff's Motion to exclude opinions offered by Mr. Taylor is accordingly **GRANTED** in part and **DENIED** in part.

## III.    Opinions Offered by Charles E. Campbell

Defendants' second expert, Charles E. Campbell, is an attorney who practiced law for almost thirty-eight years, specializing in bankruptcy law, corporate insolvency, and

the disposition of assets to creditors.  (Designation & Expert Report of Charles E. Campbell [Doc. 299-2] at 1).   In the course of his legal career, Mr. Campbell handled engagements that required him to focus on the disposition of unencumbered assets in a manner that would be fair to creditors. (Id.).   Some of his engagements also involved conducting public auctions of assets and the representation of debtors who were attempting to reorganize in bankruptcy court and continue their business. (Id.).

Drawing on this experience, Mr. Campbell offers three opinions:

**Opinion 1:** "[T]he six alternatives outlined in the August 31, 2006 Memorandum (the "2006 Memo") from the attorneys for H&S outlining ways to close down the company and/or dispose of its unencumbered assets are methods of disposition and liquidation customarily and usually employed by businesses facing the financial situation confronting H&S in the second half of 2006.  .  .  . [E]ach of the six methods, properly implemented, results in a disposition of assets that is fair to the creditors."

**Opinion 2:** "[A]lternative four in the 2006 Memo, as implemented, was a reasonable liquidation of assets of H&S and one that was very similar to the results that would likely have been obtained in a liquidation in the Bankruptcy Court without the attendant expenses of the bankruptcy."

**Opinion 3:** "The net proceeds of the auction in this case (with the exception of about $90,000.00 paid to an affiliate of H&S by mistake), combined with the funds already held by H&S from the operation of its business or the liquidation of other assets, were paid to unaffiliated third-party creditors, which resulted in their claims being paid substantially in full. As a result of this liquidation, . . . unaffiliated third-party creditors received at least as much as they would have received if assets had been liquidated in a bankruptcy proceeding and very likely received a significantly greater payment of their claims."

(Id. at 3-5).

In her second Motion in Limine, Plaintiff generally objects to all of these opinions (and to statements made in support thereof) on the grounds that Mr. Campbell's statements are "irrelevant," "unreliable," "legal conclusions" and would thus "confuse the jury." The Court is not persuaded by Plaintiff's conclusory challenges.

Indeed, many of Mr. Campbell's opinions are relevant, factual conclusions. As noted at the outset, the purpose of Mr. Campbell's testimony is to rebut Plaintiff's allegations that the August 31, 2006, Memorandum (recommending alternative methods of dissolving H&S Homes) is proof of an intent to defraud creditors, specifically judgment creditors like Plaintiff. See O.C.G.A. § 18-2-74(a)(1) (defining a fraudulent transfer as one made "with actual intent to hinder, delay, or defraud any creditor"). It is apparently Defendants' hope that Mr. Campbell can persuade the jury that the 2006 Memorandum is *not* proof of an intent to defraud creditors, but rather a presentation of legitimate ways to close a company operating under the financial circumstances like those facing Defendant H&S Homes.

In this context, Mr. Campbell opines that the options considered by Defendants, the process in which they liquidated assets, and the ultimate result reached in this case were customary, reasonable, and fair to third-party creditors. Contrary to Plaintiff's assertions, the Court does not find these to be impermissible legal conclusions.

19

Campbell is not directing a verdict through this testimony or otherwise providing an opinion on the ultimate question of law.   He has in fact testified that he could *not* offer an opinion as to Defendants' motive or intent (Campbell Dep. [Doc. 301] at 40); and he has not offered any opinion as to whether the auction of H&S assets were fraudulent transfers under Georgia law.   See O.C.G.A. §§ 18-2-74, 18-2-75.

Of course, Mr. Campbell may be offering an opinion that goes to an ultimate issue in this case, i.e. whether the auction was a "reasonable liquation of assets;" but such testimony is permissible.   See Fed. R. Evid 704 ("An opinion is not objectionable just because it embraces an ultimate issue.").   There is in fact very little difference in this type of testimony and that proffered by Plaintiff's expert, Harold Stowe, wherein Stowe opines that many of Defendants' actions related to the auction were "not businesslike" or "made no sense from a business standpoint." (See e.g., Harold Stowe Affidavit & Disclosure [Doc. 314-3], at ¶ 16(H)).   The jury can certainly consider both opinions about the auction and reach their own conclusion in this case.

For the most part, the Court also finds that Mr. Campbell's opinions are reliable and may assist the jury understanding the evidence or determining a fact in issue.   See Fed. R. Evid 702.   Experts in Mr. Campbell's field are known to reach reliable opinions about the areas in which he will be permitted to testify.   See Fed. R. Evid 702, advisory committee's note (2000 amends.).   The Court also finds that Mr. Campbell is testifying

20

"about matters growing naturally and directly" out of his own experience, and he appears to be applying the same care as he would be in his regular professional work outside his paid litigation consulting.   See id.   Most importantly, the Court finds that much of his testimony will in fact be helpful to the jury, as the customary methods of liquidating a going business or terminating its operations, including the fair disposition of assets, are beyond the knowledge of most lay persons.   See e.g., LNC Invs., Inc. v. First Fidelity Bank, No. 92CIV7584, 2000 WL 1024717, *3 (S.D.N.Y. July 25, 2000) ("[a] lay jury will clearly require the assistance of expert witnesses to understand" the complex and specialized setting of bankruptcy law, trust indentures, and high corporate finance).

The Court notes Plaintiff's specific objection to Campbell's conclusions about what would have happened had H&S declared bankruptcy.   Plaintiff contends that these opinions are entirely speculative and thus unreliable under Rule 702.   To some extent, the Court agrees, and this will be discussed below.

However, the Court finds that Opinion 2 – which states that the results of the auction were "similar to the results that would likely have been obtained in a liquidation in the Bankruptcy Court"– is admissible.   In large part, the basis for Stowe's Opinion 2 is the fact that all but the debts owed to judgment creditors were "paid substantially in full" as a result of the liquidation conducted by Defendants.   This fact is supported by evidence provided to Mr. Campbell, and the Court finds there is *not* "too great an

analytical gap" between this fact and Campbell's opinion that this result is similar to one that are often obtained in a bankruptcy "without the attendant expenses of [a] bankruptcy." See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 148, 118 S.Ct. 512, 139 L.Ed. 2d 508 (1997); see also, Fed. R. Evid 702, advisory committee's note, (2000 amends.) (suggesting that the court consider whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion").

Admittedly, Plaintiff makes some very good points with respect to certain facts or circumstances that Mr. Campbell may *not* have considered or that he appears to have ignored when forming this and other opinions.    Those points may certainly be raised on cross-examination; but, they do not necessarily render his opinions unreliable.   See Daubert, 509 U.S. at 596.   An expert is not required to take into account every possible factor in rendering an opinion; he must only "consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court." MicroStrategy Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005).   Mr. Campbell has considered enough factors to make Opinions 1 & 2 sufficiently reliable in the eyes of the Court. See id.

Mr. Campbell will not be without some limitations at trial, however.   The Court is particularly troubled by that part of Opinion 3 in which he predicts that, as a result of the auction, "third-party creditors received at least as much as they would have received if assets had been liquidated in a bankruptcy and very likely received a significantly

greater payment of their claims." (Campbell Report at 1).   Not only does this opinion appear to be based upon insufficient facts and data (and to involve some speculation), the Court finds that it simply requires more discussion of bankruptcy proceedings than is relevant in this case.

As Mr. Campbell himself concedes, many undetermined variables (such as who gets appointed as trustee, what active role the creditors take, whether claims of fraud are made, whether alter ego or preferences are filed, etc.) could affect the outcome of a bankruptcy.   (Campbell Dep. at 30).   It is not an exact science, and from his deposition testimony, it appears that Mr. Campbell does not sufficiently account for the alternative results that a bankruptcy could have.   See Fed. R. Evid. 702, advisory committee's notes (2000 amends.) (questioning whether expert accounted for obvious alternatives).

Ultimately, there is no need for Mr. Campbell to offer much testimony about the liquidation of assets in a bankruptcy.   The issue for the jury is not whether Defendants chose the best method for closing H&S Homes or the method by which creditors would receive the most amount of money; rather, the issue will be whether Defendants transferred H&S assets with the intent to defraud Plaintiff. See O.C.G.A. § 18-2-74. Thus, an extended discussion about the disbursement of assets in bankruptcy would not necessarily assist the jury in deciding the ultimate issue.   Such testimony would have little probative value and great potential to unnecessarily prolong the trial of this case,

confuse the issues, or mislead the jury.   See Fed. R. Evid. 403; Bitler, 391 F.3d at 1121 (explaining that the court may exclude otherwise admissible expert testimony if it does not have "sufficient bearing on the issue at hand").

Mr. Campbell will thus be precluded from speculating as to what amounts third-party creditors would have received if Defendants had chosen to declare bankruptcy instead of selling H&S assets at auction.   While Mr. Campbell may briefly discuss the option of bankruptcy (i.e., as a customary and legitimate option for dissolving a going business), it would be impermissible and unnecessary for him to speculate on the results that a bankruptcy would have actually had in this case.

Mr. Campbell is also prohibited from offering any testimony about Defendants' intent in this case; he certainly cannot testify as to what was in Defendant Horton's mind at the time the challenged decisions were made.   Again, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Rezullin Prod. Liab. Litig., 309 F. Supp. 2d 531, 514, 546-47 (S.D.N.Y. 2004).   Furthermore, Mr. Campbell many not offer any testimony about the relevant law in this case.   It is very clear that "[a] witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) (citation omitted).

Accordingly, Plaintiff's Motion to exclude opinions offered by Mr. Campbell will be **GRANTED** in part and **DENIED** in part.   To be clear, Mr. Campbell will be permitted to offer his opinions and testimony:

Opinion 1:   that Defendants considered "customary" methods of disposition and liquidation which, when properly implemented, are fair to creditors;

Opinion 2:   that, based upon his experience and in his professional opinion, Defendants conducted a "reasonable liquidation of assets" and that, to the extent that all third-party creditors were paid (save the judgment creditors), the result of the liquidation obtained similar results to those obtained in bankruptcy without the attendant expenses of a bankruptcy; *and*

Opinion 3:   that, based upon his review of the evidence, the net proceeds of the auction in this case (with the exception of about $90,000.00 paid to an affiliate of H&S by mistake), combined with the funds already held by H&S from the operation of its business or the liquidation of other assets, were paid to unaffiliated third-party creditors, which resulted in their claims being paid substantially in full.

Thus, to a very limited extent, Mr. Campbell may address the various accepted and customary methods of liquidating a going business or terminating its operations. Again, these matters are beyond the knowledge of most lay persons and may require the assistance of an expert.

However, Mr. Campbell may *not* testify that creditors received equal or greater payment of their claims than if Defendants had declared bankruptcy. (See Campbell Report, Opinion 3).   Not only is this opinion lacking in support and somewhat

speculative, it requires the inclusion of additional testimony by Campbell that has very little relevance to this case.   Indeed, even if admissible under Rule 702, extended testimony about the disbursements of assets in bankruptcy may unnecessarily prolong the trial of this case, confuse the issues, or mislead the jury, and this substantially outweighs the little probative value the testimony may have.   <u>See</u> Fed. R. Evid. 403.

## CONCLUSION

Plaintiff's Motions in Limine to Exclude Certain Opinions offered by Defense Experts Robert J. Taylor [Doc. 293] and Charles E. Campbell [Doc. 299] are hereby **GRANTED** in part and **DENIED** in part.

SO ORDERED this 7th day of August 2012.

<u>S/   C. Ashley Royal</u>
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

Jlr/lmh