THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

TERRY CARTRETTE TINDALL,           :
                                   :
          Plaintiff,               :
                                   :
v.                                 :     Civil Action
                                   :     No.   5:10-CV-044(CAR)
H & S HOMES, LLC, et. al.,         :
                                   :
          Defendants.              :
_____

**ORDER ON DEFENDANTS' MOTIONS TO EXCLUDE
OPINIONS OFFERED BY PLAINTIFF'S EXPERT HAROLD STOWE**

Currently before the Court are Defendants' Motions in Limine to Exclude
Opinions offered by Plaintiff's Expert, Harold Stowe [ECF No. 317 & 320], and
Defendants' Motion to Strike Mr. Stowe's Supplemental Affidavit [ECF No. 326].   Mr.
Stowe was retained in this case to testify on behalf of Plaintiff in the fields of corporate
governance, corporate finance, and business practice.   In his Affidavit, Mr. Stowe offers
his opinion as to whether "Defendant H&S Homes, LLC and it affiliate corporate entities
met or varied from industry standards" when they made the business transactions
challenged in this case.   (Affidavit& Disclosure of Harold Stowe [ECF No. 214], ¶¶ 5-6).

Defendants now seek to exclude Mr. Stowe's opinions and testimony.   In
relevant part, Defendants argue (1) that Mr. Stowe's original and supplemental expert

1

reports do not conform with Rule 26; (2) that many of Mr. Stowe's opinions are unreliable, are not based upon sufficient facts or data, and/or would confuse the jury; (3) that Mr. Stowe offers irrelevant and inadmissible opinions regarding the causation of Plaintiff's prior South Carolina case; (4) that Mr. Stowe is not qualified to offer opinions regarding the valuation of land; and (5) that many of Mr. Stowe's opinions must be excluded as impermissible legal conclusions.   The first of these objections are procedural and considered under Federal Rule of Civil Procedure 26; Defendants' remaining objections are evidentiary and go to the admissibility of Mr. Stowe's testimony under Federal Rule of Evidence 702.

## I.      Rule 26 Objections

### A.   Motions to Exclude Opinions under Rule 26

In their Motions in Limine, Defendants first contend that Harold Stowe's original Affidavit and any related testimony should be excluded because Plaintiff's counsel prepared much of the report and Mr. Stowe failed to disclose that he relied on this assistance in reaching his conclusions.

During his deposition, Mr. Stowe did admit that Plaintiff's counsel drafted a preliminary version of his report.   However, Stowe also testified that the report was drafted after multiple, lengthy telephone conversations with Plaintiff's counsel and that

2

he signed it only after he reviewed and modified it.   (Deposition of Harold Stowe [ECF No. 314] at 41-44).   The report was then finalized by counsel's office.   (Id. at 44).

As Defendants contend, Rule 26 requires an expert's disclosure to "be accompanied by a written report – *prepared* and signed by the witness . . . ."   Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).   The Court is not convinced, however, that counsel's assistance and involvement in drafting the report is completely prohibited – even if the assistance involves preparing the entire first draft – so long as there is "prior, substantive input" from the expert witness.   See also Manning v. Crockett, No. 95 C 3117, 1999 WL 342715 at *3 (N.D. Ill. May 18, 1999) ("some attorney involvement in the preparation of an expert report is permissible, but . . . the expert must also substantially participate in the preparation of his report").   An Advisory Committee Note to Rule 26(a)(2) in fact explains that

> Rule 26(a)(2)(B) *does not preclude counsel from providing assistance to experts in preparing the reports*, and   . . . with experts such as automobile mechanics, this assistance may be needed.   Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Fed. R. Civ. P. 26(a)(2)(B), advisory committee note (1993 amends.); see also Manning, 1999 WL 342715 at *3; Keystone Mfg. Co., Inc. v. Jaccard Corp., 394 F. Supp. 2d 543, 568

(W.D.N.Y. 2005) ("attorneys are not precluded from assisting expert witnesses in the preparation of their reports so long as the witness remains substantially involved").

That is *not* to say that it is appropriate for counsel "to prepare the expert's opinion from whole cloth" and then "ask the expert to sign it if he or she wishes to adopt it." <u>Manning</u>, 1999 WL 342715 at *3. That level of attorney influence and involvement would clearly exceed the level of assistance contemplated by Rule 26. <u>Id.</u>

However, it does not appear that Plaintiff's counsel created Mr. Stowe's opinion "from whole cloth." Rather, as shown above, Mr. Stowe's deposition testimony indicates that he provided his own opinions and substantial input for the text of the report before counsel prepared a draft. (<u>See</u> Stowe Dep. 41-44). Mr. Stowe then reviewed that draft and made multiple changes before it was put in final form. (<u>Id.</u>) Thus, contrary to Defendants' assertions, Mr. Stowe's deposition testimony does not suggest either that Plaintiff's counsel created Mr. Stowe's opinions or that Mr. Stowe merely perused the report and signed his name to it. <u>C.f.</u>, <u>Manning</u>, 1999 WL 342715 at *3. Indeed, the report was "written in a manner that reflects the testimony to be given" and was "signed by the witness." <u>See</u> Fed. R. Civ. P. 26(a)(2)(B), advisory committee note (1993 amends.).

Defendants' arguments are well-taken, however. Mr. Stowe's deposition testimony does raise questions as to *whose* opinions these actually are. Mr. Stowe was

unable to recognize blatant errors and misstatements in the Affidavit (see e.g., Affidavit & Disclosure of Harold Stowe [ECF No. 314-3] at ¶15(d)(1)) and could not state the "business judgment rule" at his deposition though his Affidavit states that he reviewed Defendants' decisions within the context of the "*time honored business judgment rule, the text of which has long been settled and is an accepted industry standard.*" (Id. at ¶ 7).   Mr. Stowe's affidavit also includes opinions based on sources he apparently did not have. Stowe opines, for instance, that he based one opinion *in part* on the deposition testimony Martin Fierman and Joe Briley (Id. at ¶ 16(H)(2)); yet Stowe's Affidavit does not list these depositions as documents he considered, and he did not produce these documents at his deposition. (See id. at ¶ 13 & Stowe Dep. [ECF No. 314 & 316]).

Defendants also point out that Mr. Stowe, who has never testified before as an expert in any case, may not actually be an unbiased, independent advisor in this case. Mr. Stowe admits to being a personal friend of Plaintiff's counsel, Mr. Lovelace.   The two have had a personal and professional relationship for many years – which included social visits to one another's homes, friendships between their children, and Plaintiff's counsel representing Mr. Stowe in multiple real estate transactions.   (Stowe Dep. at 47-50).   Defendants also question why Mr. Stowe had not yet billed Plaintiff's counsel for his time in this case, though his Affidavit was completed and signed more than a year before his deposition.   (Id. at 44).

Nonetheless, in light of Mr. Stowe's direct testimony explaining that he did provide substantial input into the drafting of the Affidavit,[1] the Court is not completely persuaded that either Mr. Stowe's undisclosed reliance on drafts provided by counsel, his personal relationship with Plaintiff's counsel, or the errors in his report requires that Mr. Stowe's Affidavit be stricken *in its entirety* under Rule 26.   The Court instead finds that these matters are more aptly considered in the context of Mr. Stowe's credibility as a witness and the reliability of the opinions he offers.   <u>See</u> Fed. R. Civ. P. 702; <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592-93 (1993)).   For this reason, the Court will not strike Mr. Stowe's original Affidavit for failure to comply with Rule 26.[2]   <u>See United</u>

---

1. Though not considered above, Mr. Stowe's recent supplement also provides evidence that he was substantially involved in the creation of his Affidavit.   Therein, Mr. Stowe avers that he

> reviewed all of the documents which were the basis of [his] report prior to the time [he] rendered [his] opinion, and . . . had discussed, at length, materials provided to [him] with counsel for Plaintiff; and had made [his] opinions and/or conclusions known to counsel for Plaintiff, who, at [his] request, crafted [his] opinion into a format consistent with the requirements of Rule 26(a)(2)(6).

(Stowe "Supplemental Affidavit & Disclosure" [ECF No. 323-1] at ¶ 10).   He then "took the draft provided to [him] based on [his] preliminary discussions with Plaintiff's counsel and made comments and corrections; compared and contrasted the draft opinion with the documents which [he] had reviewed; and . . . signed the Opinion making it [his] opinion and [his] work product." <u>Id.</u>

2. Defendants have also failed to persuade this Court that they are entitled to see copies of the prior drafts of Mr. Stowe's report.   Rule 26 in fact "protect[s] drafts of any report or disclosure." Fed. R. Civ. P. 24(b)(4)(B) & advisory committee note (2010 amends.); <u>see</u> <u>also</u> <u>e.g.</u>, <u>Graco, Inc. v. PMC Global, Inc.</u>, No. 08–1304 (FLW), 2011 WL 666056, at * 14 (D. N.J. Feb. 14, 2011) ("[Defendant] is not entitled to any drafts, regardless of form, of expert reports . . . .").

States v. Kalymon, 541 F .3d 624, 638 (6th Cir. 1998) ("A party's attorney can reduce an expert's oral opinion to writing so long as the report reflects the actual views of the expert."); see also e.g., Estate of LaFarge ex rel. Blizzard v. Kyker, No. 1:08CV185, 2011 WL 6151595, *6-7 (N.D. Miss. Dec. 12, 2011) (finding that counsel's preparation of report did not exceed "the bounds of legitimate assistance as to negate the possibility that the expert actually prepared his own report"); Isom v. Howmedica, Inc., No. 00 C 5872, 2002 WL 1052030, *1 (N.D. Ill. May 22, 2002) (finding that expert report drafted by attorney after extensive discussions with expert witness satisfied Rule 26(a)(2)(B)).

### B.  Motion to Strike Supplemental Affidavit

Defendants also object to Mr. Stowe's recently filed "Supplemental Affidavit & Disclosure."   Defendants contend that this post-deposition supplement also violates Rule 26.   They in fact characterize Mr. Stowe's Supplemental Affidavit as "a sham affidavit," arguing that his supplemental statements are untrustworthy as they directly contradict Stowe's original Affidavit and/or deposition testimony.

The "sham affidavit rule" provides that "[w]hen a party has given clear answers to unambiguous questions . . . , [it] cannot thereafter [submit] an affidavit that merely contradicts, without explanation, previously given clear testimony."   See Van T. Junkins and Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).   "The requirements for applying the sham affidavit rule are very stringent," however, and

Defendants haven not persuaded the Court that those requirements have necessarily been met in this case.   See In re Stand 'N Seal Prod. Liab. Litig., 623 F. Supp. 2d 1355, 1361 (N.D. Ga. 2009).   Indeed, when reviewing an affidavit under the rule, the district court "must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" Id. (quoting Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986). Here, the amended testimony appears create an issue of credibility rather than a "transparent sham."

Moreover, a comparison of the deposition testimony and affidavit reveals that, for the most part, the supplemental statements are intended to clarify Mr. Stowe's prior vague, incorrect, or incomplete deposition testimony.   In analogous situations, it has been held that "the non-moving party is *not* precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition," and that "minor inconsistencies that result from an honest discrepancy [or] mistake . . . afford no basis for excluding an opposition affidavit." Messick v. Horizon Industries, Inc., 62 F.3d 1227, 1231 (9th Cir. 1995) (emphasis added).

The Court thus does not find Mr. Stowe's post-deposition filing to be a "sham affidavit."   The *real* problem with Mr. Stowe's supplement is *when* it was filed.   Mr. Stowe's original Affidavit was timely filed, pursuant to Rule 26 and this Court's

scheduling order, in April of 2011.   However, because of Defendants' request for an

extension of time, Mr. Stowe was not deposed until a year later, in April of 2012.   After

noting many weaknesses in Mr. Stowe's opinions, Defendants thereafter filed their

motions to exclude his testimony on May 1 and May 2, 2012.   When Plaintiff responded

to these motions, she attached Mr. Stowe's "Supplemental Affidavit" in an attempt to

cure some of those deficiencies noted by Defendants.   Defendants now request that

either the Supplemental Affidavit be stricken or that they be allowed further discovery,

as they did not have the opportunity to depose Mr. Stowe with respect to his

supplemental statements.   Defendants are most concerned with paragraphs 1, 2, 3, and

9 of the Supplemental Affidavit, which they characterize as entirely "new opinions."

Despite Defendants' assertions, the Court does not find that Mr. Stowe offers *new*

opinions in his Supplemental Affidavit, though some of his statements do "differ[]

substantially" from his deposition testimony.   In re Stand 'N Seal, 623 F. Supp. 2d at

1362 (citing Rowe Int'l Corp. v. Ecast, Inc., 586 F. Supp. 2d 924, 935 (N.D. Ill. 2008)).   For

example, in Paragraph 15 of his original disclosure, Mr. Stowe opines that

> the damages claimed by Plaintiff *established by the South Carolina judgment*
> were most probably caused by the acts, delicts, departure from, avoidance
> of, and flagrant attempts to avoid corporate responsibility and Defendants'
> duties to Plaintiff as established by the State and Appellate Courts of South
> Carolina . . . .

(Stowe Aff. at ¶ 15) (emphasis added).   When asked to clarify what he meant in this paragraph during his deposition, Stowed confirmed that Paragraph 15 of his Affidavit refers to the "cause[] of damages in Plaintiff's South Carolina [case]."   (Stowe Dep. at 58).   Defendants thus discontinued questioning on Paragraph 15 and moved to exclude that opinion as irrelevant.   Now, in his Supplemental Affidavit, Mr. Stowe attempts to correct his alleged error and make a belated clarification of his statement:

> In Paragraph 15 of my Affidavit, the opening paragraph was inadvertently scrambled.   The claims of plaintiff in this litigation are based upon and arose out of the verdict the Plaintiff was awarded in South Carolina and affirmed by the Appellate Court in South Carolina, but the subparagraphs of 15 apply to claims in this case and not to claims made in the South Carolina case.

(Stowe, Supp. Aff. at ¶ 1).

Upon reading the remainder of Paragraph 15, it does appear that Mr. Stowe's opinions address conduct at issue in the present case.   Mr. Stowe was thus either confused at the time of the deposition or he was unsure of his opinion.   Either way, the Court again finds that this type of contradictory testimony is more relevant in the context of the credibility and/or reliability of his testimony than whether he should be allowed to include this re-statement as part of his testimony.

Rule 26 in fact allows a party to supplement an expert's disclosure if he "learns that in some material respect the disclosure response is incomplete or incorrect." Fed. R.

Civ. P. 26(e).  This duty to supplement "extends both to information included in the report *and to information given during the expert's deposition.*"  Id. (emphasis added).   It is also not unusual for a witness to make substantive changes or amend to his deposition testimony before the trial.   In such cases, courts generally allow the original testimony to remain a part of the record (to be used at trial) and may authorize the re-opening of depositions for a limited examination on the change. See AIG Centennial Ins. Co. v. O'Neill, No. 09–60551–CIV, 2010 WL 4363176 * 4 (S.D. Fla. Oct. 22, 2010).

Of course, a supplemental expert report "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy."   Cochran v. Brinkmann Corp., No. 1:08-cv-1790-WSD, 2009 WL 4823858, *5 (N.D. Ga. Dec. 9, 2009).   "[A] report that suffers from "a major omission" cannot be cured by the use of supplementation," and Rule 26(e) "does not cover failures of omission because the expert did an inadequate or incomplete preparation." Martinez v. Rycars Const., LLC, No. CV410–049, 2010 WL 6592942, *2 (S.D. Ga. Dec. 2, 2010) (quoting Goodby's Creek, LLC v. Arch Ins. Co., No. 3:07-cv-947-J-34HTS, 2009 WL 1139575, *3 (M.D. Fla. April 27, 2009) (internal citations omitted)); Cochran, 2009 WL 4823858 at * 5 (supplement disallowed when testing conducted after initial disclosure).

Here, there is really no evidence of undue delay or neglect on the part of by Mr. Stowe or that the Supplemental Affidavit was an attempt by Plaintiff's counsel to

"engage in additional work, . . . annul opinions, or offer new ones to perfect a litigation strategy." C.f., Cochran, 2009 WL 4823858 at *5.   The present case is thus distinguishable from the one repeatedly cited by Defendants, in which there was no reasonable excuse for the expert's laxity in completing necessary testing in time to meet court-imposed deadlines.   See id. at * 7.

Defendants also fail to persuade the Court that the entire Supplemental Affidavit must be stricken simply because it was "filed over one year *after* expert disclosures were due pursuant to Rule 26 and this Court's Scheduling Order . . . ," (Motion to Strike [ECF No. 326] at 3) (emphasis in original).   The extremely late filing in this case was actually due to *Defendants*' request for an extension of time to depose Plaintiff's expert.   (See "Motion to Extend Time to Depose Plaintiff's Expert" [ECF No. 187]).   As discussed above, Mr. Stowe's initial disclosure was filed in April of 2011, and Defendants requested that they be allowed to postpone his deposition until after this Court ruled on the motions for summary judgment. (See id.)   The deposition was thus not taken until a year later, in April of 2012.   Apparently after (or as a result of) the deposition, Plaintiff realized that Mr. Stowe's original Affidavit was incorrect or incomplete and thus submitted his Supplemental Affidavit.   If Defendants had deposed Mr. Stowe prior to the original deadline, June 15, 2011, his Supplemental Affidavit would likely not have been "filed over one year *after* expert disclosures were due."

More importantly, the Court finds that Defendants will not necessarily be prejudiced by the late filing.   As will be discussed in the remainder of this Order, even with Mr. Stowe's supplemental statements, much of the testimony specifically challenged by Defendants (addressed in paragraphs 1 and 9 of the Supplemental Affidavit) will be excluded under Rule 702. Defendants' motion to strike those paragraphs of the Supplemental Affidavit is thus moot.

The Court further finds that, contrary to their representations, Defendants did have an adequate opportunity to cross-examine Mr. Stowe with respect to the other supplements specifically challenged in their Motion (addressed in paragraphs 2 and 3 of the Supplemental Affidavit).   As will also be discussed in detail below, the additional studies and statistics referenced in his Supplemental Affidavit were produced at Stowe's deposition, and Defendants questioned him about all of these documents in some detail. (See Stowe Dep. at 146-154).   Defendants thus were *not* unduly surprised by the inclusion of these sources in his Supplemental Affidavit.

Therefore, it is extremely unlikely that the Court will permit further discovery at this late stage of the proceedings.   Nonetheless, if after this Order, Defendants believe that additional discovery is absolutely necessary, the Court may entertain a separate motion for a limited re-opening of Mr. Stowe's deposition.   Any motion to this effect shall be filed within ten (10) days of the date shown on this Order.   Otherwise,

Defendants' Motion to Strike the Supplemental Affidavit of Harold Stowe [ECF No. 326]

is **DENIED**.

## II.    Rule 702 Objections

In their Motions in Limine, Defendants also seek to exclude all of Mr. Stowe's

expert opinions under Federal Rules of Evidence Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will
>     help the trier of fact to understand the evidence or to determine a
>     fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts
>     of the case.

Fed. R. Evid. 702.  Simply stated, expert testimony is admissible only upon a finding

that the expert is qualified to testify competently regarding the matters he intends to

address, that the methodology by which the expert reached his conclusions is

sufficiently reliable, and that the expert's testimony will assist the trier of fact.  See

McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

"Experts may be qualified in various ways." United States v. Frazier, 387 F.3d

1244, 1260 (11th Cir. 2004).    An expert's training or education may provide one means

by which an expert may qualify to give certain testimony; however, experience in a

particular field may also qualify an expert to offer an opinion on a particular matter.  Id.

14

at 1260-61.   Because "experts come in various shapes and sizes[,] there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."   Santos v. Posadas de Puerto Rico Assocs., 452 F.3d 59, 63 (1st Cir. 2006).   The district court must therefore focus its inquiry on whether the expert has the requisite knowledge, skill, experience, training, and education to offer the testimony he intends to introduce.   Fed. R. Evid. 702.

As to the reliability requirement, trial courts must assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."   Frazier, 387 F.3d at 1262 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993)) (internal alteration omitted).   The "reliability" of an expert is of course different than his "believability or persuasiveness, which remains an issue for the trier of fact."   Rink v. Cheminova, Inc., 400 F.3d 1286, 1293 n. 7 (11th Cir. 2005).   A district court may not exclude an expert because he is unpersuasive or lacks credibility.   Id.   The court's inquiry must focus "solely on the principles and methodology [of the expert], not on the conclusions that they generate."   Daubert, 509 U.S. at 595.

In conducting this inquiry, the district court can consider many factors.   In Daubert the Supreme Court suggested that, when evaluating the reliability of an expert's scientific testimony, a district court consider the (1) testability; (2) error rate; (3) peer

15

review and publication; and (4) general acceptance of an expert's opinion. 509 U.S. at

593-95.   These factors are not generally applicable in the context of non-scientific

testimony, however.   In such cases, the Advisory Committee Notes for Rule 702 suggest

that the Court consider factors such as:

(1) Whether the expert[] [is] proposing to testify about matters growing naturally and directly out of research [he] has conducted independent of the litigation, or whether [he] has developed [his] opinion expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3) Whether the expert has adequately accounted for obvious alternative explanations;

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

See Fed. R. Evid. 702, advisory committee notes (2000 amends).

Expert testimony must also assist the trier of fact in either understanding the

evidence or determining a fact in issue. Fed. R. Evid. 702(a). "Proffered expert testimony

generally will not help the trier of fact when it offers nothing more than what lawyers for

the parties can argue in closing arguments." Frazier, 387 F.3d at 1262–63.   Thus, expert

testimony is admissible only if it "concerns matters that are beyond the understanding of

the average lay person. Id.   The opinions must also "fit" with the facts of the case,

16

McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004), and have "sufficient bearing on the issue at hand." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1121 (10th Cir. 2004).

Ultimately, Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury. Daubert, 509 U.S. at 589 n.7; McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005); McCorvey, 298 F.3d at 1256. At the same time, however, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder. A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury." Allison, 184 F.3d at 1311. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. The court's duty is thus limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence." Frazier, 387 F.3d at 1272. The admission of expert testimony is a matter wholly within the discretion of the district court, which is accorded considerable leeway in making its determination. Cook ex rel. Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1103 (11th Cir. 2005); Frazier, 387 F.3d at 1258.

With the above legal standards in mind, the Court will address the challenged opinions in turn below.

17

A.  Stowe's Opinions and Testimony Regarding the Accepted "Standards of Corporate Governance"

Mr. Stowe, an apparent expert in "corporate governance" and "business practices," has offered multiple opinions in his Affidavits and deposition as to whether Defendants complied with accepted standards of corporate governance or otherwise acted in a business-like manner when making the decisions at issue in this case. Defendants now object to this testimony to the extent that Mr. Stowe seeks to explain and/or apply the accepted "standards of corporate governance."   Defendants argue that his opinions are irrelevant, unreliable, and may confuse the jury.   The Court agrees.

In his Affidavit, Mr. Stowe explains the basis for his opinions regarding Defendants' alleged non-compliance with the accepted "standards of corporate governance":

> When considering *standards of conduct*, one begins with the duties and responsibilities of Directors.   Directors must direct the management of the corporation, and they also have a vital oversight role in monitoring not only management conduct and evaluating performance, but also must be directly involved in the accuracy of financial reports and reporting.

> This traditional standard gained heightened status as a result of the financial crisis which appeared as the result of the financial scandals including those effecting Enron, Tyco International, Adelphi, and Worldcom, as the result of which Congress passed sweeping legislation – *The Sarbanes-Oxley Act of 2002* (Pub. L. 107-204, 116 stat. 745, enacted July 20, 2002).   . . .

(Stowe Aff. at ¶¶ 7 & 8) (emphasis added).

18

Thus, in support of his opinions about Defendants' compliance with the relevant "standards of corporate governance," Mr. Stowe appears to refer to those standards imposed by "The Sarbanes-Oxley Act." In his deposition, Stowe confirmed that that these were the standards he applied when forming his opinions. (<u>See</u> Stowe Dep. at 24).

Sarbanes-Oxley, however, is legislation that addresses the maintenance and disclosure of financial information by *public* companies. (Stowe Aff. at 9; Depo at 28); 15 U.S.C. § 78(m); <u>see</u> <u>also</u> <u>e.g.</u>, <u>Georgia *ex rel*. Saunders v. Mortg. Elec. Registration Sys., Inc.</u>, 1:10–CV–3419–TWT–RGV, 2011 WL 1335824, at *11 (N.D. Ga. March 11, 2011) ("Sarbanes–Oxley only applies to publicly held companies."). During his deposition, Mr. Stowe in fact agreed that the standards imposed by "Sarbanes-Oxley" are "*not* imposed on privately owned companies" such as those involved in this case. (Stowe Dep. at 28). In his Supplemental Affidavit, however, Mr. Stowe attempts to clarify and further explain his opinion. He now states that the Sarbanes-Oxley corporate governance standards *are* sometimes imposed on private companies – as "there is no bright line distinction in terms of corporate best practices and/or statutory mandates between publicly and privately held business organizations." (Stowe Supp. Aff. at 9).

As discussed above, this apparent contradiction may be considered in the context of Mr. Stowe's credibility and could affect the weight of his testimony at trial. The more pressing problem, however, is the absence of any support for this opinion. This, of

course, goes to reliability of Mr. Stowe's testimony, which is a matter for this Court.   <u>See</u>

Fed. R. Civ. P. 702(b), (c).   Indeed, Mr. Stowe fails to provide any support for his

opinion that the Sarbanes-Oxley corporate governance standards are imposed on the

directors and members of private companies and does not explain in what circumstances

or to what extent that the Act may or has been applied to privately held corporations and

limited liability companies.

Mr. Stowe also does not appear to rely upon any materials or publications related

to private, closely-held companies like those involved in this case.   Nor does Mr. Stowe

rely on any materials or publications related to the distinguishable standards of

governance applicable to limited liability companies.   At his deposition, Stowe only

identified two documents that he relied on when reaching this opinion: (1) a pamphlet

entitled "Key Agreed Principles to Strengthen Corporate Governance for U.S. Publicly

Traded Companies," and (2) excerpts from the Corporate Governance Quick Reference

Guide by McKenna, Long & Aldridge, LLP entitled "Governance Guidelines/Code of

Ethics/Whistleblower Provisions.   (Stowe Dep. at 24-27).   Mr. Stowe concedes that both

of these documents are focused on corporate governance within the context of

publicly-traded companies.   (<u>Id</u>. at 26; 28).

Thus, while courts do generally allow expert testimony on matters of corporate

governance, <u>see</u> <u>United States v. Brooks</u>, No. 06–CR–550 (S–1)(JS), 2010 WL 291769, *4

20

(E.D.N.Y. Jan. 11, 2010), in this instance, Mr. Stowe has failed to demonstrate that he utilized a reliable basis for applying the "standards of corporate governance," – as guided by Sarbanes-Oxley, "SEC regulations," and "New York Stock Exchange regulations" (Stowe Dep. at 25) – to the facts of this case.   See Fed. R. Evid. 702(c).   By his own admission, the standards considered by Mr. Stowe are not imposed on private companies, and he has failed to identify any support for his opinion that Defendants were somehow obligated to conform with those standards intended for public companies.   To this extent, the Court also agrees with Defendants' argument that Mr. Stowe's testimony would likely not assist the jury, as he has failed to demonstrate that the standard he applies actually "fits" with the facts of this case. See McDowell, 392 F.3d at 1299.   Plaintiff provides no legal argument to the contrary.   (See Pl.'s Response [ECF No. 324] at 9).

Mr. Stowe's opinions and testimony regarding the appropriateness of Defendants' actions under the accepted "standards of corporate governance" are accordingly excluded.

B.  Stowe's Opinions and Testimony Regarding the Business Judgment Rule

Defendants also object to Mr. Stowe offering any opinion as about Defendants' conduct within the context of the "business judgment rule."   Indeed, while Mr. Stowe claims to be fully prepared to testify as to the best "theoretical" business practices, he

admits that he did not consider and is not familiar with the Georgia Corporations Code and could not properly articulate "*the time-honored business judgment rule*," on which he purports to have relied in this case.

> In his original Affidavit, Mr. Stowe explains that
>
> [t]he first topic which needs to be addressed in connection with Corporate Governance Standards relates to whether or not the Board of Directors and/or subordinate management of any and/or all of the entity Defendants in this case made decisions consistent with *the time honored business judgment rule, the text of which has long been settled and is accepted industry standard*.

(Stowe Aff. at ¶ 7) (emphasis added).   However, when asked to provide the well-settled text of the "time honored business judgment rule" in his deposition, Mr. Stowe testified that it "is just that the decisions in a business will be made according to sound principles and for the benefit of the business and its owners." (Stowe Dep. at 55).   Counsel for Defendants then questioned Stowe about whether this was the standard he applied in reaching his opinions:

> Q:    And that is the -- that statement that you just gave is the standard for the Business Judgment Rule that you have applied in this case?
>
> A:    That's how I understand it, yes.
>
> Q:    Do you know whether or not the state of Georgia has a definition of the Business Judgment Rule in its code?
>
> A:    I don't.

Q: Okay. Is the text of the Business Judgment Rule, as you have just stated it, are those words, words that are published in any kind of treatise that you can point us to, as far as what you just said the Business Judgment Rule was?

A: Not to my knowledge, no.

Q: Is that something that you have distilled from your sort of living as a corporate executive over the 12 years?

A: Yes.

(Stowe Dep. at 55-56).

In the context of Georgia law, Stowe clearly misstates and/or has an incorrect understanding of the business judgment rule.[3]  He has apparently designed his own version of the "business judgment rule" without consulting any acceptable treatise or authority on the matter.   This renders his opinion wholly unreliable, as he has clearly failed to utilize standard or methodology that other experts in his field would have relied upon.   See Fed. R. Evid. 702(c).   As such, any testimony about his "business judgment rule" is not relevant and would not assist the jury in understanding the issues

---

3 The business judgment rule for both corporations and limited liability companies is set forth in the Georgia Code, see O.C.G.A. §§ 14-2-830; 14-2-842; and O.C.G.A. § 14-11-305, and provides that "corporate officers and directors discharge their duties in good faith and with the care of an ordinarily prudent person in a like position." Brock Built, LLC v. Blake, 300 Ga. App. 816 (2009).  "The business judgment rule affords an officer the presumption that he or she acted in good faith, and absolves the officer of personal liability unless it is established that he or she engaged in fraud, bad faith or an abuse of discretion . . . ." Id.

23

this case.   See Billstein v. Goodman, No. 08–13415, 2012 WL 1048468, * 3-4 (E.D. Mich.

Mar. 28, 2012) (excluding testimony of expert who applied her own standards of "best

practices").   Plaintiff in fact appears to concede this point.   (See Pl's Responses [ECF

No. 323] at 3 & [ECF No. 324] at 11).

For this reason, any opinion or testimony regarding application or consideration

of "the business judgment rule" is hereby excluded.

C.   Stowe's Opinions and Testimony Regarding Causation of Damages and
     Defendants' Intent

In Paragraph 15 of his original Affidavit, Mr. Stowe opines that Plaintiff's

damages

> were most probably caused by the acts, delicts, departure from, avoidance
> of, and flagrant attempts to avoid corporate responsibility and Defendants'
> duties to Plaintiff as established by the State and Appellate Courts of South
> Carolina . . . .

(Stowe Aff. at ¶ 15).   Defendants seek to exclude this entire opinion because it refers to

the causation of damages awarded in the Plaintiff's prior South Carolina litigation.

As discussed above, Mr. Stowe has since amended his testimony to clarify that his

findings "apply to the claims in this case and *not* to claims made in the South Carolina

case."   (Stowe Supp. Aff. at ¶ 1; see also Pl.'s Response [ECF No. 323] at 2 ("The

subtopics set out in paragraph 15 do not attempt to re-litigate the South Carolina

judgment.") (emphasis added)).   Plaintiff has also conceded that Mr. Stowe "will not be

24

asked to opine on causation of damages." (Pl. Response [ECF No. 324] at 11). Defendants' specific objections to Paragraph 15 are thus moot.

Yet, for those reasons discussed above, Stowe's opinion in Paragraph 15 will still be excluded to the extent it is based on Defendants' compliance with the "standards of corporate governance." See Section A., *supra*.  The opinion in Paragraph 15 is also inadmissible to the extent that Stowe makes impermissible inferences about Defendants' motive or intent in this case.  As quoted above, the introductory paragraph refers to Defendants' "flagrant attempts to avoid . . . [their] duties to Plaintiff as established by the State and Appellate Courts of South Carolina." (Stowe Aff. at ¶ 15).  Mr. Stowe seems to be opining that Defendants' *intent* was to avoid paying the judgment awarded to Plaintiff by the South Carolina courts.   Later in the same paragraph, Mr. Stowe further opines that Defendants implemented "a business methodology by and related to H&S Homes *for the purpose of* avoiding payment of Plaintiff's judgment."   (Id.) (emphasis added).   Such "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony."   In re Rezullin Prod. Liab. Litig., 309 F. Supp.2d 531, 514, 546–47 (S.D.N.Y. 2004); see also Kaufman v. Pfizer Pharm., Inc., No. 1:02–CV–22692, 2011 WL 7659333, *9 (S.D. Fla. Aug. 4, 2011).   Mr. Stowe will therefore be prohibited from providing these opinions or any related testimony about Defendants' intent or motive.

D. <u>Stowe's Opinions and Testimony Regarding Defendants' Business Practices</u>

The above findings notwithstanding, the Court does agree with Plaintiff that some of Mr. Stowe's opinions about Defendants' business practices are admissible. Those opinions are based upon Mr. Stowe's decades of practical experience in the areas of corporate finance and management and may help the trier of fact.  <u>See</u> Fed. R. Evid. 702; <u>Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. P'ship</u>, No. 04-80283-CIV, 2005 WL 5955691, *5 (S.D. Fla. Jan. 11, 2005).   They are "factual, rather than legal conclusion[s]," and are "likely beyond the trier of fact's general knowledge." <u>Id.</u>   Indeed, experts like Mr. Stowe are commonly allowed to provide testimony about whether there has been a deviation from normal or standard business practices.  <u>See</u> <u>e.g.</u>, <u>id.</u>; <u>The Shaw Group, Inc. v. Marcum</u>, 516 F.3d 1061 (8th Cir. 2008) (affirming admission of expert testimony as "ordinary business practices"); <u>Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp.</u>, No. 2:07–cv–16–FtM–99SPC, 2011 WL 470561, * 4 (M.D. Fla. Feb. 2, 2011) (allowing expert to compare party's conduct to what he "has seen in his experience to be standard and typical in the industry" so long as he did not testify as to ultimate legal conclusion that the matter was handled in "good or bath faith"); <u>CDX Liquidating Trust ex rel. CDX Liquidating Trusee v. Venrock Assoc.</u>, 411 B.R. 571, 589 (N.D. Ill. 2009) (expert could properly "testify about [d]efendants' conduct in light of industry . . . standards").

However, there exists a fine line between permissible and impermissible expert

26

testimony in this area.   Id. at 588.   While it is permissible for an expert to testify about Defendants' conduct in light of his knowledge of general business practices and standards, it is not permissible for the same expert to "opine about whether Defendants breached applicable duties or apply the law to the specific actions they took. . . ."   Id.; c.f., U.S. v. Brooks, No. 06–CR–550 (S–1)(JS), 2010 WL 291769 * 4 (E.D.N.Y. Jan. 11, 2010) (government's expert in securities fraud case could not apply corporate governance concepts, as such testimony went to the ultimate legal conclusion).

Thus, as with the opinions provided by Defendants' experts, Mr. Stowe's testimony must be limited to factual observations.   He will not be permitted to make any legal conclusions as to whether Defendants' conduct was unlawful or fraudulent or whether any Defendant breached a legal duty. See Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law."); United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977) ("courts must remain vigilant against the admission of legal conclusions.").   Again, this point seems to be conceded.   According to Plaintiff, Mr. Stowe has not and does not intend to offer any legal conclusions. (See Pl.'s Response [ECF No. 324] at 10).

Defendants also contend that essentially *all* of Mr. Stowe's opinions in Paragraph 16 must be excluded because they are based on the concepts of corporate governance,

fiduciary duty, and the business judgment rule.  To some extent, that may be true. This Court has already excluded Mr. Stowe's opinions regarding the "standards of corporate governance" and/or the business judgment rule.  The Court also explained above that Mr. Stowe will not be permitted to make any legal conclusions as to whether Defendants breached a legal duty.

Stowe's opinions in Paragraph 16 need not be excluded entirely, however.  As discussed above, Mr. Stowe has based some of his opinions on his professional experience in the fields of corporate finance and management and his knowledge of business practices:

> As I understand the scope of my inquiry, it is to reach a conclusion or conclusions as to whether or not H&S Homes, LLC and its affiliate corporate entities met or varied from industry standards for Corporate Governance, Corporate Decision Making, and Corporate Conduct, and *good business practice*.

(Stowe Aff. at ¶6) (emphasis added); see also id. at ¶ 16B ("acceptable business practice") and ¶ 16H ("not businesslike and made no sense from a business standpoint").

The Court further finds that these opinions satisfy those factors for reliability listed in the advisory committee notes for Rule 702.   See Fed. R. Evid. 702, advisory committee notes (2000 amends).   Again, as discussed above, these are the types of opinions that business experts commonly give and have been recognized as reliable, and there is no indication that Mr. Stowe failed to exercise the care that he normally would in his

28

profession when reaching his conclusions in this case.   With respect to those opinions that he may give, the Court also finds that his opinions about "good business practices" were derived independent of this litigation, out of his years of experience, and that he has not "unjustifiably extrapolated" any unfounded conclusions.   Stowe squarely bases his opinions on the information provided to him.   Based on his deposition, the Court also finds that Stowe sufficiently "accounted for obvious alternative explanations," as opposing counsel cross-examined him about other potential justifications for the decisions made, and Stowe sufficiently explained why he still believed that Defendants engaged in questionable business practices.

The Court will now address Defendants' specific objections to those opinions stated in Paragraphs 16 (B), (C), (F), (G), (H), and (I) in turn below:

1.  *Opinion and Testimony Related to Paragraph 16(B)*

In Paragraph 16(B), Mr. Stowe concludes that Defendants' failure to document matters related to corporate governance was not an "acceptable business practice." (See Stowe Dep. at 76 & Aff. at ¶ 16(B)).

> [T]here is inadequate documentation in the materials which I have reviewed relative to the defendant companies, if any documents there was, and oftentimes there was no documentation where documentation was indispensable to acceptable business practices to reflect that interaction between H&S and the other Horton Companies to which it was subordinate were conducted on an arm's length basis.

29

(Stowe Aff. at ¶ 16(B))

Portions of this opinion could potentially be admissible as a factual, rather than legal conclusion if it was indeed based upon Mr. Stowe's experience and knowledge of ordinary business practices. Dubiel, 2005 WL 5955691 at *5. However, Mr. Stowe confirmed in his deposition that this opinion refers to documentation related to "corporate governance" matters and not to actual business transactions. (Stowe Dep. at 76). Stowe also admitted that the lack of documentation "probably" had "no direct link" to Plaintiff's injuries in this case. (Id. at 77).

This Court has already excluded Mr. Stowe's opinions regarding the "standards of corporate governance." Mr. Stowe's admission that this lack of documentation probably had no direct link to Plaintiff's injuries in this case also renders his opinion irrelevant. See Fed. R. Evid. 401; Fed. R. Evid. 702; see also, McDowell, 392 F.3d at 1299 (testimony should not be admitted if it does not "fit" the facts of the case). Accordingly, the opinion stated in Paragraph 16(B) and any testimony related thereto is excluded.

2. *Opinion and Testimony Related to Paragraph 16(C)*

In Paragraph 16(C), Stowe opines that Defendants engaged in "specific business methodologies which assured minimizing rather than maximizing the yield from the sale of H&S assets . . . ." (Stowe Aff. at ¶16(C)). These methodologies included, but were not limited to the auction of the former H&S mobile

30

homes on a unit by unit basis[4] as opposed to selling the mobile homes as a business inventory with related equipment so as to allow a prospective purchaser to immediately begin business operations with a full inventory of mobile homes.

Id.   In his deposition, Mr. Stowe further explained this opinion and stated that the crux of it is that "the process that was used to get rid of [H&S] assets . . .  wasn't a process that would get the best values." (Id. at 77).   Stowe's supplement similarly explains that Opinion 16(C) "is not confined to selling the business as a going concern" but "concerns other methods of selling the assets other than piecemeal." (Supp. Aff. at ¶ 11).

Defendants have moved to exclude this opinion on the grounds that Stowe is impermissibly applying the "standards of corporate governance" and the business judgment rule to the facts of this case.   The Court disagrees.   It is apparent from both his Affidavit and deposition testimony that this opinion is based on his knowledge and experience in business and is not a matter of corporate governance or application of the business judgment rule. (See id. at ¶ 16(C); Dep. 75-82).

The Court is also not persuaded by Defendants' argument that this opinion must be excluded as a mere "assumption" that Defendants made no effort to sell H&S as a going business.   Experts are entitled to make reasonable factual assumptions.   Here,

---

4 Stowe later explained that he intended to refer to the sales lots, offices, and equipment rather than to the auction of "mobile homes on a unit by unit basis."   (See Stowe Dep. at 79-80).   It is undisputed that the mobile home inventory was not auctioned.   (Id. at 79).

Stowe testified that none of the evidence indicated that any effort had been made to sell H&S as a going business. (Stowe Dep. at   82).   He also testified that this opinion was based on H&S financial records, showing that the company had cash at the time of the auction and thus "had more time" to explore other options of liquidation, which could have gotten "better values." (Id. at 116).   According to Stowe, based on his experience, H&S should have "at least [gone] through those steps" of exploring other options, and there was no indication that H&S went through these steps. (See id.).

Moreover, Defendants have not shown that Stowe's factual assumption is incorrect or inadequate.   Mims v. United States, 375 F.2d 135, 143 (5th Cir.1967) ("[E]xpert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based . . . ."). Defendants have not identified any evidence suggesting that they did attempt to sell H&S as a going business.   To the extent that there is evidence demonstrating that such an attempt was made or an explanation why it was not, Defendants may produce that at trial.   Inasmuch, Defendants' objection that Stowe's opinion is based upon a "limited knowledge of the facts" goes more to the weight of Mr. Stowe's opinion than its admissibility.   See Daubert, 509 U.S. at 596.

### 3.   Opinion and Testimony Related to Paragraph 16(F)

In Paragraph 16(F), Mr. Stowe opines that "H&S was undercapitalized."   He

claims to have based this opinion on "the testimony of Mr. Horton" and the fact that "by 1997 H&S was not only insolvent but owed millions of dollars to Horton Homes . . . ." (Stowe Aff. at ¶16(F)).

Defendants argue this opinion is "fatally flawed," as Stowe relies on a "balance sheet test for undercapitalization," i.e., "if the balance sheet show[s] negative net worth, [the company is] undercapitalized." (Stowe Dep. at 87).   According to Defendants, Stowe failed to consider whether the company was "capitalized partly with equity and partly with working capital loans," and that if Stowe's understanding of capitalization is correct, "almost every start-up company would be undercapitalized[,] making the opinion useless to a jury." (Brief [ECF No. 317] at 10-11).

Be that as it may, it is still unclear whether this is a valid ground for excluding Mr. Stowe's testimony.   This is, unfortunately, the full extent of Defendants' objection, and Plaintiff provides absolutely no response to the argument.   But see, In re Summit Place, LLC, 298 B.R. 62, 74 (Bkrtcy. W.D. N.C. Nov. 4, 2002) ("Insolvency is determined by a balance sheet test.").

Plaintiff does respond, however, that Mr. Stowe's opinion is supported by the evidence.   According to Stowe's Affidavits, he relied on the testimony Dudley Horton and Steve Sinclair when forming this opinion. (Stowe Aff. at ¶16(F); Supp. Aff at 12).   Dudley Horton in fact testified that H&S was *not* started with sufficient capital,

(Deposition of Dudley Horton, Sept. 22, 2011, [ECF No. 202] at 67-68]).   Steve Sinclair

seems to have conceded the same point.   (See Stowe Supp. Aff. at ¶ 12 (citing

Deposition of Steve Sinclair, March 28, 2011, at p. 59)) ("H&S knew that [it] was going to

open sales lots, that this would be very expensive, and that it only started with $ 100,000

in capital.").   Based on this, the Court finds that Mr. Stowe's factual conclusion in

Paragraph 16(F) has sufficient foundation.   He may testify to this matter.

4.  *Opinion and Testimony Related to Paragraph 16(G)*

Defendants also object to Mr. Stowe's Paragraph 16(G) on the grounds that it is

not supported by sufficient evidence.   Therein, Stowe opines,

> The Defendants frequently commingled their property.   This is shown by
> the transfer of property from H&S to other defendants and by the
> willingness of Horton Homes to transfer its property for little or no
> consideration.

(Stowe Aff. at ¶ 16G).   During his deposition, Mr. Stowe identified two facts to support

this opinion: (1) that H&S sales lots ultimately "ended up with the Triangle companies"

and (2) that Dudley Horton signed a Consent Action "up-streaming" valuable H&S real

estate to Horton Homes "for no consideration."   (Stowe Dep. at 88-97).

Stowe was forced to admit, however, that he had no documentation or reason to

believe that H&S actually transferred those sales lots to the Triangle companies.   (Id. at

90-93).   In fact, H&S was only leasing those properties, and Stowe has no knowledge of

the terms or expiration of those leases.  (Id.)   Admittedly, all Stowe knew was that the Triangle companies eventually "ended up" with their own leasehold interest in the property. (Id. at 89-90).   Stowe also had to admit that no property was ever transferred as a result of the Consent Action; that he never saw a deed transferring any H&S property to any other Defendants; and that Dudley Horton testified that no property would be transferred as a result of the Consent Action.   (Id. at 94-96).   Stowe further conceded a dividend may have been declared in this case, and if so, there would be nothing wrong with the transfer. (Id. at 95-96).   Mr. Stowe was thus unable to identify an actual "transfer" from H&S to any other Defendant to support his opinion.

Supplemental testimony provided by Mr. Stowe does not provide much more support.   In his Supplemental Affidavit, Stowe states that his opinion regarding comingling was also based upon his reading of the August 31, 2006, Memorandum to Defendants which suggests that "the assets of H&S were going to be transferred not for its own good but for the good of the Horton family companies of a whole."   Even if this generalized assumption based upon a single memorandum can be considered evidence of commingling, it is still not a sufficient basis for Mr. Stowe's opinion that "Defendants *frequently* commingled their property." (Stowe Aff. at ¶ 16(G) (emphasis added).

Thus, based on the evidence identified by Mr. Stowe, the Court finds that his opinion that "Defendants frequently commingled their property" is not supported by

sufficient facts or data and must be excluded under Rule 702.

   5.  *Opinion and Testimony Related to Paragraph 16(H)*

Paragraph 16(H) of Stowe's deposition provides a detailed list of those actions

and decisions by Defendants that he considers to have been "not businesslike" or that

made "no sense from a business stand point."  In his Supplemental Affidavit, Mr. Stowe

further explains,

> "The opinions I state in the subparagraphs to 16(H) all are given from the standpoint of H&S actions not being businesslike and not making sense from a business standpoint.   Based on my training and experience I found each of the actions described to be quite different from what I would expect to be taken by the owners and operators of a supposedly separate business."

(Stowe Supp. Aff. at ¶ 14).   These actions include:

1. The decision to make no effort to negotiate terms with its parent company when it was continually losing large amounts of money and going deeper and deeper into debt to its parent when its parent was making money.

2. The decision to allow a default judgment for $ 22,000,000 to be entered against it by default with no effort being made to defend the case or negotiate a settlement.

3. The decision to acquiesce in its own dismantling and replacement by another affiliated company or companies doing the same thing at the same place with the same employees.

4. The decision to auction its property piecemeal instead of selling itself as a going business or selling the lots as a package, which

36

was the businesslike way to obtain value of its property as shown on its balance sheets.

5. The decision by H&S not to seek any compensation from Regal, Beacon, and New Generation or other defendants for the assets paid for by H&S and reflected on its balance sheets as having value in the millions of dollars.

6. The decision by H&S not to seek to recover valuable assets paid for by H&S and shown on its balance sheets as having values in the millions of dollars.

7. The decision by H&S not to seek payment of the rebates shown to be owed it on its balance sheets.

8. The failure of H&S to properly control its accounts payable so that it either intentionally or by mistake paid thousands of dollars' worth of bills which rightly should have been paid by other defendants . . . .

9. The acquiescence by H&S in paying the legal bills which gave the blueprint for its own dismantling

10. The decision to sell its office units separately that were the core of its investment in its sales lots so that the remainder of its investment in those sales lots became virtually useless.

11. The decision to terminate its leases of sales lots at a time when it was not in default and had substantial investments in those lots which were destroyed by that decision.

12. The decision to allow all its inventory of homes to be repurchased at a time when it was not in arrears and had substantial investments in add-ons which were contained in or attached to said homes.

13. The decision of H&S to sell its $ 405,000.00 investment in

> Putnam Mortgage and Finance for $ 10.00 in early 2007 to the
> former head of H&S without any appraisal or other advice as to
> its value . . . .

Defendants move to exclude all of these opinions as impermissible legal conclusions.   However, as previously addressed, the Court finds that these statements are not legal conclusions invading on the province of the jury.   They are factual conclusions supporting Mr. Stowe's opinion that Defendants made some questionable or unusual business decisions.   Again, testimony similar to that offered in Paragraph 16(H) has been allowed.   See e.g., Royal Marco Point 1 Condo. Ass'n, 2011 WL 470561 at * 4; CDX Liquidating Trust, 411 B.R. at 589.

To the extent Defendants object to these opinions as being based upon a limited knowledge of the facts or subject to a valid dispute, the Court again finds that these objections are a matter for vigorous cross-examination and the presentation of contrary evidence.   See Daubert, 509 U.S. at 596.   Stowe may therefore testify as to those opinions stated in Paragraph 16(H).

6.   *Opinion and Testimony Related to Paragraph 16(I)*

In the final paragraph of his Affidavit, Stowe opines

> My foregoing opinion is rendered on the basis set forth above[] is to a
> reasonable degree of certainly with regard to departure by Defendants
> from the established Standards of Care and conduct and were the most
> probable cause of the damages sustained by plaintiff as already established
> by the Courts.

(Stowe Aff. ¶ 16I).

Defendants object to this opinion to the extent in which Mr. Stowe has applied the "standards of corporate governance" to the facts of this case and/or seeks to testify that Defendants' conduct was the "most probable cause of the damages sustained by [P]laintiff."   Again, for those reasons discussed above, Defendants' objection is sustained with respect to any opinion based on an alleged violation of the "standards of corporate governance."   Mr. Stowe may not offer this testimony.   Plaintiff has also stated, in response to the present Motions, that Mr. "Stowe will not be asked to opine on causation of damages." (Resp. [No. 324] at 11).   Thus, this objection appears to be moot.

Still, Mr. Stowe will be precluded from offering any opinion or testimony related to Paragraph 16(I) of his Affidavit, as well as those related to Paragraphs 16(B) and 16(G), as discussed above.   Stowe may testify regarding the opinions stated in Paragraphs 16(C), (F), and (H) of his original Affidavit.

E.   Stowe's Opinions and Testimony Regarding the Appreciation of the Real Property Owned by H&S Homes

Mr. Stowe's remaining opinions concern the value of real property transferred by H&S and whether those sales were made for less than "reasonably equivalent value." See O.C.G.A. § 18-2-74; 18-2-75.   In his Affidavit Stowe opines that

the value of property in the southeast including the states of South

39

Carolina, North Carolina, Georgia, and Tennessee appreciated from 2002[,] when H&S acquired the land shown on the balance sheets[,] until January 2007[,] when it sold that land to Best Value for prices much less than the cost at which it purchased that land.

(Stowe Aff. at ¶ 14).   Stowe's Affidavit further explains that "[t]hese opinions are *based upon statements kept by appraisers, bankers, real estate agents and are reflected in the public records of the [c]ounties in which H&S operated*, which are generally recognized as reliable."   (Id.) (emphasis added).

Defendants object to the admission of this testimony on the grounds that (1) Mr. Stowe has not demonstrated the necessary knowledge, skill, experience, training, or education to offer an opinion on the value of real property, and (2) the opinion is not based on sufficient facts or data.   See Fed. R. Evid. 702.

This Court addressed similar arguments when Defendants sought to strike Stowe's Affidavit on summary judgment.   Though Defendants' Motion to Strike Stowe's Affidavit was ultimately found to be moot,[5] the Court did conclude that, *based on the information provided*, Mr. Stowe was qualified to offer his opinion and that his opinions appeared to be sufficiently reliable:

Mr. Stowe, is qualified to review the financial records, relevant business

---

5 In its Order, the Court found that there was sufficient evidence to send Plaintiff's fraudulent transfer claims to trial, even in the absence of Mr. Stowe's opinion. See Order, Jan. 20, 2012 [ECF No. 282] at p. 18.

environment, and actions of those involved to determine whether a business transaction was conducted within the generally accepted business or corporate standards.   Likewise, a corporate decision to sell property for less than its value may, under certain circumstances, be one that falls below the generally accepted business standards.

. . .   Not only is Mr. Stowe qualified to make that opinion within the scope of his expertise, he has also identified a reliable, accepted basis for forming that opinion.   Mr. Stowe relied, in part, *on statements by appraisers, bankers, real estate agents, and public records in the counties in which H&S operated* which apparently demonstrated a general economic condition of growth and land appreciation during the relevant time period.   Defendants do not dispute whether these are the kind sources that experts in Mr. Stowe's field would normally rely on when forming an opinion about the appropriateness of a business transaction. [cite omitted] . . . Indeed, it seems that experts in Mr. Stowe's field would reasonably rely on information about the general economic conditions at the time of a transfer (such as those indicating a trend of appreciation) when evaluating transactions that involve the sale of corporate land assets.   Experts may also rely on the opinions of other non-testifying experts when reaching their conclusions. See U.S. v. Winston, 372 F. App'x 17, 20 (11th Cir. 2010) (finding that district court did not err by admitting testimony of an expert witness who relied in part on another expert's report).   Mr. Stowe could thus properly rely on the statements by qualified non-testifying experts in real estate valuation when forming his broader opinions.   See id.

. . . [H]owever, the data cited by Mr. Stowe is much too vague, standing alone, to support an opinion that the specific parcels of land owned by H&S actually appreciated in value between the time they were purchased by H&S and when they were sold at auction in 2007.   The fact that land in that area generally appreciated does not prove that the specific parcels appreciated or to what extent they may have appreciated.   There is no doubt that some parcels of land in the Southeast may have even depreciated during that time period.   Thus, more specific calculations addressing each individual parcel of land would be required to form an opinion about the land value, and it would have to be offered by an expert properly qualified in that field. See U.S. v. 33.5 Acres of Land, More or

Less, Okanogan County, State of Wash., 789 F.2d 1396, 1401 (9th Cir. 1986) ("The preferred means of determining [land] value is by referring to sales of comparable property."); In re Vallambrosa Holdings, L.L.C., 411 B.R. 899, 908 (S.D. Ga. 2009) (finding that a "[l]and sales comparison approach represents the more reliable method of determining value.").    An opinion as to land value based only on the general data cited by Mr. Stowe would thus be inadmissible. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 2140 (11th Cir. 2005) (excluding expert testimony based "broad principles of pharmacology" instead of specific scientific data or testing).

On the other hand, the general proposition cited by Mr. Stowe may be considered among other evidence in reaching the larger opinion for which Mr. Stowe is qualified to state. Indeed, Mr. Stowe indicates that in forming his opinions, he also relied on the deposition testimony of Defendant Steve Sinclair [Doc. 40] and Defendant Best Value's Objections and Answers to Plaintiff's First Interrogatories [Doc. 63-3]. (See Stowe Aff.) These sources indicate that some of the land lots sold to Defendant Best Value were purchased for a portion of the price H&S paid for them and that Best Value then sold the lots within that same year for a significant profit. Thus, while the data indicating a generalized appreciation in property between 2002 and 2007 may not by itself prove an increase in value of the specific land at issue, the subsequent sale of this land for a significantly higher price in the very same year certainly suggests that Best Value may have paid less than market value for those properties.   These facts together (and when combined with other evidence considered by Mr. Stowe) do provide a sufficient and reliable basis to support Mr. Stowe's opinions that H&S departed from accepted business standards when it transferred assets for less than fair market value.

(Order, Jan. 20, 2012 [ECF No. 282] at 13-18) (emphasis added).

Thus, the Court has already addressed Mr. Stowe's qualifications to provide a limited opinion as to the appreciation in land values, and Defendants have not shown that this finding needs to be reconsidered.   However, the Court's finding on the

reliability of these opinions is another matter.   Unfortunately, at the time of this ruling, Mr. Stowe had not yet been deposed,[6] and the Court could only trust that those statements in his Affidavit were an accurate explanation of the sources on which he relied.   This Court's trust was apparently misplaced, and that portion of the Court's Order must be now re-visited.

Indeed, when specifically questioned about Paragraph 14 of his Affidavit during his deposition, Mr. Stowe could not produce any of the "***statements kept by appraisers, bankers,*** [and] ***real estate agents***" or any "***public records of the [c]ounties in which H&S operated***" that were specifically mentioned in Paragraph 14 of his Affidavit. (See Stowe Aff. at ¶ 14; Stowe Dep. at 34-38).

> Q:   Paragraph 11 asked you to bring here today the -- the statements that -- copies of the statements that you said were kept by appraisers, bankers, and real estate agents that are specifically mentioned in Paragraph 14 of your affidavit.   Do you have those?
>
> A:   No, I don't have those.
>
> Q:   All right.   Now, these are -- these are things that you said you based your opinions on. So where -- where are those statements?
> A:   Well, I just -- it's not in anything I kept.   I just read various market letters and so on prepared by appraisers.   And it's just a matter of

---

6 In June of 2011, Defendants moved for an extension of time to depose Mr. Stowe, suggesting that it would be beneficial to both parties for Defendants to depose Mr. Stowe after the Court ruled on the various motions for summary judgment. (See "Motion to Extend Time to Depose Plaintiff's Expert Witness [ECF No. 187]).   Plaintiff consented to the extension of time, (Pl.'s Response [ECF No. 189] at 2), and this Court granted the Motion (See Order, Jun 20, 2011).

normal course of my business, and I didn't retain those.   So I was basing my opinion on just that knowledge I gained by reading those kind of documents during that period between 2002 and 2007.

Q:     Well, so when you -- when you actually wrote your April 1, 2011, affidavit and report, you did not -- you did not physically have any of the statements that you said you were basing this Paragraph 14 on?

A:     That's correct. But I -- that's when we got up the -- the documents that we've produced just on national trends of real estate values.

Q:     So if I understand what you're saying, over the period of 2002-2007, you --- you say you read the material written by appraisers.

A:     Yes, sir.

Q:     And that you were basing your opinions on those things that you read by appraisers during that period ?

A:     Appraisers and other real estate experts, newsletters, and so on.

Q:     Are you able to name any of the appraisers whose statements you're saying you read between 2002 and 2007 ?

A:     No, I can't recall those.

(Stowe Dep. at 34-36).

Thus, contrary to the Court's prior assumptions, Mr. Stowe did *not* rely on specific "statements" of other experts.   (Id. at 34).   It is also apparent that Mr. Stowe did *not* physically research the "public records of the [c]ounties in which H&S operated" as the Court presumed.

Q:      Do you know the counties that H&S operated in ?

A:      Not -- no.

Q:      . . . [D]id you bring with you here today any copies of public records of – that you're talking about in this sentence, of counties in which H&S operated ?

A:      No, sir.

Q:      All right.   When you wrote your April 1, 2011, affidavit and report, did you have in your possession any copies of public records in counties that H&S operated in ?

A:      No, sir.

Q:      All right.   Did you ever, yourself, visit any counties in which H&S operated for the purpose of checking county records ?

A:      No.

Q:      All right.   Did you hire someone else to do that ?

A:      No.

Q:      Are you able to identify, as you sit here today, any single public record in any county in which H&S operated that you say you relied on when you made this statement ?

A:      No, sir.

(Id. 37-38).

Based on this testimony, Defendants now seek to exclude Mr. Stowe's opinions in

Paragraphs 14 and 16(A).   However, the text cited above was *not* the extent of Stowe's

deposition testimony.   Though Defendants do not reference it, Mr. Stowe was later

questioned about the statistics and studies that he *did* consult when forming his

opinions.   (See Stowe Dep. at 146-154).

It is entirely unclear why it did not occur to Mr. Stowe, during the earlier portion

of his deposition, to mention the studies and statistics that he purports to have relied on

in reaching his opinion, but he did eventually make them known to Defendants. See id.

This is also reflected in Mr. Stowe's Supplemental Affidavit:

> The empirical data referred to in opinion 14 . . . was based on credible
> studies and statistics with regard to valuation of real property such as
> residential, commercial and forest lands, both on a National basis and on a
> State-by-State comparative basis for periods of time and subsequent to the
> transfer of assets by H&S. . . .
>
> Defendants questioned me at length about the data which I relied on in
> forming my opinion 14 that prices of land had appreciated during the
> period 2002 until January 2007.   Basically, the data are various Federal
> Government Reports which show the values of various types of land on a
> monthly basis based upon actual sales recorded in the county courthouses.
> . . .   As to all types of land there is a substantial appreciation during the
> period 2002 to January 2007.   The materials I relied on are the kind which
> an appraiser, banker, real estate agent, businessman, or other expert in the
> field would reasonably rely on in forming the opinion of whether or not
> property had appreciated over a particular period.

(See Supp. Aff. at ¶¶ 2 & 3).

Admittedly, Mr. Stowe's "Opinion 14" makes absolutely no reference to any

"study" or "statistics"; nor does he list these as materials he relied upon in reaching his

46

opinions.   (Stowe Aff. at ¶¶ 13-14).   Nonetheless, Stowe did produce and testify about these documents at his deposition, and Defendants had a full and fair opportunity to cross examine him about them.   (See Stowe Dep. at 146-154).

Among the documents produced were (1) copies of various federal housing studies which give a record of both national and state-by-state housing price indices – i.e., measuring the price change in single family homes each quarter, (Id. at 146-151; Ex. 10 [ECF No. 316-1] at 52-126); (2) graphs from a presentation conducted by an economist at Coastal Carolina University showing both a national and east-coast "housing price index" and an "inflation adjusted U.S. price index," (Id. at 151; Ex. 10 at p.127-142); (3) pages from a "computer blog" discussing the decline in timber values in 2009 (Id. at 152; Ex. 10 at 143-144); (4) an index of commercial real estate price changes from the "MIT Center for Real Estate," (Id. at 152; Ex. 10 at 145); and (5) a reports on farm and pastureland values from the United States Department of Agriculture (Id. at 152; Ex. 10 at 146-147).

Mr. Stowe did not maintain a copy the original documents considered, though he did in fact possess them at the time he signed his Affidavit in April of 2011.   (Id. at 150-51).   According to Stowe, he made his initial assumptions about the appreciation in real estate value based on his own knowledge and experience and then found this information on the computer "to confirm that real estate values in general were headed

up" during the relevant time period.   (Id. at 152; see also id. at 149, 151, 153).

Though Defendants take issue with the late disclosure of these sources, they do not challenge whether these are the types of things that experts in Mr. Stowe's field would generally rely upon.   From his testimony, it indeed appears that these are the very same things that Mr. Stowe "consults from time to time" and tries "to keep up with" in his profession.   (See id. at 148; 152); see also Rule 702, advisory committee notes (2000 amends.) (suggesting that courts consider whether the expert "is being as careful as he would be in his regular professional work.").   It also appears, from his testimony, that Mr. Stowe's opinion was not developed expressly for this litigation, but "naturally, directly out of research he normally conducts independent of this case."   See id. (suggesting that courts consider whether research was "conducted independent of the litigation").   Moreover, as discussed in the Court's prior Order on his testimony, experts in Mr. Stowe's field are known to review the financial records, relevant business environment, and actions of those involved to determine whether a business transaction is prudent, (Order, Jan. 20, 2012 at 13), and the studies on which he relied do in fact show that real estate values *generally* appreciated during the period from 2002 to 2007.

Based upon this and other considerations previously discussed, the Court thus finds Mr. Stowe's opinions to be sufficiently reliable under Rule 702.   (See also Order, Jan. 20, 2012 at 13-18) (identifying additional reasons why Mr. Stowe's valuation

testimony is sufficiently reliable).

However, as this Court previously explained, Mr. Stowe's ability to provide any opinion as to real estate appreciation in this case is limited to this very general proposition.   He is not qualified to estimate the fair market value of real property or proffer any an opinion that the specific parcels of land owned by H&S *in fact* appreciated in value during the period from 2002 to 2007.   Stowe's valuation testimony does not even need to be formed as an "opinion" on the facts of this case.   Rule 702 allows an expert to simply provide information relevant to the issues in the case "leaving the [jury] to apply [it] to the facts." Fed. R. Evid. 702, advisory committee notes (1972 proposed rules).   Experts should in fact be encouraged to testify in non-opinion form when it appears that the jury can draw the requisite inference themselves. Id.

In light of the current economic climate and recent years of economic decline, the Court also finds that Stowe's limited testimony may help the jury decide a fact in issue. See Fed. R. 702(a).   The evidence in this case is expected to show that H&S sold land lots for a fraction of the cost it paid for them few years earlier.   Steve Sinclair testified that land lots purchased by H&S at $ 13,079.00, $ 13,210.00, and $ 13,111.00 were sold at auction to another Horton company for $6,600.00 each, a price approximately 50% of that paid by H&S. (Sinclair Dep. Oct. 20, 2009 [Doc. 40] at 127).   Thus, testimony that real estate values had not yet begun their sharp decline and that land was still generally

49

appreciating in value during the relevant time period may assist the jury in deciding whether those lots were in fact sold for less than a reasonably equivalent value.

Certainly, Mr. Stowe's lack of information about statistics or studies involving mobile home subdivisions and the absence of evidence of the actual fair market value of these lots at the time of transfer is something the jury may also consider.   Again however, this is a matter more appropriately raised on cross examination and rebutted through the presentation of contrary evidence, as it goes to the weight of the evidence, not its admissibility. See Daubert, 509 U.S. at 596.   Mr. Stowe will thus be permitted to give his opinion in Paragraph 14 that real estate values generally appreciated between 2002 and 2007.

## CONCLUSION

For the aforementioned reasons, Defendants' Motions in Limine to Exclude Opinions offered by Plaintiff's Expert, Harold Stowe [ECF No. 317 & 320] are **GRANTED** in part and **DENIED** in part.   Defendants' Motion to Strike Mr. Stowe's Supplemental Affidavit [ECF No. 326] is **DENIED**.

SO ORDERED this 7th day of August 2012.

S/   C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

jlr