1               IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
2                     MACON DIVISION

3        ——————————————————

TERRY CARTRETTE TINDALL LONG, :
4                              : Case No. 5:10-cv-44
VS                            :
5                              : August 17, 2012
H&S HOMES, LLC, ET AL         :
6                 DEFENDANTS  :   Macon, Georgia

7   —————————————————————————————

                     PRETRIAL CONFERENCE
8
            BEFORE THE HONORABLE C. ASHLEY ROYAL
9           UNITED STATES DISTRICT JUDGE, PRESIDING

10   APPEARANCES:

11   FOR THE PLAINTIFF:        F. KENNEDY HALL
                              P.O. BOX 5088
12                            MACON, GA 31208-5088

13                            PETER HEARN, SR.
                              1206 THIRD AVENUE
14                            CONWAY, SC 29526

15                            RICHARD LOVELACE, JR.
                              P.O. BOX 1704
16                            CONWAY, SC 29526

17   FOR THE DEFENDANTS:       JIMMY L. PAUL
                              191 PEACHTREE ST. NE 34TH FL
18                            ATLANTA, GA 30303

19                            JOHN T. MCGOLDRICK, JR.
                              P.O. BOX 1606
20                            MACON, GA 31202

21                            LEE M. GILLIS, JR.
                              DUKE GROOVER
22                            P.O. BOX 4283
                              MACON, GA 31208

23   ————————————————————————————————————————————
                   TAMMY W. FLETCHER  USCR
24                    P. O. BOX 539
                   MACON, GA 31202-0539
25                    (478-752-3497)

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
 1                    P R O C E E D I N G S
 2   August 17, 2012
 3             THE COURT:   Good morning.  How are y'all today?  We
 4   are going to start with the first page of the proposed
 5   pretrial order and we're going to work through it.  I have a
 6   number of questions.
 7             We are going to have to come up with some ideas
 8   about how we can simplify this case for the jury.  I have some
 9   thoughts on that and we can talk about that along the way.
10             This is a very complicated case.  I think the jury
11   is going to have a lot of difficulty dealing with the issues.
12   And it's my responsibility under 611 to make sure that the
13   case is presented in a way that the jury can understand it and
14   deal with it and manage it.  And so I have some ideas about
15   that.
16             But anyway, let's just start from the beginning.  I
17   hope today to work through this.  I'm prepared to make rulings
18   on all the motions in limine that were filed.  There's one in
19   particular I'm not exactly clear about but I have looked over
20   all of those.
21             We are not going to take up the evidence in the
22   sense of the documents today.  We are going to have to
23   schedule another time to do that.
24             I will tell you that I have not read all of the
25   orders that I've entered in this case.  So don't assume that I
```

1    have and don't assume that I remember everything that I did

2    sometime in the past.

3            I am on page 2 now, and obviously we're not going to

4    be able to try the case in this courtroom.  So I want to find

5    out, as far as the Plaintiff's side, are we going to have four

6    lawyers?

7            MR. HALL:   Yes, sir.

8            THE COURT:   How many paralegals, if any?

9            MR. HALL:   We'll probably have a paralegal come and

10   go.  I'm not sure that she will be here all the time.

11           THE COURT:   And then what about on the defense

12   side?

13           MR. MCGOLDRICK:  Your Honor, on behalf of the Horton

14   Defendants, that is all the Defendants other than Mr. Sinclair

15   and H&S Homes, LLC, I will be the sole attorney representing

16   the Defendants in the trial of the case.  At this point I

17   don't anticipate have a paralegal or other counsel with me.

18           THE COURT:   Mr. Paul?

19           MR. PAUL:   Yes, sir.  I will not be present at

20   trial.

21           THE COURT:   Keep your seat.

22           MR. PAUL:   Yes, sir.  I will not be present at

23   trial.  The Court had asked who would be present.  I will not

24   be.

25           THE COURT:   You will not be present?

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
1              MR. PAUL:   No, sir.

2              MR. MCGOLDRICK:   Not as counsel.  He possibly may

3    as a witness.

4              MR. PAUL:   Yes, sir.

5              THE COURT:   Well, who is going to represent Horton

6    Homes?

7              MR. MCGOLDRICK:  I am, Your Honor.

8              THE COURT:   You're going to represent all of the

9    Defendants?

10             MR. MCGOLDRICK:  Except for Mr. Sinclair and H&S

11   Homes that are being represented by Mr. Groover and by Mr.

12   Gillis, yes, sir.

13             THE COURT:   Mr. Groover?

14             MR. GROOVER:    Yes, sir.  For Mr. Sinclair and

15   H&S Homes, Mr. Gillis and I will be present at trial to try

16   the case.  We may have one paralegal.

17             THE COURT:   Well, I think we're going to try and

18   use Judge Lawson's courtroom downstairs.  And that's not the

19   biggest courtroom but I think it's adequate for what we have,

20   based on what you told me.

21             MR. HALL:   That's on the second floor, Judge?

22             THE COURT:   Yes, it is.  Now, let's talk about the

23   estimated time for trial.  I'm now on page four.  And you're

24   estimating five to seven days and the Defendant is estimating

25   five to seven days.  I think that we ought to try and do this
```

1    case in two weeks and just move through it in that way.

2            Now, I'm thinking about dividing the case up into

3    segments and we can talk about that.  That may ultimately slow

4    it down just a little but I think it will increase the

5    likelihood of us getting a verdict in the case.  We can talk

6    about that in just a minute.  Does anybody see any

7    complication with what you have here, five days, five to seven

8    for the Plaintiff, about five to seven for the Defendant?

9            MR. PAUL:   No, sir.

10           MR. GROOVER:   No, Your Honor.

11           MR. HALL:   I believe it can be done.

12           THE COURT:   Now, in terms -- and I'm on page 5 --

13   the jury will be qualified as to the relationship with the

14   following.  I think it's for the Plaintiff, that's all

15   straightforward.  But I'm unclear about what questions I

16   should be asking about the Defendant's list here.  Now, what

17   do you want me to ask?  Stockholders, shareholders, employees?

18   I mean, what -- help me here understand.  It shouldn't be a

19   problem but I just want to know what it is?

20           MR. HALL:   I think just what you said, Judge.

21   Quite frankly they are closely held corporations.  They're not

22   going to have many shareholders, other than themselves, but

23   employees.

24           THE COURT:   Anything other than those three?

25           MR. HALL:   No, sir.

1          THE COURT:    Now, I'm on page six.

2          MR. HALL:    I do on 13 and 14.  We tried to convince

3     the other side that Mr. Lovelace and Mr. Hearn are not a

4     partnership.  And I see no reason to -- their from South

5     Carolina so it isn't going to make any difference.  But I see

6     no reason to qualify them as to these other names because they

7     are not partners in the firm and they have no contingent

8     interest in the case.  That's Mr. Brittain and Mr. Martin;

9     isn't that right Pete?

10          MR. HEARN:    Correct.

11          MR. HALL:    There's nobody else in the law offices

12     of Richard Lovelace; is that right?

13          MR. LOVELACE:    That's right.

14          THE COURT:   What's y'all's position on that back

15     there?

16          MR. PAUL:    Your Honor, we were under the

17     impression it was a partnership.  But if Mr. Hearn says it is

18     not a partnership and there's no interest in the case then we

19     agree that only Mr. Hearn would be qualified.  The jury would

20     be qualified only to Mr. Hearn.

21          THE COURT:    So, I can strike Lovelace?

22          MR. PAUL:   No, sir.

23          MR. GROOVER:    That's on number 14, Your Honor.  It

24     would just be Mr. Hearn.

25          THE COURT:    Oh, Mr. Hearn, okay.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          MR. GROOVER:   Yes.

2          MR. HALL:   You got Lovelace -- well, maybe not.

3          THE COURT:   You're going to have to pull the mike

4     closer to you.  You're going to have to lean over.  I don't

5     want y'all standing up.

6          MR. HALL:   Right.

7          THE COURT:   Is that as close as you can get the

8     microphone.  There we go.

9          MR. HALL:   Mr. Lovelace is number 3 under Plaintiff

10    and I don't see any reason to have him under 13, under the

11    Defendant.

12         THE COURT:   I'm just going to ask the general

13    question if they know them.  How about that?

14         MR. HEARN:    Your Honor, if I may.  I'm Peter

15    Hearn.  Our firm now is Hearn and Hearn.  My brother and I

16    practice together.  I do not practice what Mr. Lovelace.  We

17    formally were Hearn, Brittain and Martin.  That firm disbanded

18    two years ago.  So there are just two of us now.  It's Hearn

19    and Hearn, PA.  That is number 14.

20         MR. HALL:   Is he your partner?

21         MR. HEARN:   Yes, my brother is.

22         MR. HALL:   All right.  We better qualify him as to

23    your brother too, I guess.

24         MR. HEARN:    Right.

25         MR. HALL:   Well, his name is what?

1          MR. HEARN:    George Hearn.

2          MR. HALL:    They should be qualified as to George

3    Hearn as well.

4          THE COURT:  Now, still on page 6, under paragraph

5    six.   Are you expecting to take any depositions for use at

6    trial?

7          MR. HALL:   Your Honor, please.  When there was a

8    concern about not beginning on the 10th we thought we were

9    going to have to take maybe the deposition of Mr. Stowe

10   because he has a trip planned for about then to New Zealand or

11   somewhere.

12         THE COURT:   All right.

13         MR. HALL:   Any way, we think we can get him in on

14   Wednesday of the first week.  I wanted to discuss that with

15   you whether we could break to make sure we get him in in case

16   we are in the middle of something?

17         THE COURT:   Well, I'm not convinced we're going to

18   start the trial of this case on the 10th.

19         MR. HALL:   You're not?

20         THE COURT:   No.  We may start it the next week.

21   We've got some scheduling problems here between now and then

22   by trying to rule on these exhibits.

23         MR. HALL:   We would need to take the deposition of

24   Mr. Stowe.

25         THE COURT:   Well, then that's fine.  That's why

1      I'm asking the question.

2            MR. HALL:   Yes, sir.

3            THE COURT:   That's the only one?  It's the only one

4      you mentioned here.

5            MR. HALL:   Unless something comes up as a result of

6      your rulings.  I think that's all I contemplate.

7            THE COURT:    What about for the defense?

8            MR. PAUL:   Your Honor, I think we have through the

9      end of the day today on Mr. Stowe to file a motion.  We do not

10     anticipate filing a motion for Mr. Stowe.  We had through the

11     end of the day.  So, unless something changes during the

12     hearing I don't anticipate filing a motion for Mr. Stowe.

13           As to Mr. Draughon, I believe is the way to

14     pronounce his name, it's self-explanatory.  We passed on his

15     deposition when he was opining only about hourly rates.  We

16     didn't need a deposition.  If he's going to ever try to opine

17     about more then we would want to take a deposition because

18     he's only filed a report on rates.

19           And then, Mr. Groover is arguing our motions in

20     limine related to the new designation of Donna Lee, Mr. Peter

21     Hearn, Mr. Richard Lovelace and Mr. Hall as, in essence,

22     opinion witnesses on their own fees.

23           THE COURT:   Well, we're going to talk about that

24     when the time comes.

25           MR. PAUL:   Yes, sir.

```
 1              THE COURT:   I've read those and we'll talk about
 2     that when the time comes.
 3              MR. PAUL:   Yes, sir.
 4              THE COURT:   Well, of course, the question then is
 5     is John going to testify about anything beyond the
 6     reasonableness of the rate?
 7              MR. HALL:   That's all that's he's giving an opinion
 8     on and that's all -- I'm going to testify as to what I did and
 9     the necessity of it, as will the other lawyers.  I hope they
10     could stipulate that my hourly rate is reasonable since it's
11     about two thirds of what theirs is, Judge.
12              THE COURT:   Well, typically in this Court the
13     judge handles all the attorney's fees business.  Because it's
14     almost always under some federal statute.
15              But my understanding here is I really don't have
16     anything to do with any of it, it's all up to the jury.
17              MR. HALL:   I think it's 13-611 Judge.
18              THE COURT:   Right, okay.  So, I'm out of it.  And
19     so we are clear on John Draughon.
20              Now, I'm on page 8.  I just want to be very clear
21     about this.  Talking about here the Robert Dudley Horton
22     Trust, The Maude H. Hicks Family Trust.  They have been
23     dismissed.  I think there was one trust we left in.  What do
24     you want done about this?  They aren't going to be mentioned
25     or discussed, I assume?
```

1          MR. HALL:   No, sir.

2          MR. PAUL:   We were just saying that the caption of

3     the case would be amended to delete those Defendants.

4          THE COURT:   Well, that's what I thought you

5     wanted.  But I'm asking you if you want something more than

6     that?

7          MR. PAUL:   No, sir.

8          THE COURT:   Well then we'll take care of that.

9     Now, let's go, still on page 8, to the issues for

10    determination by the jury.  And this case is really very

11    complicated, as I've already said in terms of all the theories

12    that the Plaintiff is seeking relief under.  And I am really

13    thinking about trying to divide the case up into stages.

14          And I'm telling you this before we go through these

15    causes of actions because I think it will help you understand

16    what I'm thinking about, having decided to do this.

17          But I think that it would be appropriate to have

18    stage one deal with the question of fraudulent transfer,

19    conspiracy related to the fraudulent transfer and then the

20    issue of punitive damages, about whether they should be

21    returned, obviously not the amount.

22          Then I thought about having a second segment on

23    these other theories, which I think the jury is going to have

24    a very difficult time with, breach of fiduciary duty, which is

25    sometimes discussed as preference, corporate veil, successor

1    liability, cost of litigation and attorney's fees.  That would

2    be the second stage.

3           And really what I would contemplate here would be to

4    tell the jury that we're going to divide the case up and that

5    they are only to consider the issues that I'm going to charge

6    them on, the law, and I'll charge them on the law and that

7    they need to resolve that.  They will understand that this is

8    just one aspect of the case.

9           And what I will let you do is make limited opening

10   statements as to each segment of the case and limited closing

11   arguments as to each segment of the case.  And what I'll do is

12   I'll instruct the jury that they are to carry forward with

13   them all the evidence that they have heard plus the new

14   evidence that they are going to hear.

15          It's a little bit unclear to me, at this stage,

16   about exactly what the fraudulent transfer claims are.  I

17   mean, we have 74(a)1, 74(a)2, we have 75(a).  And then at some

18   point there was 18-2-21.  So I don't know how many of these

19   are still in the case.  Some of them obviously are to me.

20   Some of them may not be.  But before we work through this I

21   wanted to get your general reaction to this idea.

22          MR. HALL:  Obviously a lot of the evidence is the

23   same as to all of them, something could be a fraudulent

24   transfer or preference.  It could be evidence of successor

25   liability.  It could be evidence of why the corporate veil

 1    should be pierce.

 2            But, as you say, as long as the jury just carried

 3    that with them I think that would be appropriate.  I don't

 4    know how much more evidence there would be.  But it would

 5    certainly --

 6            THE COURT:   Well, I don't think there's going to

 7    be a lot more evidence.

 8            MR. HALL:   I think you're right.

 9            THE COURT:   I think that most of the evidence is

10    going to come in under part one, segment one.

11            But the problem that I understand better than y'all

12    is that some of the most difficult problems I have to deal

13    with as a Judge is a question the jury sends back.  And we'll

14    end up sometimes spending an hour trying to figure out what to

15    do.

16            And usually the questions aren't clear and the

17    answer to the question is not clear and I can just see them

18    coming back on these theories about, you know, what is a

19    fiduciary, what does that mean?  What is the corporate veil?

20    And, you know, what is successor liability and all that and us

21    spending a considerable amount of time trying to answer these

22    legal questions.  And then you're throwing two, three or four

23    different UFTA claims in on top of that, that is my concern

24    about it.

25            MR. HALL:   I think there are only two UFTA claims.

```
 1              THE COURT:   Well, we're going to narrow that down.

 2              MR. HALL:   And really I'm going to emphasize one.

 3              THE COURT:   One.

 4              MR. HALL:   Actual fraud.

 5              THE COURT:   Well, that's right.  And that's why I

 6   think this case ought to be divided up and the first segment

 7   needs to deal with the fraud.  I mean these other things are

 8   just sort of thrown in there.

 9              MR. HALL:   Well, there are other ways to recover.

10              THE COURT:   I understand.

11              MR. HALL:   I want to recover that way.

12              THE COURT:   I understand that part of it, but your

13   case is really a fraud case here.  I think that's the thrust

14   of what you are trying to prove.

15         We can flesh this out as we go through.  I think

16   some of it will be clear when we deal with some of these

17   motions in limine.

18         But just in principle that's what I think it would

19   be a good idea to do.  I haven't heard anything from the

20   defense team back there about that?

21              MR. PAUL:   Yes, sir.  I think, Your Honor, we

22   would ask for some time to confer, but we appreciate what the

23   Court is trying to do.

24         It's not something we can make a knee jerk decision

25   about because of the way this evidence fits on these claims.
```

1      That will change some of the strategy of trying the case so we

2      just need to have a chance to talk with each other, I think,

3      and hopefully get back to the Court. But we do understand it's

4      a very complicated case.

5             THE COURT:   Yeah.  Well, we don't have to decide

6      that.  I'm just trying to tell you as I went through this this

7      is what I came up with as a way to approach it.

8             MR. PAUL:   Yes, sir.

9             THE COURT:   And I do not think that we need to put

10     up two weeks worth of witness and send out six or eight

11     different legal theories, some of which are actually very

12     different from others.  Some of which require some different

13     proof.  Obviously not totally different proof, but some

14     require more proof than others.  And so that's the idea that I

15     came up with.

16            So with that in mind now, I want to work through

17     these issues.  So, we'll --

18            MR. HALL:   I think that can be done, Judge.

19            THE COURT:    We will work through here.  I tell you

20     what, before we do that this might simplify it.  Let's just

21     clarify from the Plaintiff's standpoint.  Your contention is

22     you have a 74(a)(1) and (2) claim; is that right?

23            MR. HALL:   I have a 71(a)1 and 71(a)(2) claim.  I

24     am thinking about abandoning (a)(2), but I have not reached

25     that point.

1           Now, I have recognized that I haven't had a 75

2     whatever it is (b) claim for a long time.  You ruled it out.

3           THE COURT:    Right, I did.

4           MR. HALL:    I knew that.

5           THE COURT:   That still leaves two under that theory

6     and then the 75 claim.  I don't know if you still have that in

7     the case or not?

8           They are essentially nuances here in terms of what

9     the jury has to find, I think.  There are subtle differences

10    and I sit hear and read them and I have to read pretty close

11    to figure out what the differences are.

12          MR. HALL:   My impression is that I've got the

13    74(a)1 claim.  Let me make sure that I'm not giving up

14    something important under 75.

15          THE COURT:    Well, that's fine.

16          MR. HALL:   I will do that.

17          THE COURT:    I will tell you that my experience

18    again on the bench is a really good way to lose a case is to

19    overtry it.  The only -- out of probably a hundred cases that

20    I've tried since I've been here there was only one time the

21    jury came back with a verdict that I thought was wrong.  That

22    is a pretty good record.

23          And it was a $500,000 verdict in a little dumb

24    contract case and I'm sure when I read the verdict my mouth

25    dropped to the floor.  I ended up granting judgment as a

1    matter of law to the defense.  I was affirmed in a one

2    paragraph opinion by the Court of Appeals.  But the case was

3    clearly, clearly over tried by the defense.

4            So I would just caution both of you to be careful

5    about that. That is just the benefit of my experience.

6            What about 18-2-21?

7            MR. HALL:   I think that had more to do with the

8    fraudulent judgment, the 22,000,000 judgment, the default

9    judgment issue, which you said I can't recover on because of

10   the statute of limitations.  I will have to look, but I don't

11   think 18-2-21 is -- let me think if it is relevant to any of

12   the other things.  I don't think I have a separate claim under

13   that.

14           THE COURT:   Well, when can you get back with us

15   and let us know what your theories are?  That's why we are

16   here today.  I mean, this is why we are here today, and I'm

17   trying to decide what the issues are and focus the case.

18           MR. HALL:   Right.  I will let you know early this

19   week.

20           THE COURT:   I have a jury trial next week.

21   Obviously the defense team needs to know.  So can you let us

22   know by -- everybody know by Wednesday or Thursday or

23   something like that?

24           MR. HALL:   Yes, sir.

25           THE COURT:   That obviously will have some impact

1    on the way the case is tried and will simplify the case.

2         MR. HALL:   Yes, sir.

3         THE COURT:   I had a number of questions along the

4    way but that may have cleared up some of it.  I will point out

5    that if you are going to change that then the proposed

6    pretrial order needs to be adjusted accordingly.

7         In other words, if there are some theories that you

8    are not going to pursue then don't just say I'm not going to

9    pursue those.  You need to look back through your issues and

10   see if --

11        MR. HALL:   The only one, Judge, would be -- the

12   only one I referred to in the pretrial order or any of the

13   charges or anything else was constructive fraud under (a)2.

14   So, yes I will do that.

15        THE COURT:   The pretrial is going to guide the

16   case.  And so I just want to make sure that if you say, okay,

17   I'm not pursuing this claim anymore then anything related to

18   that claim that needs to come out of this comes out, okay,

19   that's all.  Simple matter.

20        MR. HALL:   Right.

21        THE COURT:   Now on page 11, this has to do with

22   veil piercing and that's something that I think ought to be in

23   the second stage of the trial.  Although, I'm not sure there

24   would be much difference in the evidence related to that.

25   Maybe there will be, maybe there won't.  Obviously y'all know

1     the evidence better than I know it.

2              MR. HALL:   Well, a lot of it will be -- some of it

3     will be the same, in proving what they did.

4              THE COURT:   Right.

5              MR. HALL:   I will have proved that they didn't care

6     one whit whose property H&S belonged to.  They could just make

7     it go somewhere else.

8              In proving the existence of the fraud I will have

9     proved a lot of what I intend to prove.  I can't prove that

10    they didn't have separate checks and notes.  They've got

11    thousands of pages of checks and notes.  They had meetings

12    every now and then and they did a lot of stuff.

13             So I'm not going to attack the fact that they didn't

14    try to act like a corporation.  What I want to attack is that

15    when they finally decided that they had to not pay my client

16    they didn't act like H&S was separate at all.  That's the main

17    thing.

18             THE COURT:   Okay.

19             MR. HALL:   So, I just point that out.  A lot of the

20    evidence will be that.  They will probably have a lot more

21    evidence in trying to --

22             THE COURT:   Right, I understand that part of it.

23    Then next on page 12, preference and breach of fiduciary duty.

24    Now, it's my understanding here based on the case that we

25    relied on, Mr. Burke's case, it's really a breach of fiduciary

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    duty.  It's not really a preference.  And this is something

2    that I think ought to come in the second stage.

3              MR. HALL:   I agree.  I've always thought there was

4    a breach of a fiduciary duty not to do it, not to create a

5    preference.

6              THE COURT:   Well, I understand that.  But again

7    this goes back to the terminology problem.  I mean, I don't

8    somehow want to think -- the jury to think that there is some

9    separate cause of action for giving a preference and that

10   there is something else related to a breach of fiduciary duty.

11   The title of this claim is a breach of fiduciary duty.  And an

12   element of that would be preference.  Do y'all agree with

13   that?

14             MR. HALL:   I'm not disagreeing.  I'm muddling over

15   it.  I think I get to the same place you do.  I sort of

16   thought it might be a two-step phase but you get at it at the

17   same time.  They had a fiduciary duty not to create a

18   preference.

19             THE COURT:   Right.

20             MR. HALL:   And that's what the claim is.

21             THE COURT:   And if the jury finds there was a

22   fiduciary duty and if the jury finds there was a preference

23   then it seems to me -- I don't know if there are any other

24   elements, but those are the two obvious elements, then you get

25   to recover under that theory.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
1              MR. HALL:   I think that's right.
2              THE COURT:   Do y'all disagree with that?
3              MR. PAUL:    Your Honor, I think the Ware V Rankin
4    case and the other cases that this theory comes out of, as the
5    Court noted in it's order, talks about a trust or a
6    quasi-trust relationship.  And obviously there is a fiduciary
7    duty that arises out of that.  But when you read all the cases
8    it really is a particular -- it's not just an ordinary breach
9    of fiduciary duty case that has damages that run from the
10   breach of the duty.  It is a very specific trustee
11   relationship.
12             And when the Court was ruling on the statute of
13   limitations and found that in statute of limitations the Court
14   cited the trust statute as the basis for the statute of
15   limitations.
16             And that concept, it's a specific concept in the
17   context of insolvent corporation with a duty that runs to the
18   creditors instead of the stockholders.  But it is a very
19   special type fiduciary duty.  It's not just the normal breach
20   of fiduciary duty.
21             So we would say that we would -- wanted to be sure
22   there wasn't confusion about -- just charges about general
23   fiduciary duties and breaches of them and issues that are just
24   general fiduciary issues.
25             THE COURT:    No.  I don't see any general fiduciary
```

```
 1    duty here.  I see something very specific to what happened in

 2    this case.

 3              MR. PAUL:    Yes, sir.

 4              THE COURT:    And I'm not sure that we have any

 5    disagreement at all.  I think there are some very specific

 6    findings that need to be made.  I think there's sufficient

 7    evidence in this case to find that.  I don't think it is just

 8    some kind of general fiduciary duty.

 9              MR. PAUL:    Yes, sir.

10              THE COURT:    Let's talk now.  I am on page 13 and

11    this is the successor corporation theory.  And I'm not exactly

12    clear about this.

13              First, I'm not sure you need a successor corporation

14    theory if you have proven fraud.  And also, I'm not sure the

15    successor corporation theory goes against anybody but

16    Triangle.

17              MR. HALL:    Well, you got to understand that they

18    didn't give Triangle a whole lot of the assets.  They gave the

19    assets all over the place.  They carefully didn't give

20    Triangle very much.  They did give a bunch of stuff that

21    flowed through Horton Homes.

22              So I think it covers all of them.  I think it covers

23    those people who got the property.  You know, Georgia has --

24              THE COURT:    Lean forward, please, so I can hear

25    you.
```

 1          MR. HALL:   The Defendants delighted pointing out

 2     that there are no cases in Georgia on this theory.  You've got

 3     to get your guidance from other places that have actually

 4     considered this cause of action.  But I have seen cases where

 5     they tried to do approximately this and they were all held in

 6     as I recall.

 7          MR. GROOVER:   Judge, may I respond?

 8          THE COURT:   Yeah, go right ahead.

 9          MR. GROOVER:   With respect to Mr. Sinclair and

10     H&S I think you've already ruled in one of the motions that

11     they obviously could not be -- H&S can't be a successor to

12     itself and Mr. Sinclair is not a successor.  It says all

13     Defendants.  So I just wanted to clarify that.

14          THE COURT:    That's why I'm asking the question.

15          MR. HALL:   Agreed.

16          THE COURT:   I think there's a limit to this

17     theory.  See here's the problem.  This is what we have to deal

18     with here.  We can't just send out a theory to the jury

19     against all these Defendants if it doesn't apply to all these

20     Defendants.  And the verdict form is going to have to be set

21     up in such a fashion that they know that these are the only

22     Defendants that this theory even operates against.

23          So we can't have the jury sitting back there worried

24     about successor liability against Mr. Sinclair, for example,

25     when I've taken it out of the case.  Or if it doesn't apply to

1    other Defendants in the case we can't let them be sitting back

2    there trying to figure that out either.  So you understand

3    that?

4            MR. HALL:   Sure, I understand that.  And I

5    certainly didn't mean to imply that Sinclair and H&S --

6    H&S is the company, you don't want another judgment against

7    them.

8            THE COURT:   Okay.  But, I mean, that's why we are

9    working through here.  I'm trying to bring some clarity to all

10   this so we can move this trial as smoothly as it can and make

11   it as easy on the jury as we can.

12           Let me tell you, if we can stop here.  There are two

13   ideas that I have had that I think would be helpful to the

14   jury.

15           One of them is to essentially give the jury a roster

16   of who these people are.  Which would be after the fact and of

17   the stipulation.  I mean we have a number of Defendants here,

18   you know.  We have H&S gets closed out.  Then three other

19   companies are set up.  I have that written down somewhere.  I

20   don't know where it is.  But it would seem that they could

21   have some kind of flowchart or something so that when somebody

22   sits up here and talks about H&S or Mr. Horton or Mr. Sinclair

23   they would know who that is and they could move on -- okay,

24   well, I know who that person is.  They can look down and see

25   that number 22 is so-and-so and he played halfback or

1    something like that.

2              You know, you understand what I mean?

3              MR. HALL:   Yes, sir.

4              THE COURT:   I really think that an effort ought to

5    be made to come up with something that the jury can have, we

6    can give it to them at the beginning of the trial.  They will

7    know who the players are.  You might want to even put some of

8    the theories in there.  I'm not quite convinced about that.

9              But we just need to come up with a way that they can

10   deal with it.  So I want y'all to get together and work on

11   that.

12             The second thing that I think would be very helpful

13   here is a chronology.  Now, there is, in part, a chronology in

14   the stipulation.  Wherever that is.  Some of the things that

15   are important in this case are stipulated to.

16             But I think, you know, there are certain transfers

17   that were made and I think it would be a good idea to come up

18   with a chronology of events here.  Again, so the jury could

19   see how this has been.

20             I think this is especially important in a case

21   where, as here, there is a statute of limitations ruling that

22   I've made.  We've got some motions in limine on the

23   implication of that that I'll deal with in just a minute.

24             But I just wonder if there is some kind of

25   chronology that could be agreed to about some things that

```
 1     really just aren't disputed.
 2              MR. HALL:   I think that would be a good idea.  We
 3     could try to get such a thing up and submit it to the other
 4     side and see if they will approve it.
 5              MR. GROOVER:   I agree, Your Honor.
 6              THE COURT:   I think that would be very helpful to
 7     the jury.
 8              MR. HALL:  Actually we have asked them to stipulate
 9     to an organizational chart of the outfit that they actually
10     used in the McDonald case and I don't know whether they're
11     going to do it or not.
12              THE COURT:   What's the problem with that?
13              MR. MCGOLDRICK:   It's not a problem using the
14     chart, Your Honor.  But the one that Mr. Hall submitted to us
15     I don't think it's where the Court wants us to be.  It's not
16     really readable.  You can't tell who the parties are and who
17     owns who and who controls it.
18              I think we've got one actually that comes closer to
19     being the sort of thing that the Court is looking for.  So in
20     principle we're not opposing the use of an organizational
21     chart like that.  It's just the one Plaintiff presented to us
22     doesn't do the job.
23              THE COURT:   Well, I just want y'all to get
24     together and come up with these two tools that we can offer to
25     the jury.  They will have them sitting there the whole time.
```

1   We'll give them to them.

2          What I'll do is I'll start at the beginning, read

3   the stipulation to the case -- the stipulations to the jury.

4   And then I will give them those two aides.  I'll tell them

5   what they are, tell them how we came up with them and then

6   that way they'll be able to look at it and try to figure out

7   who these people are.  All right?

8          Okay.  So are you going to give me back now a

9   successor -- Are you going to tell me specifically who that

10  theory is against?

11         MR. HALL:   I envisioned that it was against

12  everybody except Sinclair.  Sinclair did not get any transfers

13  that I can lay my hands on.

14         H&S, of course, you don't get it against them.  I

15  concede that it was everybody else was involved to the extent

16  that they should be considered a successor.  But I will

17  revisit that and see if we can find something.

18         THE COURT:   Okay.  Now, next is a conspiracy

19  theory.  And that goes along in the first stage, clearly a

20  part of the fraud claim.  I didn't really have any questions

21  about that.

22         Then as to the punitive damages.  The punitive

23  damages obviously is controlled by statute.  You essentially

24  have a little minitrial on that and that would have to be at

25  the end.

1          MR. HALL:   The only thing, and I think I know the

2    answer, but the only thing is does the jury in the first phase

3    find specific intent?

4          THE COURT:   Yes.

5          MR. HALL:   So as to raise the cap?

6          THE COURT:   Yes.

7          MR. HALL:   Yeah, I think that will --

8          THE COURT:   They will be given a jury special

9    verdict form and it will say, you know, do you find, you know,

10   consciousness and so forth.  And do you find also specific

11   intent?  That's the way it needs to go.  So that they can

12   check one -- Three, no we don't find that.  Yes, we do find

13   the first part.  And then, three, yes we find intent, yes or

14   no or however.  So I think that's the way to do that.  Do

15   y'all disagree with that?

16         MR. PAUL:   No, sir.

17         MR. MCGOLDRICK:  No, sir.

18         THE COURT:    That is essentially the way the

19   statute reads?

20         MR. PAUL:   Right.

21         MR. GROOVER:   Right.

22         THE COURT:    That's the way it needs to be dealt

23   with.  Okay.  And then we'll get down to the end on that.

24         There have been rare occasions when I have been in

25   this situation but that part of the trial usually does not

1    last very long.

2              Now mental anguish.  I know that there is a motion

3    in limine related to this.  Actually there are two motions in

4    limine related to this.  And I really, in terms of the damages

5    here, I'm thinking about actually having a very short third

6    stage on that.

7              I don't see the Plaintiff testifying in this case

8    until the third stage.  And the reason for that is because

9    what happened -- this is a matter for one of the motions in

10   limine.  I mean, the Plaintiff is in this Court trying to

11   enforce a judgment that was obtained in South Carolina.  The

12   circumstance of the evidence related to the judgment I don't

13   think really have anything to do with this case.

14             The history of the case, I think, probably does.  In

15   other words, when she got the judgment and what happened after

16   that.  But that ought to be stipulated to and I think a lot of

17   that is stipulated to.

18             But I don't think that the problems that she had

19   with H&S, you know, they didn't fix her roof or whatever, the

20   water leak, or whatever and all the problems.  And she kept

21   calling them and they didn't come and on and on.  I don't see

22   what that has to do with this case.

23             The issue of mental anguish in terms of what

24   happened after that may have something to do with the case.

25   And you have alleged here in terms of the fraudulent transfers

1    and breach of a fiduciary duty.

2          But I want to understand how you see this tying into

3    the case and then I'll hear from the defense.

4          MR. HALL:   Well, I agree that her mental anguish

5    during the South Carolina litigation is not at issue here.

6    That is res judicata, it's over and done with.

7          And I think that what we allege, is that their

8    stubborn refusal to pay these judgments, for whatever reason,

9    after she had a collectible judgment in South Carolina and

10   then a collectible judgment in Georgia, they refused to pay

11   her all this time.

12          It was reasonably foreseeable to anybody that

13   doesn't pay a judgment to a poor person, particularly a person

14   -- I mean, they know who they sell trailers to.  They know

15   they are not billionaires and they know they can't afford not

16   to have $349,000 plus interest that is due to them.

17          And it was perfectly foreseeable to them that hey,

18   that lady up in South Carolina might be having some mental

19   anguish because she thinks she's got this money but she

20   doesn't really have it.

21          THE COURT:   Well, that was what I thought was your

22   theory.  Do you want to respond to that?  Somebody from the

23   defense table.

24          MR. PAUL:   Mr. Gillis is going to speak for all of

25   us on that, Your Honor.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          MR. GILLIS:    Your Honor, under Georgia law she has

2     -- she clearly in her deposition testified to a pre-existing

3     condition of depression, mental stress, fatigue, everything

4     related back even before she had any dealings with H&S and

5     buying the first mobile home.

6          Under Georgia law, and our motion speaks to this,

7     she's required with a pre-existing condition to have medical

8     testimony that there is a causal link between the nonpayment

9     of the judgment and her mental anguish.  Furthermore --

10         THE COURT:    I'm not convinced of that at all.  I

11    think she can probably give a 701 lay opinion about what this

12    did to her, but go ahead.

13         MR. GILLIS:    I think she could if, by way of

14    example, if you have a car wreck and someone breaks their arm

15    in a car wreck that never had an arm injury before I

16    absolutely agree with you under 701 they could give a lay

17    witness opinion that their arm was broken in the accident,

18    that's the pain.  But you have someone who has shoulder

19    problems and is then in an accident and complains that the

20    rotator cuff tear was caused by the accident, they can't get

21    up and give that testimony under 701.  They got to --

22         THE COURT:    Well, I agree that they can't get up

23    and testify there was a rotator cuff tear because that is a

24    medical diagnosis.  She can't do that.  But that's not what

25    we're talking about here.  We're talking about her mental

1    distress.

2        MR. GILLIS:    Well, and also, Your Honor, since

3    2006 she has not taken any depression medication, which

4    confuses the issue even further.

5        And furthermore, in her deposition she had the

6    opportunity to talk about the nonpayment of the judgment and

7    it's direct affects on her and she didn't say that the

8    Defendants or any of their actions caused her severe emotional

9    injury.

10       She hasn't testified to these things when given the

11   opportunity at the deposition.  I think under Georgia law

12   she's required to have someone say that the worsening of her

13   mental distress was caused by the nonpayment of the judgment.

14       Do I think she could have found somebody to say

15   that?  Maybe.  But she didn't and I don't think she's met her

16   burden to carry that to trial.

17       THE COURT:    All right.  Do you want to respond to

18   that?

19       MR. HALL:   I think these are general damages that

20   she can testify to.  I don't know of anybody who knows more

21   about what is bothering me today than the person who's got it

22   in his mind and is bothering him.  I want the money.  I could

23   help my husband who had cancer, and died by the way, if I had

24   some more money.  I could have helped my daughter go to

25   college and it bothered me that I couldn't do any of those

1     things.

2             THE COURT:   We're going to come back to this when

3     we get into the motion in limine.  I think there is a valid

4     theory here of recovery.  How far I'm going to let the

5     evidence go on that is a different question.  And I will look

6     a little bit further into what you just argued but it sounds

7     to me like most of what you're arguing is really something for

8     cross examination.

9             Expenses of litigation.  That's clearly in the

10    second part of the case.

11            And on 15 I think we have an agreement about this

12    but I did circle this.  Amount of punitive damages to be

13    decided at a separate trial.  And I assume that what I

14    outlined is what you had in mind about that?

15            MR. HALL:   Yes, a separate phase.

16            THE COURT:   Okay.  Other relief.  Now I'm on page

17    16 at ten.  I think that whatever relief is required or is

18    available I will be responsible for resolving that.  Does the

19    defense table have any problems with that?

20            MR. GROOVER:  No, sir.

21            THE COURT:   I have a bird dog lawyer that can find

22    anything anywhere.  So we will just appoint a receiver and

23    we'll get what is out there.

24            All right.  Now, the Defendant's issues.  And I

25    would point out that as far as one, two and three on page 16,

1    that would be in the second part of the case.

2            Successor liability would be in the second part of

3    the case.  That would include four and five.  Now, if you

4    want to respond to this Mr. Hall we can go through.  If

5    there's something you want to say about some of these you let

6    me know because I've already made some comments about these

7    theories.

8            I do have a question about six, and I'm on 17.  At

9    what point in time did H&S Homes, LLC become insolvent,

10   generally unable to pay its debts as they became due in the

11   usual course of business?

12           And I assume that that is a question that is

13   triggered by the 18-2-74(a)(2) theory?

14           MR. PAUL:    Your Honor, of course insolvency goes

15   to 18-2-74.  It goes to the preference, what is called the

16   preference claim because the transfers to be, what is called

17   the preference or the violation of the trustee's duties have

18   to be transferred while the company was insolvent.  The tests,

19   we say are different.

20           Now, the statute decides insolvency for fraudulent

21   conveyance purposes.  The case law defines insolvency for the

22   purposes of breach of the trustee's duties when a company is

23   insolvent.  And that is an equitable remedy.

24           And the equitable definition of insolvency applies,

25   we say, and the cases refer to that.  That is general

1    inability to pay debts as they come due in terms of this

2    preference claim.  And so there are different definitions.

3            The fraudulent conveyance includes both an asset

4    liability analysis and assets are defined, as the Court knows

5    very specifically, it's not all assets and liabilities are

6    defined or inability to pay debts as they come due.

7            But when you move over to the preference claim it's

8    our position that only the equitable definition of insolvency

9    applies and that is general inability or general refusal to

10   pay debts as they come due.

11           And so -- And one of the cases that we cited in our

12   standard argument talks about that a little bit.  So there are

13   two different tests.

14           THE COURT:   Well, I mean, it would also come into

15   play in this 18-2-75 claim, an element of which is the debtor

16   was insolvent at the time the debtor --

17           MR. PAUL:   That's right.  And the statute --

18           THE COURT:   We'd have to figure out what your

19   claims are on these various theories and then we've got to go

20   back and we've got to rework this.  Because this may not be an

21   issue in the case, maybe it will, maybe not, I don't know.

22           MR. HALL:   Well, they have admitted in answer to

23   interrogatories they have been insolvent on their balance

24   sheets since 1997 and it's pretty clear that they are.

25           THE COURT:   Okay.  That is a fact upon which the

1    jury can reach the conclusion that he finds there is an issue

2    here.  I'm really more concerned about the legal component of

3    it if it's really going to be in the case.

4        And you don't have to tell me now but I'm just

5    trying to point out that some things are going to get cleaned

6    up here or should get cleaned up when you know exactly what

7    theories you're going to pursue.

8        MR. HALL:   Yeah.

9        THE COURT:   So both sides are going to have to go

10   back and clean this up in light of what I'm saying.

11       MR. HALL:   They have not stated, what I believe, is

12   the meeting of insolvency under any of my theories.

13       Insolvency is a part, of course, of preference.  And

14   at the time that most of these cases were written, insolvency

15   was a lot broader, it was not stated this way.  It was stated

16   as not being able to pay all of your debts.  And it's

17   undisputed that they weren't going to be able to pay their own

18   -- they weren't going to be able to pay Horton Homes and they

19   weren't going to be able to pay these judgments that they had

20   against them.

21       As a matter of fact they tried to contend, you see,

22   two things, that we had to give up our leases because we

23   didn't have any money to pay and we had to let all of these

24   homes be repurchased because we didn't have any money to pay.

25   They have testified that that is the case.

1          I don't think that's true, but it is certainly an

2     admission that they had no money at the very time that they

3     were doing these things to begin the shoveling.  Now, they are

4     stuck with the fact that at that time they were pretty cute

5     and said they didn't have any money.  They probably did have

6     some money but they said they didn't.

7          And it fits right in with the definitions for

8     preference.  But for fraudulent transfer the balance sheet

9     admission was sufficient.

10          But you are right, if we have the two cases then if

11     they're right then you're going to have to give them may be a

12     different definition of insolvency the second time around, I

13     don't know.

14          I don't think there's an issue.  I don't see how

15     they can say this is our excuse for giving up all our homes

16     that had the add-ons in them, the 225 homes were repurchased

17     and then given to the Triangle Company.  That was done because

18     we couldn't pay them.  And we had to give up all of our

19     leasehold improvements, two or three million dollars worth of

20     leasehold improvements, because we couldn't pay our --

21          THE COURT:   I know.  I understand that part of the

22     evidence.

23          MR. HALL:   That's the problem we've got.

24          MR. PAUL:   Your Honor, if I could just be heard a

25     minute.  Just so we're clear, we disagree with Mr. Hall's

1    statement about -- even once you get inside of general ability

2    to pay debts as they mature, just so it's clear, we disagree

3    that that test is applied meaning paying all debts.  It is a

4    general inability to pay debts as they come due, is what we

5    think the case will show.

6              THE COURT:    Okay.

7              MR. HALL:    Judge, I've got a point of order here

8    that I'd like to raise.  I've been puzzling over it in my

9    mind.  Mr. Paul is not going to be counsel.  He's clearly not

10   going to be lead counsel in the case.  Now what's he doing in

11   this courtroom?

12             THE COURT:    Well, I've been thinking about that

13   since he said he wasn't going to be trying the case.  Quite

14   frankly, I don't know.

15             MR. MCGOLDRICK:    The rule --

16             THE COURT:    It's very clearly a, not unusual but,

17   extraordinary situation.

18             MR. MCGOLDRICK:    What the rule says is he can't act

19   as an advocate at trial if he's going to be a witness.

20   Because the focus of the rules is to make sure a jury doesn't

21   confuse his dual role as an advocate and that as a witness.

22   So if he's present to make the closing argument there is a

23   concern that the jury might think he's giving testimony.

24             So the rule focuses on what he does at trial and how

25   he may be perceived by the jury.  But there's no reason he

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

 1    can't continue as counsel in the case and participate in

 2    pretrial conferences and posttrial motions, appeals or what

 3    have you.

 4            THE COURT:    Well, may be so.  But he's going to be

 5    under the rule of sequestration.  He's heard everything that

 6    the Court has ruled so for.  That might be a problem.  I don't

 7    really know but we're going to move forward.

 8            Now, I'm on page 18.  And this allocation theory

 9    here is a little bit confusing to me, quite frankly.  What is

10    the percentage of -- this is 9 -- what is the percentage of

11    Plaintiff Long's claim on her judgment?

12            My understanding of this is that what I infer from

13    this is is that your position is that if there was a

14    preference then she's only entitled to a certain percentage of

15    whatever the amount was the preferred payment?

16            MR. PAUL:    Yes, sir.

17            THE COURT:    What is the basis for that?

18            MR. PAUL:    The trust fund theory whereby the

19    directors or trustees for the creditors instead of the

20    shareholders.  You got the Georgia law that says a corporation

21    has the right to prefer one creditor over another.   And the

22    cases are saying even in insolvency you can prefer one

23    creditor over another.

24            And then the preference rule, as Mr. Hall calls it,

25    comes into play saying the preference cannot be a preference

1    for the benefit of insiders.  But the goal of the trust fund

2    theory is an equitable prorated distribution between all the

3    creditors.

4            And so under this trust fund theory Ms. Long is not

5    entitled to more than a prorated share, taking all of the

6    debts and all of the money to distribute.  Adding back the

7    amount that is found to be preferential transfer.  If you have

8    a thousand dollars found to be preferentially transferred, you

9    add that back as money to be distributed.

10           THE COURT:   Okay.  I understand all that and

11   that's what I thought you were trying to say.  But that seems

12   like a hypothetical situation in this context.  I mean, the

13   reality is if she gets a judgment under any theory I don't

14   understand why she can't recover the full amount of.  I don't

15   understand why she can't recover it.

16           MR. PAUL:   Well, effectively, we're saying that

17   under this theory you get your prorated portion because that's

18   the whole point.

19           THE COURT:   I understand what you are saying but

20   that strikes me as -- I mean, what creditors are left out

21   there to recover any money?  I don't think there are any.  Are

22   there?

23           MR. PAUL:   Well, Horton Homes is there.

24           THE COURT:   You better not bring them in my court

25   if they are, I'm telling you.  Go ahead.

1           MR. PAUL:    Horton Homes and may be some others,

2    but certainly Horton Homes.

3           THE COURT:    Okay, we will look at that.  Now let's

4    look at 12.  I am on page 19.  What property is an asset?

5           I'm not clear why this is a jury question?  Why it's

6    not a legal question for one thing.  And also in light of what

7    I know about what their intentions are I'm not sure why

8    there's any question about what an asset is anyway.  I don't

9    know that they're pursuing anything that's not an asset.

10          MR. PAUL:    Yes, sir.  The 225 houses, manufactured

11   houses that H&S had or financed by General Electric and

12   Bombadier and those were secured transactions.

13          And the definition of the asset in accordance to the

14   conveyance statute excludes any assets that are subject to a

15   valid link.  And so Mr. Hall is continually saying that there

16   was a transfer of 225 houses but they were covered up with

17   about $10 million of debt.

18          And so it is our position that those houses that are

19   financed by foreplanners are not assets within the meaning of

20   the Fraudulent Conveyance Act.

21          THE COURT:    No, that looks like 18-2-71(d) --

22          MR. PAUL:    Yes, sir. (2).

23          THE COURT:    -- (2).  Encumbered by a valid lien.

24          MR. PAUL:    Yes, sir.

25          THE COURT:    What's your position on that?

1          MR. HALL:   I have never listed -- in recent times I

2    haven't listed those houses as being a transfer that I

3    considered fraudulent because apparently -- I may have missed

4    something, but I don't think so -- apparently they transferred

5    these houses back in satisfaction of the lien.  It was a wash.

6    They owed $50,000 on a transfer.  It was given to -- it was

7    repurchased by Horton Homes who gave it to Triangle and

8    Triangle owed $50,000 on the same home.

9          What I have always said was, you know, but they sent

10   all the stuff that they had bought and put in the trailers,

11   the add-ons that passed back.

12         THE COURT:   Well, were the add-ons encumbered?

13         MR. HALL:   Steve Sinclair testified that they were

14   not encumbered.  They may take the position that, well, they

15   were made part of the trailer.  But what happened was, it's

16   perfectly covered by, I think, the 13th badge of fraud, I

17   think it's the 13th, transferred to a lienholder and then to

18   an insider is a badge of fraud.  It obviously covers it just

19   like a glove.

20         They defaulted on those trailers in order to take

21   everything that they had, actually didn't move anywhere, but

22   the title went to Horton Homes and then back to those other

23   companies.

24         THE COURT:   So that's a part of your fraud theory

25   but it's not the basis of an asset that can be subject to

1    recovery; is that --

2                 MR. HALL:   Yes, it's an asset that is subject to

3    recovery.

4                 THE COURT:   But it's not part of your -- the

5    transfer is not part of your fraud theory; is that what you

6    just told me?

7                 MR. HALL:   I didn't mean to.

8                 THE COURT:   Because you say you've never contended

9    that the transfer was considered.

10                MR. HALL:   I've never contended that the

11   $14,000,000 worth of trailers that they transferred to Horton

12   Homes in exchange for $14 million worths of cancellation of

13   debt that then got transferred over there, that that was a

14   transfer.  But that all the stuff that was in it and added on

15   to it was.

16                THE COURT:   Okay.  You want to respond to that?

17                MR. PAUL:   Yes, sir.  I think that will ultimately

18   become a fact specific question about what was there that was

19   not subject to the lien.  Add-ons can be the blocks that are

20   under the trailers that don't go anywhere.  It can be the seam

21   that holds two single wides together to make a double wide.

22   It can be almost anything.  It depends on what it is as far as

23   whether it's something that was subject to a valid lien or

24   not.

25                THE COURT:   Well, let me ask the obvious question

1    here.  Do we have to get into this minutia in this case?

2            MR. HALL:    I don't think so.

3            MR. PAUL:    Our position is that if he's going to

4    allege fraudulent transfer it's got to be related to specific

5    property with a value on it that he's going to put on it.  And

6    if it is part of the lien then it's not an asset.

7            MR. HALL:    We've got balance sheets, we've got

8    numerous records that show the value of these add-ons.

9            THE COURT:    All right.  Now, I'm on page 20 and

10   16 and they essentially may be the same answer that deals with

11   what dollar amount was the value at the time the specific

12   asset was transferred.  What dollar amount was received by H&S

13   Homes for the transfer.  And what is the dollar amount?  Is

14   that essentially the same, part of the same proposition we

15   were just talking about, the same legal proposition?

16           MR. PAUL:    Yes, sir.

17           THE COURT:    What's your position on that?

18           MR. HALL:    Yes.  I think you've got to prove

19   something, even for actual fraud you've got to prove -- I

20   don't know for actual fraud that you've got to prove anything.

21   If you prove actual fraud you can -- if I approved actual

22   fraud, that a transfer was made to hinder, delay and defraud

23   the creditor, the transfer is void.  It has to go back to H&S.

24   To get money damages I think that you've got to prove some

25   value that is associated with this transfer.

1          THE COURT:   So you don't have any problem with

2     this?

3          MR. HALL:   Their own records show it.  It causes

4     complications, there's no question about that.  But it's right

5     there in black and white that they bought it for such amount

6     of money, they depreciated it a certain amount, and it had

7     this value.  And that's what they were arguing about all that

8     time.  But it's my position that there is ample proof.  And

9     they've got no contract proof.  They admit they didn't

10    appraise it.  They admit they never inventoried it.  They

11    don't know what they gave away.

12         THE COURT:   Let's turn to page 21, 17.  As to any

13    asset found to have been transferred with actual intent to

14    hinder, delay or defraud.  Do they have to establish as to

15    every asset, whether there was willful conduct, malice or

16    wantonness?  Or why isn't just one enough?

17         MR. PAUL:   Your Honor, the fraudulent transfer

18    claim and the remedy is specific as to assets.  That doesn't

19    mean that if there is an overall intent that relates to 30

20    assets, it's an overall intent that relates to 30 assets if

21    that's what the Court is asking.  But there must be, as to

22    each asset, an intent to delay, hinder, defraud creditors or

23    you do not come under 74(a)2.  You just don't get there.

24         I think we cited a case in the request to charge

25    that says, and I think it's by Judge Carley, that says that

1    you cannot have an aggregate fraudulent conveyance case,

2    you've got to have specific transfers.

3            THE COURT:    But you would agree then that this

4    does not have to be established under 74(a)1?

5            MR. PAUL:    74(a)1 does not require intent.  But

6    74(a)1 is lack of reasonably equivalent value, no intent is

7    required.  But, no, sir, if the question is, does it have to

8    be established separately?  That's what the reasonably

9    equivalent value is about is was there, as to an asset,

10   reasonably equivalent value.  So yes, sir, I say it applies to

11   both.

12           THE COURT:    What's your position on that?

13           MR. HALL:    Well, I don't think it makes -- It makes

14   no sense at all.  Of course, we've got several theories on why

15   she should recover for her mental anguish, including the

16   conspiracy and a breach of fiduciary duty.  But, no, I don't

17   think you'd have to -- you're proving general damages that

18   they deprived her of sufficient assets to pay her judgment.

19           THE COURT:    Okay.

20           MR. HALL:    And I don't think it has to be proven.

21   Obviously she knew nothing about these transfers.  I mean, she

22   didn't experience any mental anguish when they sent the

23   add-ons or anything of the sort.

24           THE COURT:    Okay.  Let me just point out that some

25   of my questions are motivated by the fact and really trying to

1    point out to y'all that we've got to come up with a verdict

2    form.  We've got to make sure we know what the jury really has

3    to find with these verdict forms.  And that's going to be an

4    issue that we are going to have to wrestle with with this

5    case.  So, that's just a general problem.

6          And now I am on page 25.  And I doubt if there is a

7    disagreement about this but I want to be sure.  This deals

8    with the successor liability theory and the way the interest

9    is computed.  Matter of fact, it probably would be a good idea

10   to just let me compute it and not ask the jury to do that.

11         MR. HALL:   I agree with that.

12         THE COURT:   I don't like to send things that the

13   jury has to compute.

14         MR. GROOVER:   I agree, Your Honor.

15         THE COURT:   It's just better if I do that because

16   it's a simple math problem.  Do y'all agree with that?

17         MR. GROOVER:   Yes, sir.

18         MR. PAUL:   Yes, sir.

19         MR. HALL:   We agree.  I'm not sure the interest

20   rate is really seven percent.

21         MR. PAUL:   I don't think it would be any problem

22   with the lawyers agreeing to the interest rate.

23         THE COURT:   Well, y'all get together on that.  I

24   mean, whatever we don't need them to decide the better off it

25   is.  I mean, some of these things really just naturally flow

1    and there's really not much.  You know, if you find X, Y and Z

2    then this is what you're going to have.

3          Let's see.  Take a look at page 30, line four or

4    paragraph four.  This deals with fraudulent conveyance, less

5    than adequate reasonably -- reasonably adequate consideration.

6    And the second sentence, because this claim does not require

7    proof of intent, attorney's fees and punitive damages are not

8    recoverable.  What's your position on that?

9          MR. HALL:  I would disagree about attorney's fees.

10   I think, yes, you've got to prove actual fraud to be entitled

11   to attorney's fees, that is correct.  To be entitled to,

12   excuse me, punitive damages.

13         I think you could have a constructive fraud case and

14   still have flagitiousness, bad faith and that kind of thing.

15   But that might not arise to the level of fraud.

16         THE COURT:   All right.  I have been through my

17   questions about the various issues for the jury.  But I want

18   to hear from either side if there's something else that I need

19   to cover specifically related to that?

20         We're going to talk about the motions in limine in

21   just a minute.  Is there anything else that we need to go over

22   that I didn't cover?

23         MR. HALL:  I raised several points at the back

24   here, let me see what's left.  Whether the case will begin on

25   September 10th and it now looks like it's set for the 17th

1      again?

2              THE COURT:    We still -- we've got to get this

3      ironed out obviously.  I don't think we're going to leave with

4      any finality today.  But, anyway.

5              Focusing on the issues now because there's other

6      things we're going to talk about.  We're not finished talking.

7      But are there any other essentially legal issues that we need

8      to deal with before we move on.

9              MR. HALL:    The only other one I listed under 23(a)

10     was whether each Defendant will agree to produce his financial

11     statements, which we don't have now.

12             THE COURT:    Well, that would only be relevant if

13     we get into the intent aspect of punitive damages, that would

14     be the very end of the case, right?

15             MR. HALL:    That is correct.  And it would be an

16     assurance that all the ones produced to date and all the ones

17     that they have created since.  I got some in the McDonald

18     case, but if they will produce all of those plus whatever else

19     they -- they even say they're going to create financial

20     statements.  I don't know what that is about.

21             THE COURT:    Do y'all have a problem with turning

22     that information over?

23             MR. PAUL:    Your Honor, the corporate Defendants, I

24     think Mr. Hall has -- the answer is no, sir.  But I think he's

25     got -- I checked and the corporate Defendants did not have

1    financial statements that are different than just the normal

2    balance sheets and income statements that have been produced.

3    That is, they don't have a financial statement that values

4    assets at market value or something.  It's all book value.

5    And Mr. Hall has all those.  I think Mr. Horton is going to

6    have a financial statement.

7              THE COURT:   Y'all get together and work this out.

8    I mean, you understand what the purpose of it is, that's

9    clear.  So get up whatever is needed, all right.

10             Now, let's look at -- Now let's take a short break.

11   How about that.

12   (Recess)

13             THE COURT:   All right.  Now, I'm on page 35.  I

14   want to know who some of these witnesses are.  Rufus Hicks,

15   number three.

16             MR. HALL:   Who they are?

17             THE COURT:   Yes.

18             MR. HALL:   Well, Rufus Hicks is the head of

19   Triangle.

20             THE COURT:   All right.  What about John Wayne

21   Moulton?

22             MR. HALL:   John Wayne Moulton is a lawyer who

23   represented Ms. Tindall Long in the domestication of the

24   judgment.

25             THE COURT:   Why does he need to testify?

1          MR. HALL:   He identified some of the documents

2     concerning the judgment and so forth.   A lot of that could

3     probably be handled by stipulation.   He may not need to say

4     very much.   And the Defendants might have -- they are the ones

5     that took his deposition.   So I guess they had something in

6     mind but I don't know what.

7          THE COURT:   Well, he's also on the defense list.

8     What's the point of him?

9          MR. PAUL:   Your Honor, Mr. Moulton did the post

10    judgment discovery for Ms. Long against H&S and Horton Homes.

11    And so we may call him to make the point that they had all of

12    the information and they did nothing with it.   So it's not as

13    if people were ducking and dodging.   That is, there were

14    81 boxes of documents produced to Mr. Moulton before any of

15    this case ever happened.   You know, there were no post

16    judgment remedies affected, so.

17          THE COURT:   Julie Caldwell.

18          MR. HALL:   She is the -- was the designated witness

19    for Hudson and Marshall.   She identified a lot of the

20    documents concerning the auction and among other things she

21    identified the disbursement sheet from Hudson and Marshall

22    that showed that the balance of the assets of the H&S auction

23    were sent to this AREIC company.

24          THE COURT:   Ben Hudson?   That's Hudson and

25    Marshall?

1          MR. HALL:  Yes.  They took his deposition, I think,
2     I can't remember.
3          THE COURT:   What's he going to say?  That he sold
4     the property at auction?
5          MR. HALL:   I probably would not call Mr. Hudson.
6          THE COURT:   What about the defense?
7          MR. PAUL:   Yes, sir.  Mr. Hudson, you know, the
8     way that the assets were disposed of, that Mr. Hall says was
9     fraudulent, was through a public auction conducted by Ben
10    Hudson in three states over three days with advertisement.
11    He will describe to the jury the entire manner in which the
12    auction was done.
13         THE COURT:   Okay.  David Giddens.
14         MR. HALL:   David Giddens is sort of -- he knows a
15    lot.  He is an accountant for H&S, for the whole family of
16    companies.
17         THE COURT:   What about Carol Jones.
18         MR. HALL:   Who?
19         THE COURT:   Carol Jones.
20         MR. HALL:   Carol Jones is an employee of AREIC.  I
21    took her deposition.  Actually she was the second 30(b)(6)
22    witness.  The first one didn't know a lot of stuff.  Yeah, Mr.
23    Giddens was the first AREIC witness and he didn't know a lot
24    of things.  But she came back and added a few things.
25         THE COURT:   What about Hobbs Gnaim, who is an

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    attorney?

2              MR. HALL:   Hobbs Gnaim we took his deposition --

3              THE COURT:    This is their list.  We've moved to

4    their list.

5              MR. PAUL:   Gnaim Hobbs is a lawyer that Mr. Hall

6    deposed in Houston.  And I put him on a may call list because

7    one reason is because Mr. Hall listed all the depositions in

8    the case.  He was involved in two or three -- actually in one

9    incidental transaction that I doubt we will ultimately call

10   him for.  It kind of depends on what Mr. Hall does.

11             THE COURT:   All right.  What about Mike Willard,

12   number 15.

13             MR. PAUL:   Mike Willard is a former employee of

14   Horton Homes who is the head outside salesman and he knows

15   about the treatment of H&S as compared to the treatment of all

16   of the other dealers.

17             THE COURT:   William Weeks?

18             MR. PAUL:   Weeks is a former employee and officer

19   of Horton who bought Putnam Mortgage Company that Mr. Hall

20   contends was a transaction that occurred inside of one of the

21   statutes of limitations.  And he will say it occurred years

22   before and he will describe the transaction.

23             THE COURT:   And Sidney Williams is one of your law

24   partners, right?

25             MR. PAUL:   Yes, sir.

1          THE COURT:    And then these representatives of the

2    financing is just to explain the floor planning arrangement?

3          MR. PAUL:    Yes, sir.  To identify, if we need to

4    authenticate a document or something and to explain the floor

5    plans.

6          THE COURT:    All right.  Now I'm on page 37 at

7    paragraph 19.  There is a big difference in this Court between

8    a deposition that's being used for impeachment, which I really

9    don't have much interest in until you start to use it, or as a

10   deposition is being used as direct evidence.

11          And my question is, to both of you, are you going to

12   have any depositions that are going to be used for direct

13   evidence purposes?

14          MR. HALL:    Sid Williams, if they are just not going

15   to bring Mr. Williams from Houston we will use his deposition.

16   I think that is right.  Mr. Sinclair, unless he --

17          THE COURT:    Well, they say he -- He will be

18   present at trial?

19          MR. HALL:    Yes.

20          THE COURT:    So you can count on that one.

21          MR. HALL:    Mr. Stowe, of course, there might be

22   some circumstances under which we would use his deposition,

23   but I don't -- I anticipate taking his deposition or having

24   him here.

25          THE COURT:    Okay.  Well, let me just point out to

1    you this.  As far as depositions that you're going to use as

2    direct evidence in this case you have to designate the pages

3    that you want to use, you have to provide that information to

4    opposing counsel.  Opposing counsel gets to designate the

5    pages they want to use and if there are any objections to any

6    of it those have to be brought to my attention before the

7    trial begins.  I'm not going to rule on deposition pages at

8    the trial.  Okay.

9           MR. HALL:   Sure.

10          THE COURT:   Does everyone understand what you're

11   supposed to do on that?

12          MR. PAUL:   Yes, sir.

13          MR. MCGOLDRICK:   Yes, sir.

14          THE COURT:   Now, at the end of this, and I'm on

15   page 41, if y'all don't have any objection, I'd like to talk

16   to the lawyers for both sides about settlement in the case.

17   I'd like to do that separately.  And probably what I'll do is

18   just take the Plaintiff's side in here and talk to them and

19   then let them go and then talk to the defense side.  Does

20   anybody have any objection to that?

21          MR. GROOVER:   No, sir.

22          MR. PAUL:   No, sir.

23          MR. HALL:   No, sir.

24          THE COURT:   Now, I'm on 42.  And 42(b)2 deals with

25   Defendant's belief that Plaintiff has listed witnesses who

1    have not been previously disclosed.  Are all those covered by

2    the motions in limine or is there something that --

3              MR. GROOVER:   Yes.  They are in the motions in

4    limine.

5              THE COURT:   Okay.  All right.  Now, let me just

6    tell you, to sort of give you some parameters here.  If you

7    will look at Addendum 8, which is Plaintiff's statement of the

8    case.  Are y'all with me?

9              MR. HALL:   Yes, sir.

10             MR. PAUL:   Yes, sir.

11             THE COURT:   I don't think, as a general

12   proposition, that paragraph one, two -- obviously they are not

13   numbered -- but one, two, and three need to be brought into

14   this case.  But I think that it's okay if we start the last

15   full paragraph that I think we can say that on September 5,

16   2003 a jury returned a verdict and the total judgment was

17   $343,210 and $300,000 worth of punitive damages.

18             I think you can just track through, you know, it was

19   appealed to the South Carolina Court of Appeals.  It was

20   affirmed in 2005.

21             I don't want the jury sitting back there wondering

22   what happened between September of 2003 and September of 2012.

23   You know, what's been going on.  Well, there's a lot that's

24   been going on and they need to know what it is.  But I don't

25   understand why that all can't be handled by stipulation.

1          I mean it's really -- I'm just thinking about, for

2     example, that there was a final judgment, this is when it was

3     entered, this is the amount of it.  Obviously they have to

4     know the amount of it.  And that, you know, it was appealed.

5     Do you understand what I'm saying by that?

6               MR. HALL:   Yes, sir.

7               THE COURT:    I think that ought to be handled by a

8     stipulation.

9               MR. GROOVER:    I agree.

10              THE COURT:    And I can read that to the jury.

11         There is also, I think that what probably ought to

12    come in as part of this case, and I don't know if this is

13    covered, it may in part be covered by a motion in limine, but

14    there are some other judgment creditors who, like Ms. Tindall,

15    got judgments against H&S.  And it seems to me that it is part

16    of the Plaintiff's case that the jury should understand that

17    there are other creditors and that the whole -- specifically

18    like Ms. McDonald, for example.

19         It seems like to me that ought to be a part of the

20    case.  So a jury -- I mean, your argument that I've

21    understood, Mr. Hall, is that Horton wanted to pay off the

22    tradesmen and other people who they will continue to do

23    business with.  That they were trying to defeat the claims of

24    these judgment creditors.

25              MR. HALL:   Yes.  I think they came to the

1    conclusion that they better pay those trades creditors because

2    they were going to need them anyway.  At one time they were

3    proposing to give all the money to Horton Homes, but they

4    didn't.

5           THE COURT:    I'm trying to -- What I'm trying to

6    say is we're talking about some of the evidence.  Because

7    there are at least three different motions in limines, may be

8    more than that, related to any testimony before -- What was

9    the date?  I've forgotten what the date was, when I cutoff

10   claims for recovery.

11          My point is, if we're going to rule on these, I

12   don't think that that cuts off the evidence.  So I'm going to

13   rule against you on those.

14          So then that brings up the question of what should

15   come in.  And it seems to me that the fact that there are some

16   of these other, what I'm calling judgment creditors, we can

17   call them mobile home purchasers who purchased the home and

18   end up with the judgment.  I think that probably ought to come

19   in.  I don't know how to put that together.

20          MR. HALL:    There are just two and they are set out

21   in the memo.  And that is apparently all of them.

22          THE COURT:    Again, I don't know why that can't be

23   handled by stipulation.  All right.

24          Now, of course, we are going to have to have some

25   kind of jury instruction, and I don't know how to fashion

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1   this, about the recovery period.  The recovery period as to --

2   I mean, I think that at some point I held that there was only

3   a certain time, like February of 2006 to July of 2006?

4             MR. PAUL:    February.

5             MR. HALL:    February, you did.

6             THE COURT:    February of 2006.  So y'all get

7   together and figure out what we can tell the jury about that

8   and how that is overall going to apply in the case.

9             Because if I'm going to let in evidence essentially

10  I'm letting it in for a limited purpose.  And so, I mean, it

11  may be a very broad limited purpose but nonetheless it's still

12  a limited purpose.  When I do that I like to tell the jury

13  what the limitations are.  So y'all get together and work that

14  out.

15            Okay, now I'm over to Addendum A-9, which is the

16  Defendant's outline of the case and contention.  And there is

17  a reservation of rights here.  What did you want me to do

18  about this?

19            You say that you may have to amend the outline of

20  the case.  I mean, I understand that and I don't have any

21  problem with that.  But even at this point we're not clear

22  what the Plaintiff's causes of actions are.  I think it's

23  going to have to be at the proposed pretrial.  It's going to

24  have to be --

25            MR. HALL:    Yes, sir.

1          THE COURT:   So that takes care of that, doesn't it?

2          MR. MCGOLDRICK:   Yes, sir.

3          THE COURT:   I think a lot of what you've raised,

4   especially towards the back of this, is related to the claims

5   we have dealt with already.

6          Now, I'm looking at Addendum A, which is the

7   material undisputed facts, the stipulation.  And you have one

8   there -- I mean this is the kind of thing that, I think,

9   obviously ought to be stipulated to.  But then you skip from

10  2003 to when the South Carolina judgment was domesticated in

11  Georgia in Putnam County.  And I just think there needs to be

12  something in there about the appeal propositions, just to

13  provide them some more information.  We've already talked

14  about that.  I'm just pointing out where I think that ought to

15  go in.

16         MR. HALL:   We'll get up another proposed

17  stipulation.

18         THE COURT:    All right.  Well, we talked about this

19  throughout the day and you understand what I think you need to

20  do there.  And so I want y'all to do that and come back.

21         THE COURT:    And there is question of -- Now, I'm

22  on Addendum 17-A.  Special authorities challenging Plaintiff's

23  standing to assert the Georgia preference claim.  And I'm

24  really -- I brought this case up before, but this Fountain

25  versus Burke where you had a creditor who was allowed to bring

1    a claim for breach of fiduciary duty or breach of duty related

2    to creditors.  Doesn't that control?

3         MR. PAUL:   Your Honor, my recollection of the

4    Burke case is it's got a specific finding in it where the

5    creditor -- that the court said basically it is beyond

6    controversy or something to that affect, that the corporate

7    Defendant that owed the money was the alter ego of the

8    individual Defendant.  And on alter ego theory a creditor has

9    got standing to go after the individual of the corporation on

10   alter ego.

11         And so there were preferential transfers but my

12   recollection is the case does not discuss standing, nobody was

13   contesting standing, but it was premise and grounded on the

14   acceptance of the undisputed fact that the individual was the

15   alter ego of the corporation.

16         So I think that's a very different analysis and we

17   have looked at -- Of course, Judge Owens has got a case out of

18   this court that we cited in the Super Valu case.  And the

19   Blair-Haughton case is a Kansas case that relies on Judge

20   Owens's decision, both of which dismiss an individual creditor

21   saying that they were not the proper party.

22         And then the other cases that we have read are

23   Woodward was a receiver, McEwen was a bankruptcy trustee, Ware

24   was a bankruptcy trustee, Pharr-Luke was a creditor inside of

25   a bankruptcy objecting to a discharge.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1           THE COURT:    Well, I'm not sure it's an alter ego

2    theory.  It says in cases of insolvency, however, it may be

3    closely examined to determine whether it is, in fact, a cloak

4    or a preference granted to an officer, majority stockholder,

5    et cetera, which is what I understand Mr. Hall's theory to be.

6    We'll take a further look at that.

7           MR. PAUL:    Yes, sir.  The alter ego is the second

8    half.

9           MR. HALL:    Your Honor, please, standing is pretty

10   clearly not just an affirmative defense but it's required to

11   be -- if you object to standing you're supposed to say that

12   under FRCP-9, I think it is.  They have not raised the issue

13   that we couldn't bring the case.  They say we don't have a

14   case.  They didn't say she wasn't the right one to bring it.

15          Furthermore, <u>Fountain versus Burke</u> involves a

16   creditor recovering directly against a third person.  That's

17   what the case was about.

18          THE COURT:    All right.

19          MR. HALL:    It's true in some of these bankruptcy

20   cases but that doesn't mean an individual couldn't do it.  And

21   what Judge Owens was talking about in his case I don't think

22   was this.  I don't think he was addressing this issue.

23          THE COURT:    All right, well, let me just tell you,

24   let's move on from there.  We will resolve that.  I think it's

25   pretty clear what the Court's position is on that.

1          Next, we have the voir dire questions.  I'm going to

2     let y'all do the voir dire questions.  You will have only an

3     hour a piece, and that means per side, not per Defendant.  And

4     if you can't do it in an hour then I will do it.

5          If you have any objections to the voir dire

6     questions of either side we will take that up later.  I don't

7     think we need to deal with that today.  I don't like questions

8     that try to predispose the jurors to anybody's position in the

9     case.  I don't like questions that involve legal propositions

10     because that's a matter for the judge.  They will be well

11     charged on that.  So I don't like questions like that.  I

12     don't allow questions like that.

13          I don't allow questions that are based on extensive

14     explanations of the facts of the case.  Although I don't

15     really see any that you have in here like that.  So I don't

16     see that as a problem.

17          But with that guidance why don't you -- with that

18     guidance y'all take a look at these and then when we get back

19     together we will talk again.

20          We're not going to deal with the verdict form at

21     this point.  I typically handle that with the charge

22     conference.  The Court will come up with something.  I'll be

23     glad to hear what y'all have to say on that.  Y'all can make

24     your own submissions, but there's no reason to do that until

25     after Mr. Hall is completely clear about what his theories are

1    in the case and after the pretrial is cleaned up, the proposed

2    pretrial order.

3            Now, I'm ready to work through these motions in

4    limine.  Does anybody have anything about anything we haven't

5    covered?

6            MR. GROOVER:   No, sir.

7            THE COURT:   Now, the first Plaintiff's motion in

8    limine, which has to do with the advice of counsel defense.  I

9    assume that's not going to be part of this case since it

10   hasn't been raised?

11           MR. MCGOLDRICK:   That we do or do not raise it,

12   Your Honor?

13           THE COURT:   So do you agree to this, correct?  You

14   don't have a problem with this?

15           MR. MCGOLDRICK:   I'm sorry.  I'm not understanding

16   the Court.

17           THE COURT:   Well, maybe I didn't hear you.  You

18   need to stand a little bit closer.  The motion is that you

19   should not, the Defendant should not be able to make arguments

20   about what he's characterizing as the advice of counsel

21   defense.  And he is saying that that is something that has to

22   be affirmatively pled and that y'all didn't affirmatively

23   plead that.  And not to mention that you waived it.

24           MR. MCGOLDRICK:   Yes, we do very much oppose the

25   motion because it is the intention certainly of my clients,

1    and I believe this is true of all Defendants, to state that we

2    embark on a course of action that is being challenged in this

3    lawsuit, not with an intent to defraud the Plaintiff, but

4    because we received legal counsel that this was a perfectly

5    legal course of action to pursue.

6           It is not, in our view Your Honor, an affirmative

7    defense.  Because an affirmative defense, as I understand the

8    case law, is one that does not tend to controvert the prima

9    facie case that the Plaintiff is seeking to make out but

10   rather is one that would entitle Defendants to prevail even if

11   the Plaintiff makes out a prima facie case.

12          By way of example, if there is a case for fraudulent

13   misrepresentation in a contract context reliance is something

14   the Plaintiff has to prove.  So an absence of reliance is not

15   an affirmative defense.  But something such as a statute of

16   limitations that would enable the Defendant to prevail even

17   though the Plaintiff makes out a prima facie case would be an

18   affirmative defense.

19          THE COURT:   Well, of course, Mr. Hall is

20   contending that he's got a quote here, about pleading an

21   affirmative defense.  And then, he says, that advice of

22   counsel is an affirmative defense.  I don't know if that case

23   supports that position or not?

24          MR. HALL:   The cases support that.  There are cases

25   saying to the contrary.  It isn't crystal-clear, I will say

1    that.  And so, I think, my waiver argument is much more

2    persuasive myself.

3              THE COURT:    Do any of y'all want to respond on the

4    waiver argument?

5              MR. MCGOLDRICK:   Well, I will, Your Honor.  Does

6    the Court want me to respond to this thing about affirmative

7    defense because there is a good deal more that I think can be

8    said about it.  First of all, we don't think it is an

9    affirmative defense.

10             THE COURT:    Okay.  Well, I don't want to hear

11   anymore about that.  We'll decide that.  I understand your

12   position.  Mr. Hall just said that there are cases going both

13   ways.

14             MR. MCGOLDRICK:   Right.  I think on the issue of

15   waiver, Your Honor, there are some cases that say that if you

16   assert advice of counsel as a defense then you waive an

17   argument that the communications are protected by the

18   attorney/client privilege.  But I haven't seen any of it to

19   say that it works the other way around.  So that Mr. Hall may

20   have had an argument that he could have made when he was

21   asking the Court to vitiate the privilege that it should be

22   vitiated for that reason, but we are past that point.  Because

23   the Court has vitiated the privileges and is now going to let

24   him put in evidence the very communications that formed the

25   basis for that advice.  So I don't see at this point --

1          THE COURT:   I see what you're saying, okay.  Well,
2     we'll decide that one.  I understand your position.
3          MR. GROOVER:   Your Honor, may I briefly add one
4     thing about Mr. Sinclair?
5          THE COURT:  Yes.
6          MR. GROOVER:  I think this Court addressed it in
7     Mr. Sinclair's motion for summary judgment in the order and I
8     think it's 285.  Because that came up, the fact that Mr.
9     Sinclair relied on counsel did come up and the Court discussed
10    it in that order.
11         THE COURT:   We will look back at that.  And then
12    the second, and there are only two here, from the Plaintiff,
13    right?  You only have two?
14         MR. HALL:   That's correct.
15         THE COURT:   Correct?
16         MR. HALL:   Yes.
17         THE COURT:   Jimmy Paul should be prohibited from
18    testifying as a witness either in person or of a deposition
19    while he's also counsel in this case and should not be allowed
20    to argue to the jury regarding advice he would or would not
21    have given to the Defendant.
22         Now, I will tell you that I was very surprised when
23    Mr. Paul told me that he was not going to be the attorney
24    representing some of the Defendants in this case.  And I had
25    already concluded that if he was going to be the attorney and

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    he was going to be testifying -- well, if he was going to be

2    representing some of the Defendants in court I wasn't going to

3    let him testify.

4           But now we are in a different situation because he

5    is saying that he is not going to be the lawyer in the court

6    despite the fact that he's been the lawyer all along the way

7    and obviously is acting as lead counsel today in this

8    pretrial.  So what does that do to your argument?

9           MR. HALL:   Well, I was more surprised than you

10   were, Judge.  I suppose he can be a witness.  I don't know

11   that there is now a conflict that would keep him from being a

12   witness.

13          THE COURT:   Well, I will give you the chance to

14   revisit that.

15          MR. HALL:   The one thing is that he could be

16   prevented from being a witness as a punishment for having gone

17   through this charade all this time, it seems to me.

18          THE COURT:   Let me just say this.  I'm going to

19   put some substantial limitations on his testimony because he

20   hasn't been identified as an expert witness in this case.  So

21   you can't give any legal opinions whatsoever in this case.

22          That will involve -- I'm not sure what all that

23   involves but it certainly involves a number of things that you

24   might otherwise have been able to say that would assist your

25   client in this case.

1          So, you know, talking about giving any kind of

2   opinion about their conduct, the reasonableness of their

3   conduct, for example, I don't think that's admissible because

4   that's a legal opinion.

5          So, I haven't thought all this out because I wasn't

6   going to let you testify if you were going to be representing

7   them.  But now that you aren't, I'll have to rethink it.

8          But what I just said is very clearly going to be the

9   rule.  And by the way, the same thing would apply to Mr.

10  Williams, your partner, because he's not been identified as an

11  expert in the case.  And so I'm not going to let him give any

12  kind of expert opinions in the case.

13          I don't think there are any lay opinions that you

14  can give under 701-C because that specifically excludes those

15  matters that are within the realm of an expert.

16          So, how all that works out, you give it some thought

17  and you give it some thought and I will think about it some

18  more.  But I will know when you give the wrong opinion.  So

19  you need to be careful about that, okay.  And I'll give you

20  the opportunity to revisit this in terms of this surprise.

21          MR. HALL:   Yes, sir.

22          THE COURT:   Are we clear on that?

23          MR. MCGOLDRICK:   Well, I mean, we intend Mr. Paul

24  to testify as a fact witness.  Obviously he's not going to

25  give opinions as to whether he felt like the Defendants acted

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1      reasonably, but in his opinion was that as a lawyer, a person

2      who practices law, so he has some understanding of the law

3      that he relied on in giving them that advice.

4           In other words he understands bankruptcy and what

5      creditors can do and that sort of thing that factored into the

6      advice that he gave him and we do believe he can testify to

7      that.

8           THE COURT:   Well, he may be able to, I don't know.

9      I think out of an abundance of caution you would be very wise

10     to submit to me what you want him to say that might run a foul

11     with my ruling.  And then we'll go down the list and just see

12     what.

13          I don't think there's a problem at all with him

14     telling I advised my client to do this, I advised my client to

15     do this and that kind of thing.  But I think that -- and I'll

16     tell you because I sit here and I listen to witnesses testify

17     and they'll say fact, fact, fact, opinion, fact, fact, fact,

18     opinion.  And I don't think the lawyers really are aware that

19     an opinion just got slipped in there.  So sometimes the

20     witnesses don't understand that.  But under the circumstances

21     of this case, I'm going to keep a very tight rein on Mr.

22     Williams and Mr. Paul.  So out of an abundance of caution you

23     better let me know what you want them to say.  All right.

24          MR. MCGOLDRICK:   I got you.

25          THE COURT:   Now, we're dealing with Defendant's

1    first motion in limine.  I think I've dealt with that, haven't

2    I?

3              MR. MCGOLDRICK:  Yes, sir.

4              MR. HALL:  I think so, Judge.

5              THE COURT:   Is everybody clear on that?

6              MR. HALL:   Yes.  I even said we agree in principle

7    that we can't talk about that.

8              THE COURT:    All right.  Now, number two deals with

9    reasonableness, attorney's fees for Hearn and Lovelace.  The

10   objection essentially is that they are expert witnesses and

11   they haven't been identified.

12             MR. MCGOLDRICK:  That's correct, Your Honor.

13             THE COURT:   And I think that they can testify

14   about what they did but I don't know that they can testify

15   about the reasonableness of what they did because I think

16   that's an expert proposition.

17             MR. HALL:   Your Honor, please, if you'll consult a

18   case called Kahn versus McSweeney, it's an Eleventh Circuit

19   Case, 347 Federal Appeals at 437.  The Court was faced with

20   exactly this proposition.  And the Eleventh Circuit said the

21   District Court probably allowed the Plaintiff's counsel to

22   testify on the issue of attorney's fees.

23             In the second phase of the trial the attorney

24   testified as to the amount of attorney's fees that accumulated

25   over the course of the litigation for the purposes of an

1   attorney's fee award.

2          THE COURT:   Was that subject to a 702 objection?

3          MR. HALL:   It said that same thing.  It said, the

4   claims for attorney's fees had been part of the case for three

5   years and Huddleston has been lead counsel for three years

6   prior to the trial.  As the District Court correctly ruled

7   Kahn, the Defendant, should not have been surprised by the

8   witness and thus was not prejudiced by permitting this witness

9   to testify.  The District Court has broad discretion as lead

10   counsel for the Plaintiff's for three years.  Huddleston was

11   certainly qualified to testify as to the amount and value of

12   his and his firm's legal services.  Kahn's argument as to

13   attorney's fees fail.

14          THE COURT:   Have y'all looked at that case?  Have

15   y'all seen that?

16          MR. GROOVER:   No, no.

17          THE COURT:   Take a look at that case.

18          MR. GROOVER:   May I briefly respond?

19          THE COURT:   You may.

20          MR. GROOVER:   We understand and I did understand

21   because in their complaint it was a 13-6-11 claim for stubborn

22   litigiousness and this is part of their case.  And they did

23   identify an expert pursuant to the Court's order on April 1st,

24   2011, it was John Draughon.  It was not Mr. Hearn, it was not

25   Mr. Hall and it was not Mr. Lovelace.  And that's the subject

1    -- that's fundamentally the basis of my objection.

2              THE COURT:   All right.

3              MR. HALL:   Under Georgia law it is crystal clear

4    that an attorney can testify, that's the only thing he can

5    testify to.  He can't testify as to facts.  That's why Mr.

6    Paul can't testify.  But he can testify as to his own

7    attorney's fees and the reasonableness of them.  There must be

8    fifty cases that say that.  And you don't usually even get an

9    expert in a 13-6-11 case.  You get, under these federal

10   statutes, I think, they usually have to have them.  But I

11   think there's a totally different body of law that covers

12   this.

13             People stand up in their place and say, you know, I

14   worked hard on this case, here is my time sheet and I charged

15   $75 an hour or $400 an hour, whatever it is, and it is

16   submitted to the jury.

17             THE COURT:   Right.  We'll look into that.  We will

18   look further into that and see.  All right, now the next one

19   has to do with Rule 1006 summaries.

20             MR. HALL:   Yes, sir.

21             THE COURT:   I think that under that Federal Rule,

22   it's not very complicated to get the evidence in.  I'm not at

23   all clear this person even has to appear as a witness.  A

24   foundation has to be laid.  I think that the key thing is the

25   documents have to be turned over and made available to the

 1   other side.  My guess is these are documents that you got from

 2   them so they have the documents; is that right?

 3            MR. HALL:   That's correct.

 4            THE COURT:    Tell me what kind of summary, as far

 5   as calculation, are we dealing with here?

 6            MR. GROOVER:   Well, Your Honor, Ms. Lee, who I take

 7   it is Mr. Hall's paralegal, I really don't know her.

 8            THE COURT:    Is that correct?

 9            MR. HALL:   That's correct.  She's not going to

10   testify as an expert.  She just put these figures on the paper

11   based on their documents.

12            MR. GROOVER:   Right.  I understand the purpose

13   behind 1006 and it goes in as evidence as opposed to

14   demonstrative evidence.  And I understand that.

15            The Gray case we cited in our motion did put some

16   limitations or constraints on how and under what circumstances

17   those kinds of summaries and reports can go in.  And the

18   purpose of that is to make sure that the other side has an

19   opportunity, after looking at the charts compiled.  And her

20   charts were Plaintiff's exhibits 315 through 322, I think.  Is

21   to give the other side an opportunity to look and see, A, how

22   did you come up with this?  What documents did you look at?

23   It's not evident from the charts themselves.  It doesn't cite,

24   for example -- there's a chart 319, do you want me to bring it

25   up, Your Honor.

1          THE COURT:   No, I can see it from here.  I don't

2     know how she compiled it, what information she used to compile

3     it.  That is the first concern the Gray case has.

4          THE COURT:   I don't understand why all this can't

5     be worked out between now and the time of trial?

6          MR. GROOVER:   It might be able to, Your Honor.  I'm

7     not suggesting it can't be, it's just she's popped up on the

8     witness list, it's the first time we saw her.  We didn't

9     understand when they put that on the free for all what those

10    charts were.  We just got them the day before yesterday.

11         THE COURT:   Well, I don't think she is a witness

12    in the case to start with.

13         MR. GROOVER:   Okay.

14         THE COURT:   I think the chart, if the proper

15    foundation can be laid, then the chart comes in as evidence

16    and Mr. Hall can tell them what it reflects and how it was

17    arrived at.  But I don't think we need a paralegal coming in

18    here and explaining how they came up with that.

19         MR. GROOVER:   Your Honor, the rule does provide

20    for a reasonable opportunity to delve into how and under what

21    circumstances it was compiled.  And if we could have that

22    opportunity we may be able to stipulate.  We just didn't know

23    when they identified her in these charges.

24         THE COURT:   Well, what does that mean?  Do you

25    want to sit down and talk to her and Mr. Hall?

1            MR. GROOVER:   Yes, sir.

2            THE COURT:   Well, that's fine.  You can do that.

3     That needs to be done.

4            MR. GROOVER:   Yes, sir.

5            MR. HALL:   Yes.  I think it would make more sense

6     to the jury if she carefully explained how she did this.  She

7     obviously did it under my direction.  I told her to take that

8     chart and take that chart, take the things that they have

9     marked, particularly the houses that were repurchased,

10    calculate the add-ons on those but none of the rest of them.

11    Tell me how much furniture was in those houses?  Things like

12    that.  Tell me how many parts were bought by H&S from Horton

13    Homes, including -- They bought $80,000 worth of parts right

14    before they went out of business.  But anyway, it would help,

15    I think --

16           THE COURT:   Well, some of what you're talking

17    about is going to be the subject of cross examination of these

18    witnesses; isn't it, what you just said?

19           MR. HALL:   It could be.  But I think you could take

20    weeks, not weeks, but you could take a great deal of time to

21    sit with Steve Sinclair.  Mr. Sinclair knows all about these

22    charts, there's no doubt about that.  And he might try to pick

23    these apart.  But as far as the direct examination to get him

24    to say, okay, yeah, that shows this amount of furniture bought

25    on December 31st and add them all up.

1           THE COURT:   Well, let me say initially that what

2    I've heard so far indicates to me that this is appropriate

3    data to be put into a summary under this code section.

4           The second thing is, you have to turn the

5    information over.  But it's their information so you don't

6    have to do that.

7           The problem here seems to be twofold.  One, they

8    need to know how you did it?  And then the second problem is

9    how are we going to present it to the jury.  And I don't have

10   any particular problem with her explaining it, but I don't

11   have any particular problem with you explaining in either.

12          So, we just have to have a meeting of the minds

13   about what this shows and that it's accurate.  And then we'll

14   go from there, okay.

15          MR. GROOVER:   That's fine.

16          THE COURT:   This ought to be worked out.

17          MR. HALL:   I'm sure that would be a great relief to

18   my paralegal.

19          THE COURT:   Probably so.  The next motions in

20   limine.  I think there are three or four, three, four, five.

21   Is it like five of these that deal with trying to cut off how

22   far back I'm going to let the evidence in.  Is that

23   essentially what it is?

24          MR. PAUL:   They all deal with, I think, the time

25   four, five, six and seven.  No, it's four, five and six.

1    Motions four, five and six deal in some way with the time

2    period.  The others, seven does not and eight does not.  But

3    they deal with different issues.

4         THE COURT:    Well, I understand they deal with

5    issues -- let me tell you the way I look at this and then we

6    can decide how much more we need to talk about.  The theory

7    here essentially is a fraudulent transfer.  That's the main

8    theory in the case.

9         And there is this chronology of events that begins

10   and I don't know what the date is but it's before the time

11   that I cut off the recovery period.  But it begins, at least

12   as early as the date of the memo or the letter that I obtained

13   under the fraud claims exception.  It begins at least then and

14   probably before that time.

15        And, you know, you just can't wave a wand and make a

16   company and its assets go away.  So I think that the jury

17   needs to have the full picture of what happened here and the

18   steps along the way.  And I think that the reality is that

19   it's admissible.  I think clearly under 403 balancing that

20   certainly is prejudicial.  But I think that the weight of the

21   jury understanding the big picture outweighs any 403 prejudice

22   considerations and other considerations about misleading the

23   jury and wasting time.

24        And obviously we're going to give the jury a

25   limitation chart on that so they will understand.  But it

1    seems to me that the whole story needs to be told.

2           And as a consequence of that it seems to me further

3    that that would mean that I would rule against your order

4    four, five, six, at least those three.  Four, five, six.  And

5    did you say seven?

6           MR. PAUL:   Seven does not deal with time.  But if

7    I can be heard whenever the Court is ready?

8           THE COURT:   Go right ahead.

9           MR. PAUL:   Number four deals with default judgment

10   which the Court is, in one ruling rules is outside of the

11   four-year statute of limitations.

12          THE COURT:   Right.

13          MR. PAUL:   And in another order it's ruled the

14   default judgment was not shown to have interfered with any of

15   Ms. Long's right.  And so if it's outside the statute of

16   limitations because it's more than four years, it's actually

17   five years, and it did not interfere with any of her rights,

18   then we say it is irrelevant to the question of has there been

19   a fraudulent transfer that anybody can recover on and it is

20   very, very, prejudicial.

21          And so certainly in the fraudulent conveyance case

22   it is irrelevant and it is extremely prejudicial and it should

23   be excluded.  But it's not like the other two motions as far

24   as that part.

25          THE COURT:   Okay.  Do you want to respond to that?

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          MR. HALL:   Well, the whole story began, I think,

2     when Mrs. Christina McDonald and Ms. Tindall in 2004 got

3     affirmed by the Courts of Appeal in their respective states.

4          In Ms. McDonald's case she got it affirmed on

5     December 18th.  They hired Joe Briley to file this $22 million

6     default judgment within ten days.  And they proceeded to --

7          THE COURT:   What year was that, remind me?

8          MR. HALL:   That would have been the end of 2004.

9     Hired Joe Briley, filed a lawsuit by January 2, 2005.  Then

10    they have this reference to it in their minutes, which I think

11    is important, in February of 2005.  It says we got these

12    judgments against us, they're really causing us a lot of

13    problems and because of that we've got to start liquidating

14    our assets.  Well, they didn't do a whole lot.  Well, they

15    did.  They gave $6 million to Horton Homes.  But they waited

16    until 2006, really, to crank into gear.  But that was the

17    beginning of the intent to do what they did, and I think it

18    does show an intent from that point forward.

19         THE COURT:   Okay.  Well, I mean, I will think

20    about it.  I'm not going to rule on this right now.  I will

21    think about it in light of what you said.  I didn't remember

22    this at the previous ruling about not interfering with the

23    rights.  I'm not sure that's really dispositive of this.

24         MR. HALL:   I don't think it is.  I think it's very

25    simple for you to testify that I can't recover for it.

1          THE COURT:    Right.  I will consider this.  But it

2     sounds like, Mr. Paul, that you're saying that the next two,

3     in light of my overall position about the way the evidence

4     ought to come in, don't have any uniqueness as this one does;

5     is that correct?

6          MR. PAUL:    Yes, sir.  They are different.  They

7     are very different but the fifth motion relates to a four-year

8     statute of limitations.

9          THE COURT:    Right.

10         MR. PAUL:    According to the allegedly fraudulent

11    transfers of money from H&S to Horton.  The Court has ruled

12    out a claim under 75(b) which is a company paying an insider

13    and the Court ruled that out.  That had a one-year statute and

14    the Court granted summary judgment on the one-year statute.

15         And then Mr. Hall responded also that he was not

16    making a claim under 75(b), which is H&S paying Horton on a

17    debt.

18         Then the Court ruled that there's a four-year

19    statute on intent to hinder, delay, defraud creditors.  And a

20    four-year statute on transfer without reasonably equivalent

21    value.

22         And so a transfer without reasonably equivalent

23    value does not apply here but I think an allegation of a

24    transfer with intent to hinder, delay or defraud creditors.

25    The evidence is possibly irrelevant on there's evidence on H&S

1    paying Horton Homes.  But outside of that four-year period,

2    the outside of the statute, and there is no possible recovery.

3         THE COURT:   I'm telling you that as I said earlier

4    whatever is outside of the statute that's not recoverable,

5    isn't decisive for my evidence rulings about what's going to

6    come in.  And I don't think that controls the evidence.

7         I think the evidence is controlled by the overall

8    alleged scheme.  And I think that what needs to come in is

9    evidence of that overall scheme so the jury can understand and

10   have background about what happened.

11        MR. PAUL:   Yes, sir.

12        THE COURT:   Let's move on to the sixth motion.  I

13   was thinking this was the same.

14        MR. HALL:   The sixth motion, I concede that I can't

15   recover under 75(b).

16        THE COURT:   Well, he's conceding that so.  That

17   one is moot, okay.

18        Now we are on to seven.  What's your position on

19   this, from the Plaintiff's side?

20        MR. HALL:   Well, the Plaintiff intends that she's

21   entitled to punitive damages for the breach of fiduciary duty

22   to creditors arising from H&S's insolvency.  There are boo

23   coos of cases now holding that the breach of fiduciary duty

24   will support an award of punitive damages.  Trustees clearly

25   owe a fiduciary duty as to Wachovia Bank versus Namik, 275

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    Georgia Appeals 229, and many other cases.  Even the trustee

2    of an implied trust owe a fiduciary duty 259, Georgia Appeals

3    690.  And then you've 288 Georgia Appeals, 820.  And a recent

4    case 2012 Westlaw, 987560, which is, I think, the Georgia

5    Court of Appeals case.  I know it's a Georgia case.

6            They cite 53-12-302.  That doesn't exclude punitive

7    damages against the trustee.  And it's a recently passed

8    statute in 2010, would not govern the actions in 2007 anyway.

9    And the Sommer's Drugstore case they cite at page six did not

10   purport to be speaking about Georgia law.  So we have had a --

11   this business about recovering for punitive damages for breach

12   of fiduciary duty is pretty well established in our Georgia

13   Law.

14           THE COURT:   All right.

15           MR. PAUL:    What I was saying to the Court earlier

16   --

17           THE COURT:   Pull the mike over.

18           MR. PAUL:    I'm sorry.  This goes back to what I was

19   saying to the Court earlier this morning about the nature of

20   what Mr. Hall calls the preference action.  That is the Court

21   found it is a trust or a quasi-trust relationship relying on

22   various cases that we've all read.

23           And when you look at the recovery under that kind of

24   case it's an equitable action, the cases are saying, to

25   restore the assets and divvy them up.  It is an equitable

1        restorative type action and it is brought in equity, in

2        essence, for that purpose.

3               And none of the cases that the Court has cited or

4        that we have cited or that Mr. Hall has cited related to that

5        type of action sustained a claim for punitive damages, the

6        restatement of trust that we cited, I think, in the motion.

7               But in any event, the restatement of trust says that

8        a trust, a breach of a duty -- and it can be called a

9        fiduciary duty because that's what I was speaking about this

10       morning.  Just because you call it a fiduciary duty doesn't

11       mean that you are migrating damages over to damages bigger

12       than the nature of the case.  So the restatement of trust says

13       that the recovery is what it takes to restore the trust

14       property and any profits made by a Defendant.

15              And then the reason we cited the two ERISA cases is

16       that in the Fifth Circuit case, the Sommer's case, the ERISA

17       statute is silent as to punitive damages.  The Fifth Circuit

18       said its silent.  This is a trust relationship and it's

19       intended to restore and that is antithetical to punishing and

20       so punitive damages are not recoverable.  The Middle District

21       of Alabama case that we cite --

22              THE COURT:   We'll look at that.  I understand your

23       argument.  We'll look at that and decide.

24              And now let's move on to the eighth motion in limine

25       to exclude evidence and other communications about the consent

1    action dated December 31, 2006.  Is this another outside of

2    the statute of limitations?

3            MR. PAUL:    No.  This was December 31, 2006, so --

4    If the Court recalls the Court -- this is a corporate

5    resolution of Horton Industries whereby Horton Industries

6    passed a resolution to have its subsidiaries, Horton Homes and

7    other subsidiaries, distribute by dividend real estate assets

8    to Horton Industries.

9            Mr. Hall used this when he was moving to vitiate

10   privilege.  And there was a large inquiry into it.  Mr.

11   Williams -- I mean, Mr. Horton testified that this action was

12   done because he was negotiating with Champion Homes about a

13   possible sale of Horton Homes to Champion Homes.  Champion

14   Homes, he testified, did not want the real estate.  And so in

15   order to get lined up for that he was going to have the real

16   estate of Horton Homes transferred up to Horton Industries.

17   The transaction never occurred.  So we had Mr. Williams,

18   Sidney Williams, draft this resolution.  The resolution was

19   signed.  The Champion deal did not occur.  The real estate was

20   never transferred.  Nothing ever happened.

21           And the Court found in the order vitiating privilege

22   that that was -- that there had been a failure of proof by the

23   Plaintiff to link this to anything.  That is, it's just a

24   piece of paper and the Court specifically found it was not

25   linked to anything.  So there's no evidence that ties this to

1    anything.  And there was no action ever taken on it.  It's a

2    resolution that was never acted on.

3         And so we say, knowing the argument is going to

4    come, it's going to be very prejudicial, but the Court has

5    already found that the Plaintiff has never linked it to

6    anything.

7         MR. HALL:  Well, I think I've linked it to

8    everything.  In early December of 2006 all of a sudden a bunch

9    of arbitration demands came in from people who realized that

10   H&S didn't have anything and maybe Horton Homes did.  And they

11   named H&S and Horton Homes.  So within a matter of days Mr.

12   Paul's partner began to do a draft and then a second draft and

13   maybe a third draft.  I think there are probably three drafts

14   of this thing, but I've only got two of them, by which Horton

15   Homes was going to do a dividend of its assets and give them

16   to Horton Industries.  I say, to protect those assets from

17   these efforts to get at Horton Homes.  But it one more up the

18   line, to make them judgment proof.  It was $10.4 million worth

19   of stuff.  It was their manufacturing plant that they were

20   going to transfer.

21        And I think the importance of this thing, Judge and

22   I'm thinking this through because of your thinking about

23   dividing it into phases.

24        The consent action is mostly intended and what it is

25   most illustrative of, besides intent, is their utter disregard

1    of the corporate structure.  Mr. Horton testified about this

2    incident.  Why did you think you could just declare a dividend

3    of all your property and just give it to them?  He said,

4    because Horton Industries owns Horton Homes.  Well, that is

5    the absolute -- it's got no personality -- H&S has nothing to

6    say about this.  We're just going to give it to them.  So that

7    --

8           THE COURT:  Wait a minute.  We'll get a ruling on

9    that.  I understand the party's position.

10          Now we are moving on to the ninth motion, which has

11   to do with the Court's order issued November 2009.  I don't

12   understand -- let's see.  I'm not real comfortable with

13   something coming in about one of my orders.  I'm not clear.

14   Are you going to try to offer something about that?

15          MR. HALL:  I had it listed as an exhibit.  The

16   Court's order in McDonald we think it's relevant in that it

17   shows the Defendants were stubborn and litigious and caused

18   Plaintiff unnecessary trouble and expense.

19          You had already ruled in McDonald that they needed

20   to give this stuff up.  The expense we incurred involved

21   relitigating the issue of the fraud exception and this Court

22   had already decided that very issue.  And this is compounded

23   by the fact that the Defendants were planning all along to

24   claim advice of counsel as a defense which is clearly a waiver

25   of attorney/client privilege as to any documents related to

 1    their advice.

 2              You warned the Defendants in an early hearing in

 3    this case about rehashing matters which had been decided in

 4    McDonald.  It's true that McDonald is a separate case from Ms.

 5    Tindall's but it's joined at the hip with Ms. Tindall's case.

 6    It is right there in the same memo, side by side, that they

 7    were trying to specifically harm both of them.

 8              THE COURT:   Even if that came in, I don't think it

 9    would come in until the second stage of the trial, which is

10    where I'm thinking about putting in --

11              MR. HALL:    Attorney's fees.

12              THE COURT:   Right.  Cost of litigation.  So it

13    wouldn't come in until then anyway.  So I understand your

14    theory on that.  And under that theory it might be admissible.

15              MR. MCGOLDRICK:   Well, Your Honor, our position on

16    that is first of all it's a resolution of the discovery issue

17    in another case, not in the one that is before the Court.  Not

18    in the Tindall Long case but in another case.

19              And obviously I don't know whether -- the Court said

20    it hasn't read all it's orders, but in that case the Court

21    gave some language that was very, very unflattering and

22    uncomplimentary of the Defendants in the case.  And this is

23    undoubtedly why the Plaintiff really wants to have it in the

24    case.  It was critical of the Defendants discovery responses.

25    It held that the evidence in question gives color to a charge

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    of fraud.  And at one point the Court even said that the

2    transactions reek of fraud.

3          So, obviously, for this to come into the case would

4    be highly prejudicial and we don't think that it's relevant

5    either.  In other words, if we were trying the case and the

6    Court said from the bench, told the jury, I think these

7    transactions reek of fraud we believe that would be an

8    improper expression of opinion by the Court on the merits of

9    the case.  And we don't think they can get around that by

10   having this document go to the jury that contains that opinion

11   and go out to the Court.

12         I mean, if the argument is to show the bad faith and

13   the stubborn litigiousness there are ways of dealing with that

14   in discovery dispute.  Counsel could have asked for fees when

15   the Court was passing on that motion and never did so.

16         THE COURT:   Well, I think there's a series 403

17   problem with that.  I'm going to exclude it.  I think it's

18   highly likely that the prejudice is going to outweigh the

19   relevance.

20         And I also think there's probably a way that -- you

21   know, you can do the same thing in terms of --

22         MR. HALL:   Yes.  I'm wondering if there might be a

23   statement made leaving out why but that they had been

24   basically told that they had to produce this stuff, all of

25   this information.

1          THE COURT:   Why can't you cross examine somebody

2     about being required to -- I don't know.  You think about a

3     theory of how that can come in and we'll talk about it when we

4     get back together the next time.

5          But I think as far as that order I'm not really

6     comfortable with the order going out anyway.  I think that it

7     would be inflammatory.  Although it was obviously what I

8     thought at the time or it wouldn't have said that, so.  All

9     right.

10          And then now we have the January 10, 2011, order.

11    This is another motion to compel.

12          MR. MCGOLDRICK:   Yes, sir.

13          THE COURT:   Same deal?

14          MR. MCGOLDRICK:   The argument is pretty much the

15    same as it is in that one.  You know, candidly the Court was

16    not quite as scathing in it's characterization of our conduct

17    but in passing upon whether the threshold had been made for

18    the Court to review the documents it did state in several

19    places that the Plaintiff had made out a prima facie case that

20    communications were in furtherance of a fraudulent activity.

21          So I don't think the jury is going to be able to

22    make a fine distinction between what the Court had to reach to

23    render that opinion and whether this was an expression of

24    opinion by the Court on this.

25          THE COURT:   Well, that seems to be another 403

1    problem with me.  I don't want to inject myself into the case

2    or my rulings into the case.

3            So again if you can think about some way to

4    otherwise get that in then I'll entertain it, but I don't want

5    this case to turn on two of my orders that you blow up where I

6    said the things that I said.  I can just see, that really,

7    really -- that's a little tail wagging a big dog.

8            MR. HALL:  The Defendants are real good at

9    redacting things.  We can let them do that.

10            THE COURT:  Y'all see what you can come up with but

11    we got some 403 problems there.

12            Well, the next is this issue about Mr. Hall's

13    testifying and that goes the same way as the other.  Whatever

14    it is as to the other lawyers I assume it will go the same way

15    with Mr. Hall or is there some difference?

16            MR. GROOVER:  This is basically the same thing,

17    Your Honor.  The attorney's fees in this case are a million

18    dollar claim and they pursued it under 13-6-11.  They

19    identified Mr. Draughon last year, that would be the only

20    expert.  And these are 702 witnesses, they have to be experts

21    to testify about not only just their fees but the

22    reasonableness of their work on the case.  And they didn't

23    identify themselves.  Particularly because 13-6-11 is a jury

24    question.  I mean, a jury decides that.  And you've got to

25    show that you won -- you've been successful on your claims in

1    order to get attorney's fees to the extent the jury can award

2    them.  So they just didn't identify either themselves as

3    experts or produce as exhibits the material which we got just

4    two days ago.

5             And some of those exhibits that would apparently be

6    put in as part of the testimony appear to be summaries.  I

7    really don't know.  I don't have the source documentation.  We

8    don't know how they compiled them.  I don't if their records

9    were kept contemporaneously with their time.  Mr. Hall's is a

10   lot more detailed than Mr. Hearn and Mr. Lovelace.

11            But essentially it's the same argument on both

12   motions.  But it is a very serious claim and it's a lot of

13   attorney's fee.

14            THE COURT:   Yes.  I understand that part of it.

15            MR. HALL:   Your Honor, please.  I don't think that

16   expert testimony is required under Georgia law.

17            THE COURT:   Well, let me just say this.  Do you

18   have any different argument from what you've already argued

19   because I know what you said.  It seems to me that they all go

20   the same way.  There's no difference.

21            MR. HALL:   A few additional comments.  We didn't

22   have all the time until now.  We still don't have all the

23   time.

24            THE COURT:   I understand that too.  I will look at

25   that.  I understand that is an important issue in the case.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1      Now, next we --

2              MR. HALL:   Judge, before we leave that.  I mean if

3      there is any concern about it we could present affidavits.

4              THE COURT:    I know that's a solution to the

5      problem.  I've already thought about that.  That may not be

6      the solution but there is some solution.  So I will look into

7      this and see.

8              Okay, the next deals with and I think it is actually

9      twelve, regarding her mental anguish.  And then thirteen deals

10     with her ability to purchase goods and services.

11             And I mentioned this as we went through the issues

12     for the jury because I do think that there is a mental anguish

13     component to the damages in this case.

14             However, I am really concerned about these somehow

15     spinning out of control.  So I am more concerned about the

16     second of these two motions.  The ability to purchase goods

17     and services adversely affected her living style and living

18     conditions.  At some point it gets a little remote.

19             The question here is where is it that it gets

20     remote.  And I don't know what the answer to that is.  But I

21     just don't think she can get up and blame everything that

22     happened from 2003 until today on the fact that she didn't get

23     the money from this case.  I think that's a serious problem.

24     And I think that somehow or another that has got to be reined

25     in.

1          And, of course, I don't know what she said in her

2     deposition.  Although, y'all indicated that she really didn't

3     say much about that at all, at least certain aspects of it.

4          So I don't know how far you want to go but I have

5     some serious reservations about letting it go too far.

6          MR. HALL:   This thirteen, that would be probably a

7     very small part.  There's a case called Calvin versus Brown.

8     It does -- 246 Georgia Appeals 40 and 43, allow damages for

9     such things as damage to credit and penalties incurred caused

10    by the intentional conduct.

11         So that's the kind of thing you can recover.  But

12    the main thing is her mental state and her mental anguish.

13    It's not that she -- we're not going to try to prove little

14    things about she wasn't able to buy something at a bargain

15    price because she didn't have the money.

16         But what we do want to prove is that in some of the

17    major things in her life she felt mental anguish because she

18    was unable to do things and it occurred to her that, you know,

19    if I had this money I could help you darling.

20         THE COURT:   Well, give me some examples.

21         MR. HALL:   Her husband died of cancer and she was

22    unable to help him.  And she traveled to see him.  Pete knows

23    a lot more about it than I do.  Her daughter wanted to --

24         THE COURT:   All right.  This is what we're going to

25    do.  I want you just to come back with a list of things that

1    you think ought to be admitted and I'll deal with those more

2    specifically.  Because it's difficult for me to deal with

3    generalities, but you understand my concern here.

4              MR. HALL:    Yes.

5              THE COURT:    Again we are going to get into a 403

6    problem here, I'm afraid.  Not simply that it's just

7    prejudicial but it's consuming time.  I'm more concerned about

8    that than I am her needing an expert to testify about this

9    part of it was caused by her depression and that part of it.

10   I'm not particularly concerned about that aspect of it.  But I

11   do think it's got to be under control.  So y'all come up with

12   something and let me know what it is.  All right.

13             And then the last one I need a little clarification

14   on this.  This has to do with the altar ego allegations that

15   are outside Plaintiff's complaint?

16             MR. HALL:    They'll have to tell you what they're

17   talking about.

18             THE COURT:    Yeah.  I'm asking the defense table to

19   tell me.

20             MR. PAUL:    Yes, sir.  Paragraph 50 of the

21   complaint alleged H&S is the alter ego of Horton Homes.

22   Horton Homes is the alter ego of Horton Industries and Horton

23   Industries is the alter ego of Dudley Horton.  It set up a

24   vertical chain.

25             THE COURT:    Right.

1          MR. PAUL:   From a defense standpoint if you break

2     the chain then everybody on the other side of the chain is

3     gone from the case.  And so we have prepared this case based

4     on the allegations in paragraph 50 that I just said.  And

5     we've got expert testimony that the Court has already ruled on

6     related to issues of separateness that go to altar ego based

7     on allegations in paragraph 50.

8          Now on Friday Mr. Hall put in the point or the jury

9     issues, in his jury issues he listed as H&S the alter ego of

10    Horton Homes.  That's been in the case.  He listed as Horton

11    Homes the alter ego of Horton Industries.  That's been in the

12    case.  No problem.

13         Then he listed, is N.D. Horton Trust the alter ego

14    of Horton Industries.  Now that's never been alleged.  There

15    has not been any exhibits by us put in on the issue of

16    separateness between the trust and Horton Industries.

17         THE COURT:   Well, didn't I keep them in the case?

18         MR. PAUL:   Well, you kept them in the case --

19         THE COURT:   They are in the case under some

20    theory.

21         MR. PAUL:   Not on alter ego, on conspiracy.

22         THE COURT:   I understand.  But they're in the case

23    under some theory.

24         MR. PAUL:   On conspiracy.  The other two are gone.

25    They are in the case only on conspiracy and the Court said

1    come back a directed verdict and we'll look at it, at directed

2    verdict time.

3         But there's never been a contention of alter ego and

4    at this, 20 days from trial, there's no way to get ready for

5    that.

6         The other one is that Mr. Hall collapsed the

7    vertical chain that he alleged in paragraph 50 and he's now

8    saying that Dudley Horton is the alter ego of H&S Homes, which

9    he's never alleged.  And there has been no focus by our expert

10   on that because it's never been alleged and there's been no

11   attempt to look at the physical evidence of separateness as

12   far as assets, liabilities and transactions.  There's been no

13   focus on that.

14        And so these are two brand new claims that should

15   not be allowed 20 days before trial when we can't deal with

16   it.

17        THE COURT:    Mr. Hall.

18        MR. HALL:   The Defendants have absolutely no basis

19   to be surprised by this.  Paragraph (a) of the prayer reads as

20   follows:  That the veil of H&S be pierced so that Horton

21   Homes, N. Dudley Horton, Jr., Horton Industries, Triangle,

22   Regal, New Generation and the other Defendants are liable to

23   Plaintiff to the same extent as H&S.  They just quit reading

24   too quick, I guess.  It's clearly in the case.

25        THE COURT:    Okay.  I will rule on that one.  Does

1    that cover all the motions in limine?

2              MR. HALL:   I think it does.

3              MR. PAUL:   Yes, sir.

4              THE COURT:    Anything else?

5              MR. GROOVER:   No, sir, Your Honor.

6              THE COURT:    Now, we have a number of rulings that

7    we are going to make.  I'm not sure that a lot of them are

8    really going to alter the evidence, quite frankly.

9              But the main thing is that Mr. Hall has to let us

10   know what his lawsuit is finally and ultimately about so we

11   can get a final pretrial order that I can sign in this case.

12   Does anybody want to covering anything else?

13             MR. HALL:   Judge, if there is any problem with the

14   attorney's fee thing we would request to be able to take a

15   little deposition of somebody that can say he is a -- what I

16   envisioned was they give a deposition of each other.  I know

17   the guy, and yeah, he's worth this much an hour.  I know the

18   rates in Conway, South Carolina and clear it up that way.

19   It's a small thing.

20             THE COURT:    I don't -- assuming that -- Well,

21   we'll work that out.  Anything else?

22             MR. HALL:   No, sir.

23             THE COURT:    This is what I want to do.  I'm going

24   to go back with my staff just a minute because there's one

25   thing I need to clarify with them.  And I will come back out

1    and I'll tell you when we're going to have this next

2    conference.

3           And I would like for y'all to be gathering your

4    materials together and then when I come back in and we'll get

5    all that straight.  Then I'm going to take the Plaintiffs

6    lawyers and talk to them out there.  And when I finish talking

7    to them I'm going to excuse them, they will leave and then

8    I'll talk to the defense table, okay.

9           MR. PAUL:   Yes, sir.

10          MR. HALL:   Yes, sir.

11   (Recess)

12          THE COURT:   Let me clarify something about a

13   comment my law clerk made.  I don't need any more briefing on

14   this.  I mean, unless there is something you really want to

15   get to me about it I really went through each one of these,

16   most of them I had a pretty good idea about before I came in

17   here.  Some of them I was not exactly clear about and I wanted

18   to give each of you the opportunity to explain to me what was

19   the essence of your theory about why it should be excluded or

20   admitted.  I made some notes.  I know that she made some

21   notes.  And I just don't think we need to do any more work on

22   this unless it's something that is really unique and I don't

23   think there is.  Do y'all understand that?

24          MR. HALL:   Yes, sir.

25          MR. PAUL:    Yes.

1            THE COURT:   So what we're going to do is we are

2     going to get back together on September the 11th, Tuesday,

3     September 11th at 10:00 o'clock and we're going to resolve the

4     remaining issues in the case.

5            MS. SMITH:   August 11th, Your Honor?

6            THE COURT:   September 11th.  We're going to deal

7     with the remaining issues in the case and I will tell you, you

8     may even know it before then, what my ruling is going to be on

9     some of these motions in limine.  But we've got to hear back

10    from Mr. Hall about his theories.  And then you will turn

11    those over to defense counsel and y'all go back and I want you

12    to reevaluate the proposed pretrial order and see what, if

13    any, changes need to be made.  But I want that to be

14    coordinated, okay.  Because, I mean, depending on what causes

15    of action you may or may not dropout that could have some

16    impact on it.

17           This is what we need to do.  You need to get the

18    revised pretrial in by September 4th.  We don't need to wait

19    for that until September 11th, okay.  Do y'all understand that

20    part of it?

21           MR. GROOVER:   Yes, sir.

22           MR. HALL:   Yes, sir.

23           THE COURT:   Because there is likely to be some

24    more issues that we're going to have to deal with and clarify

25    and we don't need to wait for that until five days before

```
1    trial, six days before trial.  Anything else from anybody?

2              MR. PAUL:    No, sir.

3              MR. HALL:   No, sir.

4              THE COURT:   Okay.

5    (The proceedings were thereby concluded)

6

7              I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
     TRANSCRIPT TO THE BEST OF MY KNOWLEDGE AND ABILITY FROM THE
8    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9
                                    _____
10                                  /s TAMMY W. FLETCHER  CCR, USCR
                                    UNITED STATES DISTRICT COURT
11                                  MIDDLE DISTRICT OF GEORGIA

12                                  DATE:  August 24, 2012

13

14

15

16

17

18

19

20

21

22

23

24

25
```